

U.S. Department of Justice

Civil Rights Division

---

Office of the Assistant Attorney General           Washington, D.C. 20530

May 29, 2009

The Honorable Thurbert E. Baker
Attorney General
40 Capitol Square, S.W.
Atlanta, Georgia   30334-1300

Dear Attorney General Baker:

      This refers to the establishment of the voter verification program for voter registration application data, including citizenship status, and changes to the voter registration application for the State of Georgia, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act of 1965, 42 U.S.C. § 1973c.  We received your response to our December 15, 2008 request for additional information on March 30, 2009; supplemental information was received on April 2, 2009.

      We turn first to the verification program for voter registration application data contained in Submission 2008-5243.  Changes to the voter registration process constitute a voting change under Section 5.  Procedures for the Administration of Section 5 of the Voting Rights Act of 1965, 28 C.F.R. § 51.13(b); Morales v. Handel, Civil Action No. 1:08-CV-3172-JTC (N.D. Ga. Oct. 27, 2008).  As such, the submitting authority has the burden of establishing that a proposed change does not have a retrogressive effect on the ability of minority voters to participate in the political process and to elect candidates of choice, nor a discriminatory purpose.  Georgia v. United States, 411 U.S. 526 (1973); 28 C.F.R. § 51.52.  The voting change at issue must be measured against the benchmark practice to determine whether the opportunities of minority voters to participate in the political process and elect candidates of their choice will be "augmented, diminished, or not affected by the change affecting voting." Beer v. United States, 425 U.S. 130, 141 (1976).

      We have carefully considered the information you have provided, as well as information from other interested parties.  Under Section 5, the Attorney General must determine whether the submitting authority has met its burden of showing that the proposed change "neither has the purpose nor will have the effect" of denying or abridging the right to vote on account of race, color or membership in a language minority group.  As discussed further below, I cannot conclude that the state has sustained its burden in this instance.  Therefore, based on the information available to us, I must object to the voter verification program, on behalf of the Attorney General.



EXHIBIT 2

-2-

Under the benchmark system, all applicants swear or affirm, under penalty of law, on a voter registration application form that the information they are providing, including their citizenship status, is true. No further information is statutorily required. Under normal circumstances, registering to vote in Georgia is a single action, which can be accomplished at the applicant's convenience. Challenges to an individual's eligibility on any basis, including citizenship, happen infrequently under the benchmark system, by the state's own admission. Under the benchmark system, the state has indicated that there is no program for automated verification of information contained on voter registration applications.

The proposed verification system seeks to match the information provided by the applicant with the information maintained by the state's Department of Driver Services [DDS] and, in many cases, the federal Social Security Administration [SSA], and provides a list of those persons whose information does not match to local registrars for further inquiry. As an initial matter, we address the state's claim that it adopted the submitted verification system as part of its program for implementation of the minimum requirements for elections for federal office contained in the Help America Vote Act of 2002, 42 U.S.C. § 15301 et seq. Specifically, the state has indicated that the verification program was adopted to implement the requirements of Section 303(a)(5) of HAVA, after the state lost a private lawsuit challenging the state's previous full social security number requirement for voter registration.

A brief recap of the relevant HAVA requirements is in order. As part of the requirement that states create a computerized statewide voter registration database for elections for federal office, HAVA provides that, for a state that does not require a full social security number, it cannot accept or process an application for voter registration unless the applicant provides a driver license number or, where the applicant does not have such a number, the last four digits of the applicant's social security number. In the absence of either number, HAVA requires a state to issue the applicant a unique identification number. 42 U.S.C. § 15483(a)(5)(A)(i) and (ii). Consistent with this requirement, HAVA next provides for the attempted verification of these types of numbers and accompanying identification information, such as name and date of birth, through the use of either the state driver license agency database or, as necessary, the SSA database. 42 U.S.C. § 15483(a)(5)(B). Finally, HAVA leaves it up to the state as to whether the information provided by an applicant is sufficient to meet HAVA's requirements, in accordance with state law. 42 U.S.C. § 15483(a)(5)(A)(iii). Thus, these HAVA requirements are directed at identification, not eligibility. See Florida State Conf. of the NAACP v. Browning, 522 F.3d 1153, 1168 (11th Cir. 2008). HAVA does not speak to the question of whether a state should deem an applicant eligible or ineligible, whose information fails to match on some element contained in a state or federal database. Indeed, HAVA takes no position concerning verification of citizenship, neither requiring nor prohibiting state action to verify the citizenship of voter registration applicants. Likewise, HAVA explicitly grants the state discretion in how it implements its requirements, see, e.g., 42 U.S.C. §§ 15484-15485. Such discretion on the part of state officials is the touchstone for coverage under Section 5. Young v. Fordice, 520 U.S. 273 (1997).

