## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**STATE OF GEORGIA,**

                **Plaintiff,**

**v.**

**ERIC H. HOLDER, JR.,**
**in his official capacity as**
**ATTORNEY GENERAL OF THE**
**UNITED STATES,**
                **Defendant,**

**and,**

**TYRONE BROOKS; GEORGIA**
**ASSOCIATION OF BLACK ELECTED**
**OFFICIALS; EDWARD O. DUBOSE;**
**GEORGIA STATE CONFERENCE**
**NAACP; HELEN BUTLER; and GEORGIA**
**COALITION FOR THE PEOPLES'**
**AGENDA,**

                **Applicants to Intervene.**

**Civil Action No. 10-1062 (ESH-HHK)**

## MEMORANDUM IN SUPPORT OF MOTION FOR LEAVE TO INTERVENE AS DEFENDANTS

### I. Introduction

      This action was brought by the State of Georgia pursuant to 42 U.S.C. § 1973c seeking

preclearance of a voter verification process previously objected to by the Department of Justice

under Section 5 of the Voting Rights Act.  Alternatively, Georgia seeks a declaration that Section

5 is unconstitutional and that its enforcement be permanently enjoined.

      Applicants Tyrone Brooks, Edward O. DuBose, and Helen Butler are African American

residents and registered voters of Georgia.

Applicant Georgia Association of Black Elected Officials ("GABEO") has more than 700 members statewide.  Its main focus is on developing programs which will provide deterrents to violence and crime among youth; promoting voter registration, education and participation; forming literacy programs to battle the growing problem of illiteracy in the state; securing economic parity for all Georgians; and preserving minority voting strength.

The National Association for the Advancement of Colored People ("NAACP") was founded in 1909 and is the Nation's oldest, largest and most widely recognized grassroots-based civil rights organization.  The mission of the NAACP is to ensure the political, educational, social and economic equality of all citizens; to achieve equality of rights and eliminate race prejudice among citizens of the United States; to remove all barriers of racial discrimination through democratic processes; and to seek the enactment, enforcement and the proper construction of federal, state and local laws securing civil rights.

The purpose of applicant Georgia State Conference of the NAACP ("Georgia NAACP") is to implement the mission of the NAACP within Georgia.  The NAACP has worked to protect voting rights through litigation, advocacy, legislation, and communications, including work to promote voter registration, voter education, get out the vote efforts, election protection, and census participation and redistricting.  The Georgia NAACP has 63 branches in the State of Georgia.  Applicant Georgia NAACP was a plaintiff in *Morales v. Kemp*, Civ. No. 1:08-CV-3172 (N.D. Ga. Oct. 27, 2008) (three-judge court), which granted a preliminary injunction against Georgia's use of its non-precleared voter verification process.  Plaintiffs in *Morales* also urged the Department of Justice to object to Georgia's voter verification process when it was

submitted for preclearance.

Applicant Georgia Coalition for the Peoples' Agenda is an organized group of representatives from all of the major civil rights/human rights/peace and justice organization in Georgia, plus concerned people of conscience.  Its mission is to improve the quality of governance in Georgia; to help create a more informed and active electorate; and to have responsive and accountable elected officials.

All applicants have moved the Court for leave to intervene as of right and for permissive intervention pursuant to Rules 24(a)(1) and (2) and (b)(1) (A) and (B), F.R.Civ.P.  The Supreme Court has held that "[p]rivate parties may intervene in §5 actions," and that such intervention is controlled by Rule 24.  *Georgia v. Ashcroft*, 539 U.S. 461, 477 (2003); *accord NAACP v. New York*, 413 U.S. 345, 367 (1973).

## II.   <u>Intervention As of Right Is Warranted</u>

Rule 24(a) provides:

> On timely motion, the court must permit anyone to intervene who: (1) is given an unconditional right to intervene by a federal statute; or (2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

As an initial matter, the application for intervention is timely.  Plaintiff filed its Complaint on June 21, 2020.  The Attorney General's answer has not yet been filed.  Although the Court has directed the parties to submit a Joint Status Report on July 7, 2010, and has set a scheduling conference for July 9, 2010, no discovery has been undertaken, no dispositive orders have been entered in the case, and no trial has been set or held.  Granting intervention would not, therefore, cause any delay in the trial of the case nor prejudice the rights of any existing party. *See Bossier*

*Parish School Board v. Reno*, 157 F.R.D. 133, 135 (D.D.C. 1994) (intervention granted as timely where motion was filed on the same day the court held its first status conference).

The most important factor in determining whether intervention is timely is whether any delay in seeking intervention will prejudice the existing parties to the case. *See, e.g., McDonald v. E.J. Lavino Co.*, 430 F.2d 1065, 1073 (5th Cir. 1970) ("[i]n fact, this may well be the only significant consideration when the proposed intervenor seeks intervention of right").1 Where intervention will not delay resolution of the litigation, intervention should be allowed, provided that the proposed intervenor satisfies the criteria of Rule 24(a). *Texas v. United States*, 802 F. Supp. 481, 482 n.1 (D.D.C. 1992) (affirming the propriety of granting intervention); *Cummings v. United States*, 704 F.2d 437, 441 (9th Cir. 1983) (it was an abuse of discretion for the trial court to deny intervention in the absence of a showing of prejudice to the government).

### A.  Intervention under Rule 24(a)(1)

A statute of the United States, 42 U.S.C. § 1973b(a)(4), provides that "[a]ny aggrieved party may as of right intervene at any stage in such action [to bailout from Section 5 coverage]." Since Georgia is seeking a declaration that Section 5 is unconstitutional, which is the functional equivalent of bail out, intervention in this action should be granted of right.  Granting intervention would also serve the underlying purpose of § 1973b(a)(4) of providing an "aggrieved party" the opportunity to be heard when a jurisdiction is seeking to terminate Section 5 coverage.

### B.  Intervention under Rule 24(a)(2)

_____

1  Prejudice should not, of course, be confused with the convenience of the parties. *See McDonald v. E.J. Lavino Co.*, 430 F.2d at 1073 ("mere inconvenience is not in itself a sufficient reason to reject as untimely a motion to intervene as of right"); *Clark v. Putnam County*, 168 F.3d 458, 462 (11th Cir. 1999) (same).

Movants also meet the standards for intervention of right under Rule 24(a)(2).

## 1. **Applicants Have a Direct Interest in Preclearance and the Constitutionality of Section 5**

As racial minorities protected by Section 5 of the Voting Rights Act, and as registered

voters who reside in Georgia, the  individual applicants plainly have a direct, substantial, and

legally protectable interest in the "transaction that is the subject of the action," Rule 24(a)(2), *i.e.*,

preclearance of a voter verification process previously objected to by the Department of Justice

under Section 5, and the constitutionality of Section 5.  Because of the importance of these

interests, intervention in Section 5 cases is favored and the courts have routinely allowed it.  *See*

*Nw. Austin Mun. Util. Dist. No. One v. Holder*, 573 F. Supp. 2d 221, 230 (D.D.C. 2008)

(granting multiple motions to intervene presented by African-American, Latino and other

minority voters in case seeking bailout under Section 4(a) of the VRA and challenging the

constitutionality of Section 5 of the VRA); *Georgia v. Ashcroft*, 539 U.S. at 477; *Busbee v.*

*Smith*, 549 F.Supp. 494 (D.D.C. 1982*); City of Lockhart v. United States*, 460 U.S. 125, 129

(1983); *City of Port Arthur, Texas v. United States*, 517 F.Supp. 987, 991 n.2 (D.D.C. 1981);

*New York State v. United States*, 65 F.R.D. 10, 12 (D.D.C. 1974); *City of Richmond, Virginia v.*

*United States*, 376 F.Supp. 1344, 1349 n.23 (D.D.C. 1974); *Beer v. United States*, 374 F.Supp.

363, 367 n.5 (D.D.C. 1974*); Commonwealth of Virginia v. United States*, 386 F.Supp. 1319,

1321 (D.D.C. 1974); *City of Petersburg, Virginia v. United States*, 354 F.Supp. 1021, 1024

(D.D.C. 1972).[2]  *See also Clark v. Putnam County*, 168 F.3d 458, 462 (11th Cir. 1999) ("black

voters had a right to intervene" in action challenging county redistricting, and listing recent

---

2  In some of the cases cited above intervenors played not merely an important but a crucial role.
In *City of Lockhart*, for example, the intervenors presented the sole argument in the Supreme
Court on behalf of the appellees.  No argument was presented on behalf of the United States.  *See*
460 U.S. at 130.

voting cases allowing intervention); *Burton v. Sheheen*, 793 F.Supp 1329, 1338 (D.S.C. 1992);

*Brooks v. State Board of Elections*, 838 F.Supp. 601, 604 (S.D. Ga. 1993); *Johnson v. Mortham*,

915 F.Supp. 1529, 1536 (D.C. Fla. 1995) (registered voters had "a sufficiently substantial

interest to intervene" in a suit challenging congressional redistricting); *Baker v. Regional High

School District No. 5*, 432 F.Supp. 535, 537 (D. Conn. 1977) (residents of school district had an

interest in method of electing school board that entitled them to intervene in apportionment

challenge).

