**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **STATE OF GEORGIA,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**ERIC H. HOLDER, JR., in his official capacity as Attorney General of the United States,**<br><br>**Defendant.** | **CIVIL ACTION**<br><br>**NO. 1:10-CV-01062**<br><br>**THREE JUDGE PANEL (ESH, TBG, HHK)** |

**JOINT STATUS REPORT and LOCAL RULE 16.3 REPORT**

Pursuant to this Court's direction during a telephone conference held on July 1, 2010, Fed. R. Civ. P. 26(f) and Local Rule 16.3, Plaintiff the State of Georgia ("the State" or "Georgia") and Defendant Attorney General of the United States Eric H. Holder, Jr., through the United States Department of Justice ("Department"), respectfully submit this Joint Status Report, responding to the Court's requests for information concerning (1) the State's request that this proceeding be expedited, (2) the suggested timeline for litigation of the case and decision by the Court, (3) the parties' discovery plan, (4) any agreements reached between the parties and (5) matters upon which the parties disagree. As also requested by the Court, the parties have attached a proposed scheduling order.

## I. STATEMENT OF FACTS AND STATUTORY GROUNDS

### A. State's Statement

The State of Georgia brought this action seeking declaratory judgment from this Court, pursuant to Section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973c ("Section 5"), that the voter registration verification process outlined in Exhibit 6 to its Complaint ("the Georgia HAVA Verification Process") neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color under Section 5. If the Court declines to grant a declaratory judgment preclearing the Georgia HAVA Verification Process, then the State alternatively seeks declaratory judgment that the preclearance provisions of the Voting Rights Act are unconstitutional as applied to the State of Georgia.

The HAVA Verification Process submitted by the State for preclearance by this Court is outlined in Exhibit 6 to the State's Complaint. Similar to the process originally submitted to the Department in 2008, the HAVA Verification Process submitted to the Court verifies information only for first time registrants. The principal difference between the original process and the HAVA Verification Process outlined in Exhibit 6 is that the verification process outlined in Exhibit 6 is not triggered when an existing registrant changes fields previously identified as "critical fields" in his or her voter registration record, such as when a voter changes his or her last name. Ultimately, the pool of voters subject to verification under the

HAVA Verification Process outlined in Exhibit 6 is less than the pool of voters subject to the verification process originally submitted to the Department.

Additionally, similar to the process originally submitted to the Department, all new voter registrants, with the exception of those who registered at the Georgia Department of Driver Services ("DDS"), would be verified under the process submitted to the Court. Those who registered to vote at DDS would not be verified against the DDS database because their voter registration record was the DDS database record.

During the 18-month period of preclearance negotiations with the Department and based on input from the Department, the State offered a revised process that would be applied only to voters who registered to vote by mail without providing HAVA-approved identification. The Department refused preclearance of that process as well.

The State agrees with the Department that its previous administrative determinations are irrelevant to this Court's review of the HAVA Verification Process and ultimate decision on preclearance. However, the details of the various iterations of the process are critical to the history of this matter.

**B. Department's Statement**

The Department has never administratively reviewed, under Section 5 of the Voting Rights Act, the new version of Georgia's voter verification process as

submitted to this Court and outlined in Exhibit 6 to its Complaint. Indeed, even if the Department had so reviewed this version, any administrative determination would be irrelevant to this Court's *de novo* determination in this action. Rather, on May 29, 2009, the Department objected under Section 5 of the Voting Rights Act to an earlier and different version of the Georgia verification process that the State had submitted to the Department for Section 5 administrative review in October 2008. The Department's reasoning behind the objection is set forth in the May 29, 2009 letter, which is appended as Exhibit 2 to Georgia's Complaint.

Subsequent to the Department's May 2009 objection, and following discussion among the parties, Georgia submitted a modified version of its verification process to the Department for Section 5 administrative review, which the Department considered to be a new submission. The Department advised the State on February 22, 2010, that it could make no determination on this submission pending receipt of requested information from Georgia and the submission of recently enacted related legislation and related regulations for simultaneous Section 5 review. Exhibit 4 to Georgia's Complaint. The Georgia verification process now before this Court is different from the two previous versions of this process submitted to the Department administratively.