-3-

We now proceed to discuss the substance of the state's verification program. The results of the verification matching process described above are contained in two reports generated by the state for local registrars: the R1 and R2. The R1 report, which attempts to verify information other than citizenship, results from a data comparison that we agree with the state is required by HAVA; the issue is what the state in its discretion chooses to do with that information. The R2 report, which seeks to verify citizenship status, results from a data comparison that is discretionary on the state's part. The state has informed us that it intends to utilize the information concerning non-matches set forth in these reports in the following way:

> The R1 report lists non-matched registrants for the following criteria: first name, last name, date of birth, driver's license number and last four digits of a social security number. A failure to match in any of those categories [on the R1], pursuant to the HAVA verification process, means that the applicant has not been verified as required by HAVA and they are not considered a registered voter at that point in time.
>
> Failures to verify or match on the criteria of citizenship are listed on the R2 report. The failure to match on this criterion is treated in the same way failures to match on other criteria listed above.
>
> In all instances, a failure to verify registration then triggers further inquiry by the county registrars to resolve any questions in order to verify the registration and move the applicant onto the registration list.

Letter of March 24, 2009, at 20-21. Thus, "non-matched registrants," who have submitted registration applications or changes to their existing registration, must take further steps to establish their voting eligibility. Under the state's proposed procedures, pursuant to state law, local election officials can require these individuals also to appear at the county courthouse or office building, not at the voter's convenience, but rather on a week day, during normal business hours and, pursuant to state law, with only three days notice. O.C.G.A. § 21-2-228.

Because the state implemented these changes in violation of Section 5, see Morales, supra, we have the actual results of the state's verification process. As of March 13, 2009, a total of 199,606 individuals are flagged as a "non-match based on any criteria" on the R1 report. Since its inception, the R2 report has flagged 7,007 individuals as potential non-citizens. Under the state's proposed procedures all of the individuals flagged would have to take further, inconvenient steps to be considered registered voters.

We have considered the accuracy of the state's verification process. Our analysis shows that the state's process does not produce accurate and reliable information and that thousands of citizens who are in fact eligible to vote under Georgia law have been flagged. As an example, recent deposition testimony by state employees in the Morales litigation indicates that an error as simple as transposition of one digit of a driver license number can lead to an erroneous notation of a non-match across all compared fields. In addition, the state's response to the Department's

-4-

October 2008 inquiry concerning the state's use of the SSA HAVV system indicates error-laden and possibly improper use of the system, thereby increasing the potential for unreliable results. The R2 report has flagged a large number of persons who have subsequently demonstrated that they are in fact citizens. Indeed, of the 7,007 individuals who have been flagged on the R2 report as potential non-citizens, more than half were in fact citizens. Perhaps the most telling statistic concerns the effect of the verification process on native-born citizens. Of those persons erroneously identified as non-citizens, 14.9 percent, more than one in seven, established eligibility with a birth certificate, showing they were born in this country. Another 45.7 percent provided proof that they were naturalized citizens, suggesting that the driver's license data base is not current for recently naturalized citizens.

The impact of these errors falls disproportionately on minority voters. Although the state has not provided data on the racial and language minority characteristics of all registrants whose applications went through the verification process, we have been able to compare the composition of those persons whom the state has flagged for further inquiry because of a non-match with both the composition of newly-registered voters in the state and the composition of existing registered voters. Under either comparison, applicants who are Hispanic, Asian or African American are more likely than white applicants, to statistically significant degrees, to be flagged for additional scrutiny.