The Eleventh Circuit, in reversing a district court denial of intervention to county

residents in a voting rights case, articulated the substantial, legally protected interests of voters in

their election system:

> intervenors sought to vindicate important personal interest in maintaining the election
> system that governed their exercise of political power . . . .  As such, they alleged a
> tangible actual or prospective injury.

*Meek v. Metropolitan Dade County*, 985 F.2d 1471, 1480 (11th Cir. 1993).

Intervention is particularly appropriate in this case because applicants, unlike the

defendant, include residents and voters of Georgia and three civil rights organization that engage

in voter registration and education and whose constituents and members include residents and

voters of Georgia and are therefore in a special position to provide the Court with a local

appraisal of the facts and circumstances involved in the litigation.  In *County Council of Sumter

County v. United States*, 555 F.Supp. 694, 697 (D.D.C. 1983), the court allowed African

American citizens to intervene in a Section 5 preclearance action in part specifically because of

their "local perspective on the current and historical facts at issue."

In addition, and as noted above, applicant Georgia NAACP was a plaintiff in *Morales v.*

*Kemp*, which granted a preliminary injunction against Georgia's use of its unprecleared voter verification process. Plaintiffs in *Morales* also urged the Department of Justice to object to Georgia's voter verification process when it was submitted for preclearance.

Applicants have an interest in the subject matter of this action sufficient to warrant intervention. Indeed, as voters of Georgia, no individuals or entity could have a greater interest in the subject matter of the litigation.

### 2. Applicants' Ability to Protect Their Interests Will Be Impaired or Impeded if Intervention Is Denied

The outcome of this action may, as both a legal and practical matter, impair or impede applicants' ability to protect their interests, thus satisfying Rule 24(a)(2). If Georgia's voter verification process is precleared, racial and language minorities will be disproportionately and adversely affected. In addition, if Section 5 is found to be unconstitutional intervenors would be denied the protection of preclearance. The State of Georgia and all its subdivisions would then be free to enact changes in their voting practices and procedures without first showing that the changes did not have the purpose or effect of discriminating on the basis of race or color or membership in a language minority.

### 3. Applicants' Interests Cannot Be Adequately Represented by the Existing Parties

Applicants can satisfy Rule 24(a)(2)'s inadequate representation requirement by showing merely that representation of their interests "'*may be*' inadequate" and "the burden of making this showing should be treated as '*minimal*.'" *United Guaranty Residential Insurance Co. v. Philadelphia Sav. Fund*, 819 F.2d 473, 475 (4th Cir. 1987) (quoting *Trbovich v. United Mine Workers of America*, 404 U.S. 528, 538 n. 10 (1972)) (emphasis by the *United Guaranty* court); *see also In re Sierra Club*, 945 F.2d 776, 779 (4th Cir. 1991) (same). This Court has held that

Rule 24 "underscores both the burden of those opposing intervention to show the adequacy of the existing representation and the need for a liberal application in favor of permitting intervention." *Nuesse v. Camp*, 385 F.2d 694, 702 (D.C. Cir. 1967); *see also Smuck v. Hobson*, 408 F.2d 175, 181 (D.C. Cir. 1969) (same).

Although the Attorney General and the applicants for intervention "may share some objectives" with respect to Georgia's voter verification process and the constitutionality of Section 5, *In re Sierra Club*, 945 F.2d at 780, that does not mean that the Attorney General's interests and applicants' interests are identical or that their approaches to litigation would be the same. As *City of Lockhart* demonstrates, the government and minorities have sometimes disagreed on the proper application of the Voting Rights Act and what constitutes adequate protection of voting rights. See also *Blanding v. DuBose*, 454 U.S. 393, 398-399 (1982) (minority plaintiffs, but not the United States, appealed and prevailed in the Supreme Court in voting rights case); *County Council of Sumter County*, 555 F.Supp. at 696 (United States and minority intervenors took opposite positions regarding the application of Section 2 to Section 5 preclearance).

The Supreme Court has "recognized that when a party to an existing suit is obligated to serve two distinct interests, which, although related, are not identical, another with one of those interests should be entitled to intervene." *United Guaranty Residential Insurance*, 819 F.2d at 475 (referring to *Trbovich*, 404 U.S. at 538-539). In *Trbovich*, the Supreme Court allowed a union member to intervene in an action brought by the Secretary of Labor to set aside union elections for violation of the Labor-Management Reporting and Disclosure Act of 1959, even though the Secretary was broadly charged with protecting the public interest. The Court

reasoned that the Secretary of Labor could not adequately represent the union member because the Secretary had a "duty to serve two distinct interests," 404 U.S. at 539, a duty to protect both the public interest and the rights of union members.

In a similar case, the Fourth Circuit allowed an environmental group to intervene as a party defendant in an action where the South Carolina Department of Health and Environmental Control (DHEC) was defending the constitutionality of a state regulation governing the issuance of permits for hazardous waste facilities.  The court reasoned that DHEC could not adequately represent the environmental group because "in theory, [DHEC] should represent all of the citizens of the state, including the interests of those citizens who may be . . . proponents of new hazardous waste facilities," *In re Sierra Club*, 945 F.2d at 780, while the environmental group "on the other hand, appears to represent only a subset of citizens concerned with hazardous waste those who would prefer that few or no new hazardous waste facilities receive permits." *Id.*

Applicants' interests in this litigation are, in like fashion, sufficiently different from those of the United States to justify intervention.  The United States must represent the interests of its citizenry generally - including the interests of the plaintiff.  *Trbovich*, 404 U.S. at 538-39; *In re Sierra Club*, 945 F.2d at 780.  Where a party represents such dual interests in litigation, the "test" of whether that party will adequately represent the interests of potential intervenors is "whether each of the dual interests [of the party] may 'always dictate precisely the same approach to the conduct of the litigation.' 404 U.S. 539." *United Guaranty Residential Insurance Co.*, 819 F.2d at 475 (holding that the largest mortgage holder could intervene of right in case brought after collapse of real estate firm because the trustee could not adequately protect the interests of such holder given the trustee's duty to represent all holders with equal vigor).  Consequently, even if the United States vigorously performs its duty to represent its citizenry, representation of

- 9 -

applicants' distinct interests may still be inadequate because defendant United States must balance the competing interests presented by the proposed intervenors as well as those individuals or entities, like the plaintiff, who oppose it. While the interests of the United States and applicants may converge on issues such as the impact of Georgia's voter verification process and the constitutionality of Section 5, they may diverge when it comes to arguments to be made and deciding to appeal any adverse decisions. For other decisions holding that government parties could not adequately represent the interests of a subset of the general public, *see Chiles v. Thornburgh*, 865 F.2d 1197, 1214-15 (11th Cir. 1989) (federal prison detainees' interests may not be adequately represented by county); *Dimond v. District of Columbia*, 792 F.2d 179, 192 (D.C. Cir. 1986) (private party seeking to protect narrow financial interest allowed to intervene despite presence of government which represented general public interest); *Natural Resources Defense Council, Inc. v. United States Environmental Protection Agency*, 99 F.R.D. 607, 610 n.5 (D.D.C. 1983) (pesticide manufacturers and industry representatives allowed to intervene even though EPA was a party); *New York Public Interest Research Group, Inc. v. Regents of the University of the State of New York*, 516 F.2d 350, 352 (2nd Cir. 1975) (pharmacists and pharmacy association allowed to intervene where "there is a likelihood that the pharmacists will make a more vigorous presentation of the economic side of the argument than would" the state Regents); *Associated General Contractors of Connecticut, Inc. v. City of New Haven*, 130 F.R.D. 4, 11-12 (D. Conn. 1990) (minority contractors allowed to intervene because "its interest in the set-aside is compelling economically and thus distinct from that of the City" ).

The inability of the Attorney General to adequately represent the interests of applicants is apparent from the fact that in *Morales v. Kemp* the United States and the plaintiffs took

significantly different positions on the remedy for the Section 5 violation.  Plaintiffs, including the Georgia NAACP,  argued, *inter alia*, that a permanent injunction should be entered following the objection by the Attorney General to Georgia's voter verification procedure, while the United States argued that the preliminary injunction entered by the three-judge court should remain in effect permitting partial implementation of the objected-to change.  These different positions are reflected in the following attached documents: Plaintiffs' Supplemental Brief in Response to Court's April 30, 2010 Scheduling Order, May 10, 2010, attached as Exhibit B; and Response of Amicus Curiae United States to the Court's Questions in April 30, 2010 Scheduling Order, May 10, 2010, attached as Exhibit C.

Applicants meet the standards for intervention as of right, and their motion should be granted.

## III.   <u>Permissive Intervention Is Also Appropriate</u>

Even if this Court should determine that applicants do not satisfy the requirements for intervention of right, it should grant permissive intervention under Rules 24(b)(1)(A) and(B).  As noted above, 42 U.S.C. § 1973b(a)(4) provides that any aggrieved party may intervene at any stage of an action to bail out from Section 5 coverage.