## II. EXPEDITED TREATMENT

In light of the State's request for expedited consideration of its Complaint, the Court requested that the parties confer and propose an appropriate schedule for resolution of the case by the Court. For the reasons set forth below, the parties agree that it is not feasible for the case to be resolved prior to the commencement of the November 2010 electoral schedule. The parties agree that Count I of Plaintiff's Complaint must be resolved first because if the Court grants declaratory judgment to the State on Count I, the Court will not reach Count II. The remaining issues are addressed by the parties in the following sections.

### A. State's Position

For almost two years, the State has been attempting to obtain federal preclearance of a process to verify voters mandated by the Help America Vote Act of 2002 ("HAVA"). The State first became aware that a verification process was necessary in early 2007, when the Department notified the State that HAVA required a verification process and the State was not compliant. The State developed and implemented a process and, in mid-2007, notified the Department that it had done so.

Almost two years later, private plaintiffs sued the State, contending that the State had not obtained preclearance before implementing the verification process. *Morales v. Kemp* (No. 1:08-cv-03172, N.D. Ga.) In *Morales,* the plaintiffs (who

now have intervened in this proceeding) filed a complaint a day after the Department advised the State that it believed the HAVA Verification Process should be precleared, and less than a month before the 2008 General Election. The *Morales* litigation challenged, among other things, the State's implementation of the Georgia HAVA Verification Process without first obtaining Section 5 preclearance.

Shortly after the *Morales* case was filed, the State submitted the verification process to the Department for preclearance on October 14, 2008, requesting expedited treatment. After requesting additional information, the Department objected to preclearance. Based on discussions with the Department, the State made adjustments to the process and submitted it for reconsideration. On the last day for response, the Department advised that it was treating the request for reconsideration as a new submission and required further information. The State had no further information to provide and so advised the Department. The Department then objected to preclearance again.

In the meantime, the *Morales* court had enjoined the State from using the process until the State obtained preclearance and the court created a temporary verification process for use in the November 2008 elections, noting the need to "ensure that no eligible voter is denied the right to cast a vote that can be counted

later, and that no ineligible voter is allowed to cast a ballot that cannot be discounted later." *Morales*, 1:08-cv-03172, [Doc. 36, p. 26-27].

Recently, the *Morales* plaintiffs sought final judgment in that case. As a result of the limited application of the temporary verification process outlined in the October 27, 2008 Order of the *Morales* court, the State was unable to utilize the court's temporary verification process subsequent to the November 2008 election. Accordingly, the State and the Department, as *amicus curiae* in the case, asked the *Morales* court to continue the injunctive relief previously imposed.

On June 15, 2010, the *Morales* court did extend the injunctive relief, thus continuing to permit Georgia to implement a modified HAVA verification process pending this Court's decision on preclearance. [Doc. 110]. Although the *Morales* court's initial injunction was entered over 19 months ago, the State has effectively operated under the terms of the injunction for less than 45 days.

While the *Morales* remedy permits Georgia to conduct a verification process, it does not allow the State to remove noncitizens from its voter roll, thus compromising the integrity of that roll. Contrary to the Department's statement below, the aim of the State is to implement the voter verification process and create accurate rolls, not simply to have a verification process. Therefore, the State still seeks an expedited decision from this Court to allow it to ensure that its voter rolls

do not contain the names of individuals whom the State knows are not citizens or are otherwise not entitled to vote under HAVA and the Georgia Constitution.

However, the State recognizes that several considerations likely make it difficult, if not impossible, to have this case litigated and decided prior to the November 2010 elections, including: the need for discovery in this proceeding and the fact that individuals with knowledge of the issues in this case must devote time to run the State's November 2010 elections. Therefore, the State proposes the schedule set forth in Section III. A below, which would result in submission of a Motion for Summary Judgment to the Court regarding Count I of the State's Complaint by February 24, 2011.