African Americans comprise a majority of the registrants flagged by the R1 report. Whether one compares the over-representation of African Americans on the R1 with the number of new registrants between May 2008 and March 2009 or with the number of the state's registered voters as a whole, the different rate at which African American applicants are required to undertake an additional step before becoming eligible voters is statistically significant. The effect demonstrated by the R2 report is similarly dramatic. Although African American and white voters represent approximately equal shares of the new voter registrants between May 2008 and March 2009, more than sixty percent more African Americans voters who registered during this period are currently flagged than are whites. Again, this rate is statistically significant. Similar disproportion arises with regard to flagged Asians and Hispanics on the R2 report. Hispanic and Asian individuals are more than twice as likely to appear on the list as are white applicants. Each of the differences is statistically significant.

In sum, the state's proposed procedures for verifying voter registration information are seriously flawed. This flawed system frequently subjects a disproportionate number of African-American, Asian, and/or Hispanic voters to additional and, more importantly, erroneous burdens on the right to register to vote. These burdens are real, are substantial, and are retrogressive for minority voters. As such, an objection based upon the state's failure to establish the absence of a discriminatory effect is warranted.

In making this determination, we note that Section 5 does not prohibit a state from taking steps to ensure that only qualified individuals are registered to vote. The state must ensure that the discretionary manner in which it does so is not discriminatory. Common Cause v. Billups, 504 F. Supp. 2d 1333, 1377 (N.D. Ga. 2007), aff'd, 554 F.3d 1340 (11th Cir. 2009). In Billups,

the absence of a disparate racial effect permitted Georgia to require voters to present appropriate photographic identification as a prerequisite to voting. In <u>Crawford</u> v. <u>Marion County Election Board</u>, --- U.S. ---, 128 S.Ct. 1610 (2008), the Supreme Court rejected a facial challenge to Indiana's voter identification law. Notably, the decisions in both <u>Crawford</u> and <u>Common Cause</u> resulted from a record totally devoid of evidence of a discriminatory effect flowing from the regulations at issue. <u>Crawford</u>, at 1622-23; <u>Common Cause</u>, at 1378. That discriminatory effect, however, is present here.

Based upon our extensive review of the available information, and our extensive discussions with the state, we believe there are alternatives available to the state that could mitigate or eliminate the identified discriminatory impact of the changes at issue without affecting adversely the state's asserted goal of preventing voter fraud. We believe it would be appropriate and desirable to discuss with the state such alternative approaches. We also note that the state has very recently enacted legislation codifying a requirement for documentary proof of citizenship for voter registration, which includes a requirement for the adoption of new regulations implementing such legislation. When submitted for Section 5 review, these changes may affect the analysis of the voter verification program.

We note that under Section 5 you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the proposed changes neither have the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group. 28 C.F.R. § 51.44. In addition, you may request that the Attorney General reconsider the objection. 28 C.F.R. § 51.45. However, until the objection is withdrawn or a judgment from the United States District Court for the District of Columbia is obtained, the changes to the state voter information verification program described above will continue to be legally unenforceable. <u>Clark</u> v. <u>Roemer</u>, 500 U.S. 646 (1991); 28 C.F.R. § 51.10.

With regard to the changes to the voter registration application contained in Submission No. 2009-0284, they are related to the state's implementation of the voter information verification program, which is legally unenforceable. Accordingly, it would be inappropriate for the Attorney General to make a determination on those changes at this time. 28 C.F.R. §§ 51.22 and 51.35. We note that the Court in <u>Morales</u> found that the disparate methodologies adopted by the counties may be a change requiring review under Section 5. However, because those methodologies have not been submitted for Section 5 review, it is neither necessary nor appropriate for us to make any determination on them at this time; nor do we, similar to the Court in <u>Morales</u>, make a determination at this time as to whether each of the state's 159 counties must make a separate submission.

-6-

Because the Section 5 status of these changes are before the Court in Morales, we are providing a copy of this letter to the Court and counsel of record. To enable us to meet our responsibility to enforce the Voting Rights Act, please inform us of the action that the State of Georgia plans to take concerning this matter. If you have any questions concerning this letter, please call Robert S. Berman, a Deputy Chief in the Voting Section, at 202/514-8690.

Sincerely,

Loretta King
Acting Assistant Attorney General
Civil Rights Division