Rule 24(b)(1)(B) also permits intervention upon timely application by anyone who "has a claim or defense that shares with the main action a common question of law or fact."  Applicants oppose preclearance of Georgia's voter verification process because it has a disparate impact upon racial and language minorities.  As discussed above, applicants seek to defend the constitutionality of Section 5.  Applicants thus have claims and defenses that share common factual and legal questions with the main action.  Also as discussed above, intervention will not "unduly delay or prejudice the adjudication of the original parties' rights" Rule 24(b)(3).

- 11 -

In *Arizona v. California*, 460 U.S. 605 (1983), Indian tribes were permitted to intervene in a water rights action between states, despite intervention by the United States on behalf of the tribes. The Court reasoned that "the Indians' participation in litigation critical to their welfare should not be discouraged." *Id.* at 615. The pending litigation is no less critical to movant's welfare, and accordingly intervention should be granted.

## IV.    <u>Conclusion</u>

For the above and foregoing reasons, the Court should permit the applicants to intervene in this action as party defendants.

Respectfully submitted,

_____
Jon Greenbaum (D.C. Bar No. 489887)
Robert A. Kengle
Mark A. Posner (D.C. Bar No. 457833)
jgreenbaum@lawyerscommittee.org
bkengle@lawyerscommittee.org
mposner@lawyerscommittee.org
LAWYERS' COMMITTEE FOR CIVIL RIGHTS
UNDER LAW
1401 New York Avenue, NW
Suite 400
Washington, D.C. 20005
(202) 662-8315 (phone)
(202) 628-2858 (fax)


_____/S/_____
Laughlin McDonald
Meredith Bell-Platts
(Application pending)
lmcdonald@aclu.org
mbell@aclu.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION, INC.
230 Peachtree Street, NW
Suite 1440

- 12 -

Atlanta, GA  30303-1227
(404) 523-2721 (phone)
(404) 653-0331 (fax)

Arthur B. Spitzer (D.C. Bar. No. 235960)
artspitzer@aol.com
AMERICAN CIVIL LIBERTIES UNION OF THE
NATION'S CAPITAL
1400 20th Street, N.W., Suite 119
Washington, DC 20036
 (202) 457-0800 (phone)
 (202) 452-1868 (fax)

Chara Fisher Jackson
cfjackson@acluga.org
ACLU OF GEORGIA
1900 The Exchange, Suite 425
Atlanta, GA 30339
(770) 303-8111

*Attorneys for Applicant-Intervenors*

- 13 -

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF GEORGIA,

                   **Plaintiff,**

                  v.

ERIC H. HOLDER, JR.,
in his official capacity as
ATTORNEY GENERAL OF THE
UNITED STATES,

                  **Defendant,**

and,

TYRONE BROOKS; GEORGIA
ASSOCIATION OF BLACK ELECTED
OFFICIALS; EDWARD O. DuBOSE;
GEORGIA STATE CONFERENCE
NAACP; HELEN BUTLER; and GEORGIA
COALITION FOR THE PEOPLES'
AGENDA,

              **Applicants to Intervene.**

Civil Action No. 10-1062 (ESH-HHK)

## [PROPOSED]  ANSWER OF APPLICANTS FOR INTERVENTION TO COMPLAINT

Tyrone Brooks, Georgia Association of Black Elected Officials, Edward O. DuBose,

Georgia State Conference NAACP, Helen Butler, and Georgia Coalition for the Peoples' Agenda

("Intervenor-Defendants"), hereby answer each of the numbered paragraphs of the Complaint

(Docket # 1) filed by the Plaintiff in the above-styled action as follows:

## Answers to Allegations

1.      Intervenor-Defendants admit the allegations of Paragraph 1 to the extent that they describe the statutory basis asserted by Plaintiff for the claims presented in the Complaint.

2.      Intervenor-Defendants admit the allegations of Paragraph 2 to the extent that the Voting Rights Act authorizes the State of Georgia to bring claims seeking Section 5 preclearance before this Court.  Intervenor-Defendants deny that either the Voting Rights Act or 28 U.S.C. 2201 authorizes the State of Georgia to bring the claims presented in the Complaint on behalf of the citizens of the State of Georgia.

3.      Intervenor-Defendants admit the allegations of Paragraph 3, except to the extent that Paragraph 3 suggests that only Defendant Holder may defend a Section 5 declaratory judgment action in this Court.  Intervenor-Defendants aver that citizens of plaintiff jurisdictions frequently participate as parties in defense of Section 5 declaratory judgment actions.

4.      The allegations in this paragraph are statements of law and/or conclusions of law to which no response is required.  If deemed to allege facts, Intervenor-Defendants admit the allegations in Paragraph 4 to the extent that they accurately quote portions of Section 5 of the Voting Rights Act, but deny that Paragraph 4 faithfully quotes the governing provisions of Section 5.  Specifically, Intervenor-Defendants aver that Paragraph 4 omits the statutory requirement that a proposed voting change "neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color, *or in contravention of the guarantees set forth in section 1973b(f)(2) of this title . . .*" (emphasis added to omitted material).

5.      The allegations in this paragraph are statements of law and/or conclusions of law to which no response is required.  If deemed to allege facts, Intervenor-Defendants admit the allegations in Paragraph 5.

6.      The allegations in this paragraph are statements of law and/or conclusions of law to which no response is required.  If deemed to allege facts, Intervenor-Defendants admit the allegations in Paragraph 6 to the extent that Georgia is a covered jurisdiction for purposes of Section 5 pursuant to the determination of August 7, 1965 in 30 F.R. 9897.

7.      Intervenor-Defendants admit the allegations of Paragraph 7 to the extent that they describe the statutory basis asserted by Plaintiff for the claims presented in the Complaint and characterize Plaintiff's contentions.  Intervenor-Defendants deny that Plaintiff is prevented by Section 5 from enforcing federal laws relating to voter registration and verification.

8.      Intervenor-Defendants deny the allegations of Paragraph 8.  Intervenor-Defendants aver that an actual controversy exists between the parties only with respect to whether Plaintiff can meet its burden of proof on its Section 5 claim or whether, in the alternative, Plaintiff is entitled to a declaratory judgment and injunctive relief upon its constitutional claim.

9.   Intervenor-Defendants admit the allegations of Paragraph 9.

10.  Intervenor-Defendants admit the allegations of Paragraph 10.

## Verification Requirements under Federal Law

11.      Intervenor-Defendants admit the allegations of Paragraph 11 except to the extent that the allegations refer to "minimum election standards" while the preamble of the act refers to "minimum election *administration* standards" (emphasis added).

12.      The allegations in this paragraph are statements of law and/or conclusions of law to which no response is required.  If deemed to allege facts, Intervenor-Defendants admit the allegations in Paragraph 12 to the extent that they accurately quote portions of the Help America Vote Act ("HAVA").  The allegations do not, however, quote other relevant sections of HAVA.

3

13.     The allegations in this paragraph are statements of law and/or conclusions of law to which no response is required.  If deemed to allege facts, Intervenor-Defendants admit the allegations in Paragraph 13 to the extent that they accurately quote portions of HAVA.

14.     The allegations in this paragraph are statements of law and/or conclusions of law to which no response is required.  If deemed to allege facts, Intervenor-Defendants admit the allegations in Paragraph 14 to the extent that they accurately quote portions of HAVA.

15.     The allegations in this paragraph are statements of law and/or conclusions of law to which no response is required.  The *Schwier* consent decree and HAVA speak for themselves. If deemed to allege facts, Intervenor-Defendants admit the allegations in Paragraph 15 to the extent that they accurately cite *Schwier v. Cox* and accurately quote portions of HAVA.

16.     The allegations in this paragraph are statements of law and/or conclusions of law to which no response is required.  The *Schwier* consent decree and HAVA speak for themselves. If deemed to allege facts, Intervenor-Defendants admit the allegations of Paragraph 16.

17.     The allegations in this paragraph are statements of law and/or conclusions of law to which no response is required.  The *Schwier* consent decree and HAVA speak for themselves. If deemed to allege facts, upon information and belief Intervenor-Defendants deny that Georgia "collected full Social Security numbers from each registrant" prior to the *Schwier* decision.

## Communications with the Department of Justice

18.     Intervenor-Defendants lack sufficient knowledge to admit or deny the allegations in Paragraph 18.  Intervenor-Defendants deny the allegations of Paragraph 18 to the extent they contend that the procedures at issue in this action are "required under Section 303(a)(5)."

19.     Intervenor-Defendants admit the allegations in this paragraph to the extent that the Chief of the Voting Section of the Civil Rights Division at the United States Department of

4

Justice sent Georgia a letter dated April 23, 2007 concerning whether Georgia was "online through the HAVA verification program for matching the last four digits of social security numbers against the SSA database." Intervenor-Defendants lack sufficient knowledge to admit or deny the remaining allegations in Paragraph 19.

20.    Intervenor-Defendants admit the allegations in this paragraph to the extent that Georgia began performing record matching between the statewide voter registration database and the DDS database in or around June 2007, but deny the remainder of the allegations in Paragraph 20. Upon information and belief, Intervenor-Defendants aver that in September 2008 Georgia officials first directed county boards of registrars to prevent persons appearing on the citizenship "exceptions report" from voting.