The Department has argued to the State and now argues to this Court that that the State's request for preclearance of its HAVA Verification Process must also include a review of SB 86, a new Georgia statute that requires voters to prove their United States citizenship when registering to vote. SB 86 is unrelated to the HAVA Verification Process, and the Department is without any authority to require that the State submit the two concurrently to this Court.

The State has brought this litigation to obtain preclearance of the HAVA Verification Process. Under Section 5, the State is entitled to this Court's ruling on whether that process has the purpose or effect of discriminating against any voter on account of race or color, without regard to its submission of SB 86.

**B. Department's Position**

The Department agrees with Georgia that it is not feasible to resolve the issues in this litigation prior to the upcoming elections in the fall. As the State has indicated, pursuant to an extant federal court injunction in *Morales v. Kemp*, C.A. No. 1:08-cv-3172 (N.D. Ga.), the State currently is able to satisfy the interests it seeks to vindicate here – namely, to carry out a voter registration verification process in Georgia, including verification of citizenship – and can continue to do so pending completion of a reasonable period for discovery, briefing, trial (if needed), and this Court's ultimate determination on the merits of the State's claims. The State has been operating its voter registration verification process subject to the terms of the *Morales* court injunction for over 19 months, and more than 13 months past the time of the Department's May 2009 objection, without the apparent need of the State to seek assistance from this Court in the form of a Section 5 declaratory judgment action. Thus, there is no need for a rush to judgment. Georgia can conduct its upcoming elections having verified the eligibility status of its voter registrants, including verification of citizenship, and this litigation can follow a reasonable course.

The Department's position is best understood in context. On May 29, 2009, the Department objected under Section 5 to the State's October 2008 submission of its automated verification program for voter registration application data, including

citizenship status. Further discussions between the parties led to the State's submission of a substantially revised verification program in August 2009, concerning which the Department in October 2009 requested additional information from the State in order to complete its review of the State's revised program. Further meetings and discussions ensued, but the State did not provide any further substantive information to the Department and the parties were unable to resolve their differences, as reflected in the Department's February 2010 letter to the State.

In the meantime, the State has been operating under an October 27, 2008 federal court injunction entered in the private *Morales* lawsuit, brought by private plaintiffs who sought a court order that the State submit its voter registration verification program for Section 5 preclearance and an injunction against use of the program pending preclearance. The Department participated in the *Morales* case as *amicus curiae*. The three-judge court's injunction provided for the State's continued use of its verification program with specific conditions, pending Section 5 preclearance of the process. That injunction remains in place today, having been most recently continued by the *Morales* court on June 15, 2010.

The *Morales* court's June 15, 2010, Order reflected the views of the Department that the court's injunction should be continued to allow the modified verification process to continue and to allow more time for the State to seek

preclearance of its entire verification process. The Department had expressed to the *Morales* court its view that the Georgia verification process was intertwined with recent State legislative and regulatory enactments which had not yet been submitted for Section 5 preclearance review; to wit, on May 5, 2009, the Governor signed into law Georgia Senate Bill 86 ("SB 86"), requiring proof of citizenship for voter registration (with an effective date of January 1, 2010), and the State had adopted implementing rules in December 2009. Indeed, the Department had previously advised the State that, due to the related nature of SB 86 and its implementing rules and the State's voter registration verification process, the Department could not make a Section 5 determination on the process until the State had submitted SB 86 and the implementing rules for review under Section 5 and the submissions could be reviewed simultaneously (See Exhibit 4 to Georgia's Complaint). Thus far, SB 86 and its implementing rules have not been submitted for review under Section 5 to the Department or to this Court.

The Department continues to believe that review of the entire verification process (including all of the procedures, statute and regulations) and discussions with the State concerning the entire process may give rise to an agreement which would obviate the need for any further litigation on these matters. If such discussion does not result in an agreement, we believe that this Court should

consider the State's entire verification process at one time and not engage in piecemeal review of that process.

This case need not proceed on an overly fast track. Continuing operation under the *Morales* order will allow the State to verify eligibility of voter registration applicants, including citizenship. Moving forward in this litigation at a reasonable and orderly pace will allow the parties to seriously explore settlement, will allow the entire revised voter registration verification process to be reviewed in a careful manner and will best serve the interests of justice.