21.    Intervenor-Defendants admit the allegations of Paragraph 21 to the extent that they describe aspects of the procedures Plaintiff identifies as the "Georgia HAVA Verification Process." Intervenor-Defendants deny that the allegations of Paragraph 21 provide a complete description of the proposed process. Intervenor-Defendants aver that the proposed uses of "exception list[s]" for which Plaintiff seeks Section 5 preclearance are not required by HAVA and that it is misleading to refer to those procedures as a component of "HAVA Verification." Intervenor-Defendants further aver that the citizenship matching and hearing procedures for which Plaintiff seeks Section 5 preclearance are not required by HAVA and that it is misleading to refer to those procedures as a component of "HAVA Verification."

22.    Intervenor-Defendants deny the allegations of Paragraph 22. Intervenor-Defendants aver that the October 8, 2008 letter from the Department of Justice to then-Secretary of State Karen Handel informed the State that "[b]ecause election officials exercise substantial discretion at many points in this process of attempting to verify voter registration information

5

and in acting upon the results of that process, these changes affecting voting are covered by the requirements of Section 5 of the Voting Rights Act, 42 U.S.C. 1973c."

23.     Intervenor-Defendants deny the allegations of Paragraph 23.  Intervenor-Defendants aver that on October 9, 2008, Jose Morales, a resident of Cherokee County, Georgia, brought a Section 5 enforcement action in the United States District Court for the Northern District of Georgia against then-Secretary of State Karen Handel, stating claims under Section 5 of the Voting Rights Act and Section 8 of the National Voter Registration Act, and that Mr. Morales was represented by attorneys including the Mexican-American Legal Defense and Educational Fund, the Voting Rights Project of the American Civil Liberties Union and the Lawyers' Committee for Civil Rights Under Law.  Intervenor-Defendants further aver that the *Morales* Complaint was later amended to add plaintiffs and to state a claim under HAVA. Intervenor-Defendants further aver that the citizenship matching and hearing procedures that formed the basis of Mr. Morales' Section 5 claim were not and are not required by HAVA and that it is misleading to refer to those procedures as a component of "HAVA Verification."

24.     Upon information and belief, Intervenor-Defendants admit the allegations in this paragraph to the extent that the Chief of the Voting Section of the Civil Rights Division at the United States Department of Justice sent Georgia a letter dated October 10, 2008, concerning Georgia's Social Security Administration records matching.

25.     Intervenor-Defendants lack sufficient knowledge to admit or deny the allegations of Paragraph 25 with respect to assertions by the Department of Justice.  Intervenor-Defendants admit the allegations of Paragraph 25 to the extent that a Section 5 submission by the Georgia Attorney General was made on October 14, 2008, which sought preclearance for certain voter registration procedures based upon matching of the Georgia statewide voter registration database

and the Georgia DDS database.  Intervenor-Defendants deny the remaining allegations of Paragraph 25, specifically that the procedures identified in Plaintiff's Complaint as the "Georgia HAVA Verification Process" were fully contained in the Georgia Attorney General's October 14, 2008 submission.

26.     Intervenor-Defendants deny that the procedures identified in Plaintiff's Complaint as the "Georgia HAVA Verification Process" were fully contained in the Georgia Attorney General's October 14, 2008 submission but admit the remaining allegations of Paragraph 26.

27.     Intervenor-Defendants admit the allegations of Paragraph 27 except to the extent that this paragraph incorporates the term "temporary HAVA verification process."  Intervenor-Defendants aver that the Morales Court described its Order as "temporary remedy for the lack of preclearance, unless and until preclearance is obtained" and not as a "temporary HAVA verification process" as alleged in Paragraph 27.

28.     Intervenor-Defendants deny that the procedures identified in Plaintiff's Complaint as the "Georgia HAVA Verification Process" were fully contained in the Georgia Attorney General's October 14, 2008 submission but admit the remaining allegations of Paragraph 28.

29.     Intervenor-Defendants admit the allegations of Paragraph 29.

30.     The allegations in this paragraph contain statements of law and/or conclusions of law to which no response is required.  If deemed to allege facts, Intervenor-Defendants admit that the United States Attorney General interposed a Section 5 objection to the Georgia Attorney General's submission on May 29, 2009, but deny the remaining allegations in Paragraph 30. Intervenor-Defendants aver that this action is a *de novo* proceeding in which Plaintiff bears the burden of proof without regard to the Section 5 administrative review process.

31.     Intervenor-Defendants lack sufficient information to admit or deny the allegations of Paragraph 31.  Intervenor-Defendants aver that Plaintiffs in the *Morales* litigation were aware that discussions occurred between the Department of Justice and the Georgia Attorney General with respect to the Section 5 submission but did not participate in those discussions.

32.     Intervenor-Defendants admit the allegations of this paragraph to the extent that the United States Department of Justice sent Georgia the letter dated June 16, 2009, attached as Exhibit 3 to Plaintiff's Complaint, but deny the remaining allegations of Paragraph 32.

33.     Intervenor-Defendants lack sufficient information to admit or deny the allegations of Paragraph 33.

34.     Intervenor-Defendants lack sufficient information to admit or deny the allegations of this paragraph to the extent that a revised process "took into account the issues specifically stated by DOJ during those discussions" but admit the remainder of the allegations of Paragraph 34.

35.     Intervenor-Defendants admit that on October 13, 2009, the Department of Justice denied the Georgia Attorney General's request for reconsideration of the May 29, 2009 objection, and identified a portion of Georgia's August 11, 2009 correspondence to be a new Section 5 submission.  Intervenor-Defendants lack sufficient information to admit or deny the allegations of this paragraph concerning what the Department of Justice had advised before October 13, 2009, and deny the remaining allegations of Paragraph 35.

36.     Intervenor-Defendants deny the allegations of Paragraph 36.

37.     Intervenor-Defendants admit the allegations of Paragraph 37.

38.     Intervenor-Defendants admit the allegations of Paragraph 38, but deny that the "Georgia HAVA Verification Process" was fully contained in the state's Section 5 submission.

39.    Intervenor-Defendants deny the allegations of Paragraph 39.

40.    Intervenor-Defendants lack sufficient information to admit or deny the allegations of Paragraph 40.

41.    The allegations in this paragraph are statements of law and/or conclusions of law to which no response is required.  The Court's June 15, 2010 order in the *Morales* case speaks for itself.  If deemed to allege facts, Intervenor-Defendants admit the allegations of Paragraph 41 to the extent that they distinguish between the citizenship-related procedures at issue in the *Morales* case and other procedures at issue in this action, and deny the remaining allegations of Paragraph 41.

### **Expedited Consideration**

42.    Intervenor-Defendants admit the allegations of Paragraph 42.

43.    Intervenor-Defendants admit the allegations of Paragraph 43.

44.    Intervenor-Defendants admit the allegations of Paragraph 44.

45.    Intervenor-Defendants admit the allegations of Paragraph 45 to the extent that they describe the relief sought by Plaintiff.  Intervenor-Defendants deny that Plaintiff is entitled to expedited consideration of its claims.  Intervenor-Defendants aver that Plaintiff has been dilatory both in seeking Section 5 preclearance from the Department of Justice and in bringing this action.  Intervenor-Defendants further aver that any expedited consideration of Plaintiff's Section 5 preclearance claim should not foreshorten the opportunity for full discovery and briefing of Plaintiff's constitutional claim.

### The Georgia HAVA Verification Process Sought to be Precleared

46.     Intervenor-Defendants admit the allegations of Paragraph 46 to the extent that they describe the relief sought by Plaintiff and the procedures Plaintiff purports to implement in the future.  Intervenor-Defendants deny the remainder of the allegations of Paragraph 46.

47.     Intervenor-Defendants admit the allegations of Paragraph 47.

48.     Intervenor-Defendants admit the allegations of Paragraph 48 to the extent that they describe the relief sought by Plaintiff and the procedures Plaintiff purports to implement in the future, but deny that the procedures described in this paragraph are reasonably calculated to verify the identities of voter registration applicants.

49.     Intervenor-Defendants admit the allegations of Paragraph 49 to the extent that the procedures to which this paragraph refers do not on their face distinguish on the basis of race or color.  Intervenor-Defendants aver that the procedures to which this paragraph refers bear more heavily on racial and language minority citizens.

50.     Intervenor-Defendants admit the allegations of Paragraph 50 to the extent that they describe the procedures Plaintiff purports to implement in the future.

### Verification Process for Covered Applicants Who Provide a Georgia Driver's License Number or Georgia DDS ID Card

51.     Intervenor-Defendants admit the allegations of Paragraph 51 to the extent that they describe the procedures Plaintiff purports to implement in the future.  Intervenor-Defendants deny that any federal law requires Georgia to conduct a "citizenship status" match and aver that the decision to do so was and is entirely a discretionary choice on the part of Georgia state officials.

52.      Intervenor-Defendants admit the allegations of Paragraph 52 to the extent that they describe the procedures Plaintiff purports to implement in the future.  Intervenor-Defendants deny that any federal law requires Georgia to perform an "exact match" and aver that the decision to do so was and is entirely a discretionary choice on the part of Georgia state officials.

53.      Intervenor-Defendants admit the allegations of Paragraph 53 to the extent that they describe the procedures Plaintiff purports to implement in the future.  Intervenor-Defendants deny that any federal law requires Georgia to prepare an "exceptions report" and aver that the decision to do so was and is entirely a discretionary choice on the part of Georgia state officials.