## III. PROPOSED SCHEDULE FOR CASE

### A. State's Proposed Schedule

The State proposes the following timeline for this case:

The Department's Answer or other responsive pleading will be filed on or before August 16, 2010. Both parties will file Initial Disclosures pursuant to Fed. R. Civ. P. 26(a)(1) by September 1, 2010. The deadline for amending the pleadings shall be September 1, 2010.

Fact discovery on Plaintiff's Complaint shall commence on September 1, 2010 and shall be completed by November 16, 2010.

By November 16, 2010, the parties shall identify any expert who will testify and shall produce a copy of such expert's respective vitae, any contractual agreement regarding the nature and scope of expert services and a copy of the

expert's report. By December 15, 2010, the parties shall identify any rebuttal experts who will testify and shall produce a copy of such rebuttal expert's respective vitae, any contractual agreement regarding the nature and scope of expert services and a copy of the rebuttal expert's report. Expert discovery shall close on January 7, 2011.

The parties shall then file cross-motions for summary judgment addressing Count I of Plaintiff's Complaint, due on January 21, 2011, with respective responses due on February 10, 2011 and replies due February 24, 2011.

If necessary, after the Court's decision on the cross-motions for summary judgment on Count I of Plaintiff's Complaint, the Court will set a briefing schedule for cross-motions for summary judgment on Count II of Plaintiff's Complaint.

If a trial is necessary, the pretrial conference shall be held at time designated by the court. Counsel who will try the case must attend. The Court will set a trial date at the pretrial conference. A pretrial statement shall be filed and served by each party at least 11 days before the conference in the manner prescribed in Local Rule 16.5.

**B. Department's Position**

The Department does not object to the general outline of the schedule proposed by the State, though the Department does not believe that the schedule need be expedited to the same extent as does the State.

The Department continues to believe that there remains a significant possibility that a resolution of all of the issues related to the State's voter verification program can be achieved if all of the related voting changes (including SB 86 and the state's implementing regulations) are reviewed simultaneously.

## IV. LOCAL RULE 16.3 MATTERS

The parties hereby report to the Court on the 14 matters listed in Local Rule 16.3 as follows:

*1. Whether the case is likely to be disposed of by dispositive motion; and whether, if a dispositive motion has already been filed, the parties should recommend to the court that discovery or other matters should await a decision on the motion.*

The parties agree that this case is likely to be resolved on a motion for summary judgment. The parties agree that the schedule for filing such motions should be as outlined in Section III above.

*2. The date by which any other parties shall be joined or the pleadings amended, and whether some or all the factual and legal issues can be agreed upon or narrowed.*

The parties agree that that the deadline for amending pleadings should be September 1, 2010. The parties agree that they will work to stipulate to as many facts as possible in order to expedite the resolution of this matter.

*3. Whether the case should be assigned to a magistrate judge for all purposes, including trial.*

As required by 42 U.S.C. § 1973c, and pursuant to 28 U.S.C. § 2284, the Chief Judge of the United States Court of Appeals for the District of Columbia Circuit, on July 1, 2010, appointed a three-judge district court to hear and decide this case. Accordingly, the parties agree that this case cannot be assigned to a magistrate judge.

*4. Whether there is a realistic possibility of settling the case.*

The State of Georgia and the Department believe there is a realistic possibility of resolving this case and will attempt to reach that resolution.

*5. Whether the case could benefit from the Court's alternative dispute resolution (ADR) procedures (or some other form of ADR); what related steps should be taken to facilitate such ADR; and whether counsel have discussed ADR and their response to this provision with their clients.*

While the parties do intend to work toward a resolution of this matter as noted above, the parties agree that the Court's ADR procedures will not presently assist in resolving the issues in this case.

*6. Whether the case can be resolved by summary judgment or motion to dismiss; dates for filing dispositive motions and/or cross-motions, oppositions, and replies; and proposed dates for a decision on the motions.*

In the event that the parties cannot resolve this matter, the parties agree that the case may be resolved on a motion for summary judgment. The parties propose that they file cross-motions for summary judgment on the schedule set forth in Section III above. The State believes this case is not the subject of a motion to dismiss because the State has a statutory right to seek a declaratory judgment from

this Court under 42 U.S.C. § 1973c. The Department has not yet determined whether to file a motion to dismiss as to some or all of the claims.