54.      Intervenor-Defendants admit the allegations of Paragraph 54 to the extent that they describe the procedures Plaintiff purports to implement in the future.  Intervenor-Defendants deny that any federal law requires Georgia to provide an "exceptions report" to county boards of registrars and aver that the decision to do so was and is entirely a discretionary choice on the part of Georgia state officials.

### Verification Process for Covered Applicants Who Provide Only Last Four Digits of Social Security Number

55.      Intervenor-Defendants admit the allegations of Paragraph 55 to the extent that they describe the procedures Plaintiff purports to implement in the future.

56.      Intervenor-Defendants admit the allegations of Paragraph 56 to the extent that they describe the procedures Plaintiff purports to implement in the future.

57.      Intervenor-Defendants admit the allegations of Paragraph 57 to the extent that they describe the procedures Plaintiff purports to implement in the future.

58.     Intervenor-Defendants admit the allegations of Paragraph 58 to the extent that they describe the procedures Plaintiff purports to implement in the future.  Intervenor-Defendants deny that any federal law requires Georgia to prepare an "exceptions report" and aver that the decision to do so was and is entirely a discretionary choice on the part of Georgia state officials.

59.     Intervenor-Defendants admit the allegations of Paragraph 59 to the extent that they describe the procedures Plaintiff purports to implement in the future.  Intervenor-Defendants deny that any federal law requires Georgia to provide an "exceptions report" to county boards of registrars or requires such a report to be used for any purpose; Intervenor-Defendants aver that the decision to do so was and is entirely a discretionary choice on the part of Georgia state officials.

**United States Citizenship Verification Process**

60.     Intervenor-Defendants admit the allegations of Paragraph 60 to the extent that they set forth Plaintiff's own description of the citizenship verification process for which Plaintiff seeks a declaratory judgment, and otherwise deny the remainder of the allegations in this paragraph.  Upon information and belief, including reference to the actual practices implemented by Georgia without Section 5 preclearance, Intervenor-Defendants aver that this paragraph is a materially incomplete description of the purported citizenship verification procedures that Georgia would employ if Section 5 preclearance were granted by this Court.

61.     Intervenor-Defendants admit the allegations of Paragraph 61 to the extent that they set forth Plaintiff's own description of the citizenship verification process for which Plaintiff seeks a declaratory judgment, and otherwise deny the remainder of the allegations in

this paragraph.  Intervenor-Defendants deny that O.C.G.A. 21-2-228 requires county boards of registrars to routinely conduct inquiries into the citizenship of voter registration applicants.

## COUNT I – DECLARATORY RELIEF

62.     In response to this paragraph Intervenor-Defendants reincorporate by reference their responses to the allegations of Paragraphs 1 to 61.

63.     Intervenor-Defendants deny the allegations of Paragraph 63.

64.     Intervenor-Defendants deny the allegations of Paragraph 64.

65.     Intervenor-Defendants deny the allegations of Paragraph 65.  Intervenor-Defendants aver that Paragraph 65 omits the statutory requirement with respect to "denying or abridging the right to vote on account of race or color, *or in contravention of the guarantees set forth in section 1973b(f)(2) of this title* . . ." (emphasis added to omitted material).

66.     Intervenor-Defendants deny the allegations of Paragraph 66.  Intervenor-Defendants aver that Paragraph 66 omits the statutory requirement with respect to "denying or abridging the right to vote on account of race or color, *or in contravention of the guarantees set forth in section 1973b(f)(2) of this title* . . ." (emphasis added to omitted material).

67.     Intervenor-Defendants deny the allegations of Paragraph 67.

68.     Intervenor-Defendants admit the allegations of Paragraph 68 to the extent that the procedures to which this paragraph refers do not on their face distinguish on the basis of race or color.  Intervenor-Defendants aver that the procedures to which this paragraph refers bear disproportionately more heavily on racial and language minority citizens.

69.     Intervenor-Defendants deny the allegations of Paragraph 69.

70.     Intervenor-Defendants deny the allegations of Paragraph 70.

## COUNT II – DECLARATORY AND INJUNCTIVE RELIEF

71.     In response to this paragraph Intervenor-Defendants reincorporate by reference their responses to the allegations of Paragraphs 1 to 70.

72.     Intervenor-Defendants deny the allegations of Paragraph 72 except to the extent that it describes the relief sought by Plaintiff.  Intervenor-Defendants deny specifically that Plaintiff is entitled to the relief sought in Paragraph 72.

73.     Intervenor-Defendants admit the allegations of Paragraph 73.

74.     Intervenor-Defendants admit the allegations of Paragraph 74, except to the extent that Paragraph 74 characterizes conditions in 1982 by the phrase "even as late."

75.     Intervenor-Defendants deny the allegations of Paragraph 75, except that Intervenor-Defendant admits that the 2006 reauthorization of Section 4 of the Voting Rights Act maintained the pre-existing Section 4 coverage determinations based upon the 1964, 1968, and 1972 presidential elections, and that Georgia consequently continued to be a covered jurisdiction.

76.     Intervenor-Defendants deny the allegations of Paragraph 76.

77.     Intervenor-Defendants deny the allegations of Paragraph 77.

78.     Intervenor-Defendants deny the allegations of Paragraph 78.

79.     Intervenor-Defendants deny the allegations of Paragraph 79, except that Intervenor-Defendants admit that Section 2 is a permanent provision of the Voting Rights Act, that Section 2 is nationwide in scope, and that Section 2 permits challenges to certain types of voting practices and procedures.  Intervenor-Defendants aver that the Supreme Court has found Section 2 and Section 5 to "combat different evils and, accordingly, to impose very different duties upon the States." *Reno v. Bossier Parish School Board,* 520 U.S. 471, 477 (1997).

Intervenor-Defendants aver that Section 2 is not an adequate substitute for Section 5 with respect to the State of Georgia.

80.  Intervenor-Defendants deny the allegations of Paragraph 80.

81.  Intervenor-Defendants deny the allegations of Paragraph 81.

82.  Intervenor-Defendants deny the allegations of Paragraph 82.

83.  Intervenor-Defendants deny the allegations of Paragraph 83.  Intervenor-Defendants specifically deny that Section 5 harms or has harmed minority voters in any way. Intervenor-Defendants aver that Section 5 has been and continues to be a crucial protection for minority citizens against voting discrimination in Georgia.

84.  Intervenor-Defendants deny the allegations of Paragraph 84.  Intervenor-Defendants specifically deny that Section 5 prevents Georgia from conducting any federally-mandated activities with respect to HAVA.  Intervenor-Defendants aver that Section 5 requires preclearance only for those voting practices and procedures that result from the exercise of discretion by Georgia and its officials.

85.  Intervenor-Defendants deny the allegations of Paragraph 85.

86.  Intervenor-Defendants admit the allegation of Paragraph 86 that Georgia is unable to change the requirements of HAVA that applicants be verified and deny the remainder of the allegations of this paragraph.

87.  Intervenor-Defendants admit the allegations of Paragraph 87 but aver that this paragraph fails to identify numerous additional reasons for which bailout would be denied should it be sought by Georgia.

15

88.     Intervenor-Defendants lack sufficient knowledge to admit or deny the allegations of Paragraph 88 without identification of the classes of governmental units purported to be enumerated by this paragraph.

89.     Intervenor-Defendants lack sufficient knowledge to deny or admit the allegations of Paragraph 89 without identification of the classes of governmental units to which this paragraph refers.  Intervenor-Defendants deny the allegations of this paragraph with respect to any voting practice or procedure enacted by the Georgia Legislature, signed into effect by the Governor, or carried out at the direction of the Office of the Georgia Secretary of State. Intervenor-Defendants aver that a substantial portion of the Section 5 objections and other voting rights violations in Georgia have concerned election practices and procedures for counties and county school boards, which must be enacted by the Georgia Legislature and signed into effect by the Governor of Georgia.  Intervenor-Defendants further aver that the "exception" lists which Plaintiff proposes to distribute to county registrars (see Pars. 54, 59 and 61) are to be used by county election officials at the specific direction of the Georgia Secretary of State.

90.     Intervenor-Defendants deny the allegations of Paragraph 90.  Intervenor-Defendants aver that in the absence of Section 5 it is highly likely that minority citizens in Georgia will be subjected to intentional discrimination by state and local officials in the enactment and administration of new voting practices and procedures.

91.     Intervenor-Defendants deny the allegations of Paragraph 91.  Intervenor-Defendants aver that in the absence of Section 5 it is highly likely that minority citizens in Georgia will be subjected to intentional discrimination by state and local officials in the enactment and administration of new voting practices and procedures.