*7. Whether the parties should stipulate to dispense with the initial disclosures required by Rule 26(a)(1), F.R.Civ.P., and if not, what if any changes should be made in the scope, form or timing of those disclosures.*

The parties agree that the Initial Disclosures shall be made no later than September 1, 2010.

*8. The anticipated extent of discovery, how long discovery should take, what limits should be placed on discovery; whether a protective order is appropriate; and a date for the completion of all discovery, including answers to interrogatories, document production, requests for admissions, and depositions.*

In order to expedite this proceeding, the parties agree that a brief period of fact discovery will commence on September 1, 2010 and end on November 16, 2010. If experts are designated, the parties agree that expert discovery should commence on November 17, 2010 and close on January 7, 2011.

*9. Whether the requirement of exchange of expert witness reports and information pursuant to Rule 26(a)(2), Fed. R. Civ. P., should be modified, and whether and when depositions of experts should occur.*

The parties propose that the Court adopt the schedule for the exchange of expert reports and depositions of experts as outlined in Section III above.

*10. In class actions, appropriate procedures for dealing with Rule 23, F.R.Civ.P. proceedings, including the need for discovery and the timing thereof, dates for filing a Rule 23 motion, and opposition and reply, and for oral argument and/or an evidentiary hearing on the motion and a proposed date for decision.*

Not applicable. This case is not a class action.

*11. Whether the trial and/or discovery should be bifurcated or managed in phases, and a specific proposal for such bifurcation.*

The parties agree that this Court should consider and decide the issues raised in Count I of Plaintiff's Complaint first, prior to considering the alternative claim raised in Count II, if necessary.

*12. The date for the pretrial conference (understanding that a trial will take place 30 to 60 days thereafter).*

The parties agree that the pretrial conference (if required) should be scheduled as designated by the court in the event that any issues remain after the Court's decision on the cross-motions for summary judgment as to Count I of the Plaintiff's Complaint.

*13. Whether the Court should set a firm trial date at the first scheduling conference or should provide that a trial date will be set at the pretrial conference from 30 to 60 days after that conference.*

The parties agree that the Court should not set a firm trial date at the initial scheduling conference but should instead provide that a trial date will be set at a pretrial conference following the Court's decision on summary judgment, if required.

*14. Such other matters that the parties believe may be appropriate for inclusion in a scheduling order.*

The parties do not presently believe that any other issues are appropriate for inclusion in a scheduling order.

## V. PROPOSED SCHEDULING ORDER

The parties' proposed scheduling order is attached as Exhibit 1.

Dated: July 7, 2010

Respectfully submitted,

/s/ Anne W. Lewis
Anne W. Lewis
Georgia Bar No. 737490
*Special Attorney General for the State of Georgia*
Frank B. Strickland
Georgia Bar No. 687600
*Deputy Special Attorney General for the State of Georgia*
Bryan P. Tyson
Georgia Bar No. 515411
*Deputy Special Attorney General for the State of Georgia*
STRICKLAND BROCKINGTON LEWIS LLP
Midtown Proscenium Suite 2200
1170 Peachtree Street, NE
Atlanta, Georgia 30309
Telephone: 678.347.2200
Facsimile: 678.347.2210

*Special Attorneys General for the State of Georgia*

Respectfully submitted,

RONALD C. MACHEN, JR.
United States Attorney
District of Columbia

THOMAS E. PEREZ
Assistant Attorney General
Civil Rights Division

/s/ Brian F. Heffernan
T. CHRISTIAN HERREN, JR.
BRIAN F. HEFFERNAN
Attorneys
Voting Section
Civil Rights Division
United States Department of Justice
Room 7254 - NWB
950 Pennsylvania Ave., N.W.
Washington, DC 20530
Phone: (800) 253-3931
Fax: (202) 307-3961

*Counsel for Defendant Eric H. Holder, Jr., Attorney General of the United States*