Respectfully submitted,

_____

Jon Greenbaum (D.C. Bar No. 489887)
Robert A. Kengle
Mark A. Posner (D.C. Bar No. 457833)
jgreenbaum@lawyerscommittee.org
bkengle@lawyerscommittee.org
mposner@lawyerscommittee.org
LAWYERS' COMMITTEE FOR CIVIL RIGHTS
UNDER LAW
1401 New York Avenue, NW
Suite 400
Washington, D.C. 20005
(202) 662-8315 (phone)
(202) 628-2858 (fax)

_____/S/_____

Laughlin McDonald
Meredith Bell-Platts
(Application pending)
lmcdonald@aclu.org
mbell@aclu.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION, INC.
230 Peachtree Street, NW
Suite 1440
Atlanta, GA  30303-1227
(404) 523-2721 (phone)
(404) 653-0331 (fax)

Arthur B. Spitzer (D.C. Bar. No. 235960)
artspitzer@aol.com
AMERICAN CIVIL LIBERTIES UNION OF THE
NATION'S CAPITAL
1400 20th Street, N.W., Suite 119
Washington, DC 20036
(202) 457-0800 (phone)
(202) 452-1868 (fax)

17

Chara Fisher Jackson
cfjackson@acluga.org
ACLU OF GEORGIA
1900 The Exchange, Suite 425
Atlanta, GA 30339
(770) 303-8111

*Attorneys for Applicant-Intervenors*

# EXHIBIT B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **JOSE MORALES, et al.** | ) | |
| | ) | **Civil Action Number** |
| **Plaintiffs,** | ) | **1:08-CV-3172 JTC** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **BRIAN KEMP, in his official** | ) | |
| **capacity as Georgia Secretary of State,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## PLAINTIFFS' SUPPLEMENTAL BRIEF IN RESPONSE TO COURT'S APRIL 30, 2010 SCHEDULING ORDER

Pursuant to this Court's April 30, 2010 Scheduling Order, Plaintiffs respectfully submit the following Supplemental Brief to respond to the questions posed by the Court concerning the necessity for and scope of further injunctive relief in this action. For the reasons discussed below, this Court should lift the preliminary injunction, and enter a permanent injunction based on Plaintiffs' claim under Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c. The permanent injunction should prohibit Defendant from implementing the citizenship verification procedure for voter registration at issue in this lawsuit, unless and until the procedure receives Section 5 preclearance. Such an injunction will eliminate the need to resolve the remaining claims in this action.

Background

The material facts with respect to Plaintiffs' Section 5 claim have not

changed since Plaintiffs filed their motion for summary judgment in September

2009.   At that time, the voter registration procedure at issue in this action had been

objected to by the Attorney General, and the Attorney General had declined to

withdraw that objection.   Since then, the Attorney General has again declined to

withdraw the objection.   Plaintiffs submit that continued forbearance from granting

permanent relief in this action is therefore not justified.   *Lopez v. Monterey,* 519

U.S. 9, 21-22 (1996); *Clark v. Roemer,* 500 U.S. 646, 654-55 (1991).

The necessity for entry of a permanent injunction in this case is not affected

by Defendant's adoption of a modified citizenship verification procedure for voter

registration in 2009, or by the Georgia General Assembly's adoption of a different

set of citizenship verification procedures for voter registration in Act 143, S.B. 86

(2009) (later supplemented by implementing regulations).   As the Supreme Court

unanimously observed in *Lopez*, any such collateral factual "complications do not .

. . change the basic nature of the §5 preclearance process," or "the role of the three-

judge district court." 519 U.S. at 23.   When presented with an unprecleared voting

change, a three-judge Section 5 court has two obligations: first, it must "ensure that

the covered jurisdiction submits its election plan to the appropriate federal

authorities for preclearance as expeditiously as possible," *id.* at 24; and second,

"[i]f a voting change subject to §5 has not been precleared, §5 plaintiffs are entitled to an injunction prohibiting implementation of the change." *Id.* at 20. Here, the citizenship verification procedure that is the subject of this lawsuit has been submitted to the Attorney General, and the Attorney General has interposed an objection. Accordingly, this Court should enter an injunction prohibiting future implementation of the change.

The fact that Georgia has adopted changes which may, if precleared, supplement or supersede the original, unprecleared procedure at issue here does not, and could not, affect the State's legal authority to implement that procedure: regardless of the subsequent changes, the fundamental precept of Section 5 remains that "[n]o new voting practice is enforceable unless the covered jurisdiction has succeeded in obtaining preclearance." *Id.* at 20. *See also Clark v. Roemer*, 500 U.S. 646, 652-55 (1991) (district court was required to enjoin elections for unprecleared judgeships notwithstanding the fact that the state had subsequently adopted other judgeships for the same judicial districts, which were to be implemented since they had been precleared).[1]

_____

[1] A three-judge district court in the Fourth Circuit recently entered a permanent injunction in a Section 5 case, on March 1, 2010, enjoining implementation of an unprecleared South Carolina election practice. *Gray v. South Carolina Election Commission,* 2010 U.S. Dist. Lexis 18034 (D. S.C.). The district court relied on the Supreme Court's decision in *Lopez* in issuing the injunction.

Responses to the Court's Questions

Plaintiffs respectfully submit the following responses to the Court's specific inquiries:

1.  The current Section 5 status of the citizenship verification procedure at issue in this lawsuit is that the procedure remains unprecleared.  The Attorney General interposed an objection to the procedure on May 29, 2009, and on October 13, 2009, the Attorney General denied the State's request that the objection be withdrawn (these letters were previously lodged with the Court).  Most recently, on February 22, 2010, the Department of Justice wrote to the State regarding the procedure and reiterated that the Attorney General would not withdraw the objection.  See Attachment A.

Subsequent to the May 29, 2009 objection, Defendant requested that the Attorney General preclear a modified version of the objected-to citizenship verification procedure; however, that procedure remains unprecleared as well.  On October 13, 2009, the Attorney General responded to the State's submission of the modified procedure by requesting additional information, pursuant to 28 C.F.R. § 51.37.  The State has not yet provided that information and the Justice Department, in its February 22, 2010 letter to the State, reiterated that the Attorney General requires the requested information in order to make the Section 5 determination on the modified procedure.  The Justice Department also stated in

the February 22 letter that the modified procedure must be reviewed simultaneously with the new citizenship verification procedures contained in Act 143, and with the verification procedures included in regulations adopted to implement that Act. As of this date, the State has not sought preclearance for the Act 143 procedures (either by making a submission to the Attorney General or by filing a declaratory judgment action in the United States District Court for the District of Columbia), although the Act (by its terms) was to become effective on January 1, 2010.[2]

2. It is Plaintiffs' understanding that Defendant and the Office of the Georgia Attorney General have had some discussions with the Department of Justice concerning the citizenship verification procedure that is the subject of this lawsuit. Plaintiffs are not aware of the full extent of those discussions, but these discussions have not led the Attorney General to withdraw the Section 5 objection and there is no indication that the objection will be withdrawn in the future.

As of this date, Defendant has not filed a declaratory judgment action in the United States District Court for the District of Columbia seeking preclearance for the citizenship verification procedure at issue in this lawsuit. Defendant has had

---

[2] Plaintiffs do not have any information indicating that the modified administrative verification procedure or the Act 143 procedures have been implemented (contrary to Section 5) in any Georgia county; however, Plaintiffs cannot speak with certainty on this issue.

the option since before the citizenship verification procedure was first put into effect to seek judicial Section 5 preclearance from that court.  There have been news reports to the effect that the Georgia Attorney General and Defendant disagree as whether to file a suit in the District of Columbia Court, a suit which might include a claim seeking preclearance of the objected-to citizenship verification procedure.  Defendant has not informed Plaintiffs of any decision to institute litigation in the District of Columbia Court.

3.  For the reasons set forth above, the State's enactment of Act 143 and its promulgation of regulations to implement that statute have no effect upon this lawsuit.[3]

Plaintiffs note, however, that an injunction prohibiting the implementation of the citizenship verification procedure at issue here would not affect the State's ability to implement Act 143, if the Act 143 procedures are precleared.  To ensure that this is clear, Plaintiffs' proposed order explicitly provides that it does not apply to Act 143.

_____

[3] Assuming that the State seeks preclearance for the Act 143 verification procedures in the near future, it is likely that a final Section 5 determination on these changes will not be forthcoming for several months, at a minimum.  If the State seeks preclearance by filing suit in the District of Columbia District Court, even an expedited litigation process will require at least several months to yield a resolution.  If the State files an administrative submission, it is reasonably likely that the Attorney General's initial response would be to request additional information, pursuant to 28 C.F.R. § 51.37, and accordingly the 60-day review period would not begin until that information is provided by the State.

4. Entry of a final injunction in this case would affect voter registration for this year's regular, biennial, 2010 primary and general elections. The primary is to be held on July 20, 2010, with a runoff primary, if needed, on August 10, 2010. The voter registration deadline for the primary is June 21, 2010. The general election will be held on November 2, 2010, with a runoff, if needed, on November 30, 2010. The voter registration deadline for the general election is October 4, 2010. See http://sos.georgia.gov/elections/elections_events.htm.

5. The core term of the permanent injunction that should be entered in this case is that the Defendant (and all county election officials) be prohibited from implementing the citizenship verification procedure at issue in this lawsuit for purposes of conducting voter registration. This necessarily means that Defendant would be prohibited from applying the verification procedure to new voter registration applicants or newly applying it to existing registered voters.[4] In addition, individuals who previously were flagged pursuant to the verification procedure should have their voter registration applications processed without regard to the unprecleared procedure (however, any registration applicant who has notified election officials that he or she is not a United States citizen should, of course, remain unregistered). As indicated above, the injunction should further

---

[4] The State has applied the unprecleared verification procedure to new voter registration applicants, and to existing registered voters who seek to make changes to certain data fields in their voter registration record.

specify that it has no application to the State's potential implementation of Act 143.  Plaintiffs refer the Court to their "Proposed Final Judgment and Order" previously lodged with the Court (Document 89, Attachment #22).

6.  For the reasons set forth above and in our prior court submissions concerning the pending motions (Document 89, Attachment # 1; Document 92; Document 94; and Document 96), the current preliminary injunction must be replaced by a permanent injunction.  If the preliminary injunction were to be continued, it would need to be modified to update it to the current election cycle. Plaintiffs respectfully submit, however, that the circumstances under which the existing injunction was entered (i.e., the then-imminent 2008 general election and the lack of Justice Department review regarding the verification procedure) are not present today, and do not justify any continued implementation of the unprecleared change.[5]

7.  This Court is obligated to resolve the Section 5 claim prior to addressing Plaintiffs' claims under the National Voter Registration Act and the Help America Vote Act.  These latter claims were raised by Plaintiffs prior to the Attorney General interposing the Section 5 objection to the citizenship verification

---

[5] Although the Court attached certain conditions to the State's implementation of the citizenship verification procedure for purposes of conducting the 2008 general election, that only temporarily postponed application of the Supreme Court directive that "§5 plaintiffs are entitled to an injunction prohibiting implementation of [an unprecleared voting] change." *Lopez v. Monterey County*, 519 U.S. at 20.

procedure. Since, under Section 5, the unprecleared status of the verification procedure means that the procedure is not "enforceable," Plaintiffs' other statutory claims are not ripe for consideration at this time. *See Connor v. Waller*, 421 U.S. 656 (1975) (district court erred in deciding constitutional challenges to state redistricting plans because the plans "are not now and will not be effective as laws until and unless cleared pursuant to § 5").

Conclusion

For these reasons, and as set forth in greater detail in Plaintiffs' previous submissions, Plaintiffs urge this Court to now enter a permanent, final injunction prohibiting Defendant from implementing the unprecleared citizenship verification procedure for voter registration.

Respectfully submitted,

*s/ Laughlin McDonald*
Laughlin McDonald
Counsel for Plaintiffs

Laughlin McDonald
Meredith Bell-Platts
ACLU Voting Rights Project
230 Peachtree Street, NW
Suite 1440
Atlanta, GA 30303
(404) 523-2721
lmcdonald@aclu.org
mbell@aclu.org

Jon Greenbaum
Robert A. Kengle
Mark A. Posner
Lawyers' Committee for Civil Rights Under Law
1401 New York Avenue, NW
Suite 400
Washington, DC 20005
(202) 662-8389
jgreenbaum@lawyerscommittee.org
bkengle@lawyerscommittee.org
mposner@lawyerscommittee.org

Nina Perales
Mexican American Legal Defense and Educational Fund
110 Broadway, Suite 300
San Antonio, TX 78205
(210) 224-5476
nperales@maldef.org

Brian Spears
Law Office of Brian Spears
1126 Ponce de Leon Ave., NE
Atlanta, GA 30306
bspears@mindspring.com

Jason S. Pielemeier
Young K. Lee
Debevoise & Plimpton
919 Third Avenue
New York, NY 10022
pielemeier@debevoise.com
yklee@debevoise.com

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| JOSE MORALES, *et al*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )   Civil Action No. |
| | )   1-08-CV-3172-JTC |
| KAREN HANDEL, | ) |
| in her official capacity as | ) |
| Georgia Secretary of State, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## RESPONSE OF *AMICUS CURIAE* UNITED STATES
## TO THE COURT'S QUESTIONS IN APRIL 30, 2010 ORDER

On April 30, 2010, this Court entered a Scheduling Order: 1) setting a

hearing date of May 24, 2010, on Defendant's Motion to Dismiss or in the

Alternative Motion for Summary Judgment [#88] and Plaintiffs' Motion for

Summary Judgment and Permanent Injunctive Relief [#89]; and 2) directing the

parties to file by May 10, 2010, supplemental briefs addressing questions posed by

the Court.    As ordered by the Court, the response of *amicus curiae* United States

to the Court's questions are set forth below.

1. **The current status of the State's request for Section 5 preclearance of its citizenship verification program for voter registrants, which is the subject of this lawsuit.   This question includes the status of any revised procedures submitted to the Department of Justice ("DOJ").**

On May 29, 2009, the Department of Justice interposed an objection under Section 5 of the Voting Rights Act, 42 U.S.C. 1973c, to, among other things, the State's automated program of verifying citizenship for voter registration applicants [#88-9].   The objection followed a substantial period of interaction between the Department of Justice and the State, which began about a month prior to the State's October 14, 2008 submission of its citizenship verification program under Section 5, and included the Department's December 15, 2008 request to the State for more information [#89-16], the State's March 24, 2009 response to that request [#89-19], as well as numerous discussions between the Department and the State during the pendency of the review of the initial submission.

In its May 29, 2009 objection letter, the Department determined that the State had not met its burden of showing that the State's proposed citizenship verification program had neither the purpose nor will have the effect of denying or abridging the right to vote on the basis of race, color or membership in a language

2

minority group.     However, the Department in its letter also indicated that it

believed that there were alternatives available that could mitigate or eliminate this

discriminatory impact, and reached out to the State to engage in further discussion

concerning these alternatives in an effort to resolve the Section 5 issues that had

been raised.

Subsequent to further discussions between the Department and the State, on

August 12, 2009, the State submitted to the Department a request that it reconsider

and withdraw its previous May 29 objection, while at the same time submitting a

substantially revised verification program [#89-20].     On October 13, 2009, the

Department responded to this request of the State [Exhibit 1].     In that response, the

Department advised the State that, in light of the fact that the State's August 12

letter did not provide any additional information or arguments to support its

reconsideration request, the Department of Justice would not withdraw its previous

objection to the original verification program.     In addition, the Department

advised the State that, because the revised verification program which was the

subject of the State's August 12 letter contained "significant" alterations to the

originally objected-to program, it in fact constituted a new change submitted under

3

Section 5 for preclearance.    Treating the request as a new submission, the Department indicated that it needed additional information, set forth in the letter, in order to complete its review of the State's revised program.    Also in that letter, the Department reiterated its willingness to meet with the State to attempt to resolve outstanding issues.

On December 14, 2009, representatives of the Department of Justice, including the Assistant Attorney General for the Civil Rights Division, Thomas Perez, met with Georgia Attorney General Thurbert Baker and members of his staff, and engaged in a productive discussion in an attempt to move towards possible resolution of issues surrounding the State's verification program. Following this meeting, as requested by the Georgia Attorney General, the Department expedited the review and preclearance of certain of the State's voter registration forms and procedures.    Then, on December 22, 2009, Attorney General Baker advised the Department by letter, following his discussion of the matter with then-Georgia Secretary of State Karen Handel, that the Secretary had decided not to provide any further information to the Department, and that the Secretary requested a Section 5 determination of the State's verification program

4

based on the State's previous submissions [Exhibit 2].

On February 22, 2010, having received no further information from the State, the Department sent a letter to the State reiterating its previous decision declining to withdraw the Department's May 29, 2009 objection to the State's original submission [Exhibit 3].   With regard to the State's revised verification program, the letter noted that the State had not provided information responsive to the Department's October 13, 2009 request for the information that was necessary for the Department to make a determination on the State's submission.   The letter also noted that Georgia Senate Bill 86 ("SB 86"), requiring proof of citizenship for voter registration (with an effective date of January 1, 2010), and recently adopted implementing rules, had not yet been submitted to the Department for Section 5 review.   Thus, the Department advised the State that, due to the related nature of SB 86 and its implementing rules and the State's revised citizenship verification program, the Department could not make a determination on the revised program until the State had submitted SB 86 and implementing rules, and the revised citizenship verification procedures that the state intended to implement under SB 86, for review under Section 5 and the submissions could be reviewed

5

simultaneously.   The Department in the letter also repeated its willingness to renew discussions with the State aimed at reaching a resolution of outstanding issues.   The State has not responded to the Department's letter.

2. **Do the State and DOJ remain in discussion regarding the State's citizenship verification program?   If not, has the State filed suit or does it intend to file suit and seek judicial review in the United States District Court for the District of Columbia?**

At the present time, the State and the Department are not engaged in discussions concerning this matter.   On April 22, 2010, the Department was provided by the Georgia Attorney General's office with a copy of a letter sent that date by Georgia Attorney General Thurbert Baker to new Georgia Secretary of State Brian Kemp [Exhibit 4].[1]   In the letter, which was reported in the news media, Attorney General Baker advised Secretary Kemp that, in his view, the prospects for resolution of outstanding issues in this matter – both regarding the State's verification program and the newly enacted SB 86 and implementing regulations - would best be achieved through administrative submission of the

------

[1] Former Georgia Secretary of State Karen Handel resigned her office as of the end of 2009.   Brian Kemp has been appointed by Governor Perdue as the new Secretary of State.

6

statute, regulations and verification procedures to the Department of Justice and to continuing our discussions.   Attorney General Baker's letter further advised Secretary Kemp that his previous meeting with the Department had led Attorney General Baker to believe that the Department was "sincere in its desire to assist the State of Georgia in getting both the verification process and SB 86 precleared."   In light of this view, Attorney General Baker informed Secretary Kemp in this letter that he was declining to initiate Section 5 litigation in the United States District Court for the District of Columbia to preclear the verification process, including newly enacted SB 86 and related regulations, and left it to Secretary Kemp to determine if he wanted to initiate such litigation on his own.   Attorney General Baker also indicated in the letter that his office had been ready "since January" to submit administratively to the Department of Justice under Section 5, the State's verification program as well as SB 86 and its implementing regulations, and remained ready to do so.   Were the State to make such a submission, it would be the first time that the Department would have the State's entire verification program before it to review.

As indicated above, in the Department's letters to, and in conversations with,

7

the Georgia Attorney General's Office, the Department has expressed a willingness

to attempt to resolve these matters through further discussion and through an

administrative submission by the State to the Department under Section 5 of all

related voting changes simultaneously (including SB86, the related administrative

rules, and the verification procedures).   The State has thus far not responded.   As

of this date, the State has not provided the additional information requested in the

Department's letter of October 13, 2009, or made a new submission under Section

5 of all related changes as requested on February 22, 2010.   Nor has the State filed

a Section 5 declaratory judgment action in federal district court in Washington,

D.C. concerning this matter.   The United States at this time does not know the

State's plans in this regard, aside from what is set forth in Attorney General Baker's

April 22, 2010 letter and subsequent news reports.

3. **What is the effect, if any, upon this case of the State's enactment of Senate Bill 86, Act 143 (2009) and the adoption of related administrative rules, which require proof of citizenship for voter registration?**

As indicated above, at the present time, SB 86 and its implementing

administrative rules have not been submitted to the Department for review under

Section 5, nor has the State initiated a Section 5 declaratory judgment action in the

United States District Court for the District of Columbia seeking preclearance of the same.    Thus, neither the statute nor the rules can be enforced because they have not received the necessary Section 5 preclearance.    As the United States has noted, however, in its most recent February 22, 2010 letter to the State and in previous correspondence, the Department views SB 86 and its implementing rules as related to the State's revised verification program and, in our view, their enactment has a "significant" impact on the Department's determination under Section 5 concerning that submission.    As we indicate below, we believe that this interrelatedness should factor into this Court's decision on the injunctive relief to be granted at this time.

**4. <u>Provide a timeline showing all upcoming election dates in Georgia during 2010 that an injunction in this case will impact.</u>**

The United States does not have complete information in this regard, and submits that the State of Georgia is in the best position to answer this inquiry of the Court.

9

**5. If the three judge panel enters final judgment and a permanent injunction in this case, what are the appropriate terms of such an injunction?   What objections does any party have to the proposed permanent injunction requested by Plaintiffs?**

The United States agrees with Plaintiffs that, in light of the fact that the State's automated voter registration citizenship verification program, as originally submitted to the Department of Justice for Section 5 preclearance in October 2008, and as subsequently revised and submitted in August 2009, is subject to and has not been precleared under Section 5, such program cannot be implemented by the State, and is properly the subject of an injunction under Section 5.   The United States does not believe that a permanent injunction should be entered at this time. Rather, as discussed below, the United States believes that this Court should, as a prudential matter, maintain the status quo under the October 27, 2008 preliminary injunction, pending further attempts to resolve important issues related to this matter.

6. **If the three judge panel denies both parties' Motions for Summary Judgment, should the existing preliminary injunction remain in effect? If not, how should the three judge panel modify the preliminary injunction?**

The United States submits that the Court's October 27, 2008 preliminary injunction should remain in effect to allow the State to take action possibly obviating the necessity for a permanent injunction in this case.

There have been numerous constants in the United States' dealings with the State concerning its citizenship verification program since its submission in October 2008, all of which bear upon the remedy in this case.   The United States has repeatedly indicated to the State its view that Section 5 does not prohibit Georgia from taking steps to ensure that only qualified individuals who are citizens are registered to vote.   Rather, under Section 5, the State must ensure that the discretionary manner in which the State does so does not violate the substantive non-discrimination requirements of Section 5.   The United States has thus raised concerns as to the State's citizenship verification program <u>not</u> because of <u>what</u> the State was doing, but rather <u>how</u> it was doing it.   This is reflected in the Department's requests of the State for clarification and additional information, that began well before December 2008 and continued through our most recent contact

11

with the State in February 2010.    These requests have been made in good faith and express the Department's desire to find answers to lingering questions about the State's at-times confusing and ever-changing verification procedures, in an attempt to reach a resolution of this matter in an efficient and timely manner.    The Department's efforts in this regard have not gone unnoticed, as reflected in the April 22, 2010 letter of Georgia Attorney General Baker to the Georgia Secretary of State.    Further, the Department has continually pointed out to the State the relatedness to this process of the enactment of SB 86 and its implementing rules, beginning with its May 29, 2009 letter, and continuing through our letters of October 13, 2009 and February 22, 2010.

As indicated above, the United States does not know the State's intentions regarding seeking preclearance for its voter registration citizenship verification procedures.    The United States remains ready to work cooperatively with the State in discussing its remaining questions regarding the verification procedures under Section 5, as well as to consider under Section 5 any submission by the State of SB 86 and its implementing regulations.    We would note that SB 86, and the recently adopted sets of rules implementing it, set forth procedures for verification of

12

citizenship data of voter registration applicants that build more definition into the State's verification program than appears to have existed in the past, and appear to address some of the concerns expressed by the Department in its dealings with the State on this matter.   At present, however, nothing is before the United States for review.

In light of the above, we believe it is now up to the State as to how this matter should proceed.   As stated above, the Department of Justice remains ready to begin discussions anew with the State concerning an administrative submission of whichever version of its verification procedures it now proposes to use, in conjunction with the submission of SB 86 and its implementing regulations, if the State determines to follow this path.   The Department continues to believe that such a procedure has the potential to avoid additional litigation.   Of course, the State may choose to seek preclearance through a declaratory judgment action in federal court in Washington, D.C.   In any event, given the interrelatedness of the various measures and their inevitable impact on the State process challenged herein, we believe that this Court should maintain its preliminary injunction in this case, and direct the State to take action to seek Section 5 preclearance (either from

13

the Department of Justice or the D.C. District Court) of all processes involved in

verifying citizenship of voter registration applicants, within a prescribed time

period; e.g., 30 days.   If, at the end of that time, the State has not taken such

action, it should be required to show cause to this Court why a permanent

injunction should not issue prohibiting the State from utilizing any system for

verification of citizenship different than its benchmark system unless and until it

has been precleared.   If, however, the State does take such action, the preliminary

injunction should remain in effect so as to prevent both eligible voters from being

denied the right to vote and to prevent ineligible voters from casting votes that

cannot be discounted, pending a decision on the State's preclearance request.   If

such procedures are precleared, there would appear to be no need for a permanent

injunction based on Section 5.   If such procedures are ultimately not precleared,

plaintiffs should be entitled to a permanent injunction requiring the State to use its

benchmark procedures for verifying citizenship pending preclearance of any new

State verification procedure.

7. **Plaintiffs also raise claims under Section 8 of the National Voter Registration Act and Section 303 of the Help America Vote Act, which are outside the jurisdiction of the three judge panel.   Should the Court resolve these claims prior to resolution of the Section 5 claim that is before the three judge panel?**

The United States continues to maintain, consistent with its position in its Second Memorandum as *Amicus Curiae* [#95], that, so long as the State's citizenship verification procedures have not been precleared under Section 5 of the Voting Rights Act, they are not legally enforceable, and challenges to those procedures under other legal theories, such as under the NVRA and HAVA, remain premature.   *Connor* v. *Waller*, 421 U.S. 656 (1975) (where voting changes were unprecleared under Section 5, it was error for district court to proceed to consider constitutional challenges to those voting changes).   Thus, the United State believes that the Court should hold the Plaintiffs' NVRA and HAVA claims in abeyance pending resolution of the Section 5 preclearance issues.

15

Respectfully submitted,


SALLY QUILLIAN YATES               THOMAS E. PEREZ
United States Attorney             Assistant Attorney General
Northern District of Georgia       Civil Rights Division


*/s/ Sharon D. Stokes*             */s/ T. Christian Herren, Jr.*
_____            _____
SHARON D. STOKES                   T. CHRISTIAN HERREN, JR.
Assistant United States Attorney   BRIAN F. HEFFERNAN
(Georgia Bar No. 227475)           Attorneys
600 U.S. Courthouse                Voting Section
75 Spring Street, SW               Civil Rights Division
Atlanta, Georgia 30303             U.S. Department of Justice
(404) 581-6301                     950 Pennsylvania Ave., NW
Sharon.stokes@usdoj.gov            Room NWB-7254
                                   Washington, D.C.   20530
                                   Phone: (202) 514-4755
                                   Fax:   (202) 307-3961
                                   chris.herren@usdoj.gov
                                   brian.f.heffernan@usdoj.gov


May 10, 2010


16