## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **STATE OF GEORGIA,** | |
| **Plaintiff,** | **CIVIL ACTION** |
| **v.** | **NO. 1:10-CV-01062** |
| **ERIC H. HOLDER, JR., in his official capacity as Attorney General of the United States,** | **THREE JUDGE PANEL (ESH, TBG, HHK)** |
| **Defendant,** | |
| **TYRONE BROOKS, et al.,** | |
| **Defendant-Intervenors.** | |

## FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT

COMES NOW Plaintiff the State of Georgia ("Plaintiff" or "State") in the above-styled case, and files its First Amended Complaint for Declaratory Judgment ("First Amended Complaint") in accordance with this Court's Order regarding amendments to pleadings [Doc. 10].  The First Amended Complaint is identical to the original Complaint [Doc. 1] except that Exhibit 6 of the original Complaint has been replaced by Exhibit 6 to this First Amended Complaint.  Therefore, for its First Amended Complaint, pursuant to 42 U.S.C. § 1973c (hereinafter, the "Act"), Plaintiff  seeks declaratory judgment that (1) the verification process created by the State of Georgia pursuant to the Help America Vote Act of 2002 ("HAVA") and

(2) the proposed procedures of the Secretary of State incidental to the verification process (both collectively, the "Georgia HAVA Verification Process") neither have the purpose nor will have the effect of denying or abridging the right to vote on account of race or color under Section 5 of the Voting Rights Act of 1965, 42 U.S.C. § 1973c (hereinafter, "Section 5").  Alternatively, the State of Georgia seeks a declaration that Section 5, as most recently amended and renewed in the Fannie Lou Hamer, Rosa Parks, and Coretta Scott King Voting Rights Act Reauthorization and Amendments Act of 2006, is unconstitutional and its enforcement should be permanently enjoined.

1.

This action is brought by Plaintiff the State of Georgia ("Georgia" or "the State") pursuant to Section 5 and 28 U.S.C. § 2201.

2.

Georgia is a State within the United States of America authorized to bring this action on behalf of itself and its citizens.

3.

Defendant Eric H. Holder, Jr., Attorney General of the United States, is charged with certain responsibilities pursuant to Section 5, including the defense of a Section 5 declaratory judgment action brought in the United States District Court for the District of Columbia.

4.

Section 5 prohibits a State or political subdivision, subject to Section 4(b) of the Act, 42 U.S.C. § 1973b(b) (hereinafter, "Section 4"), from enforcing "any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force and effect on November 1, 1964" unless it has obtained a declaratory judgment from the United States District Court for the District of Columbia that such change "neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color" or has submitted the proposed change to the Attorney General of the United States and the Attorney General has not objected to it.

5.

Under 42 U.S.C. § 1973b(b), the State of Georgia is a covered jurisdiction subject to the preclearance requirement of Section 5 because in 1965 (1) the Attorney General determined that Georgia "maintained on November 1, 1964, any test or device," and (2) the Director of the Census determined "that less than 50 per centum of the persons of voting age residing therein were registered on November 1, 1964, or that less than 50 per centum of such persons voted in the presidential election of November 1964."

6.

Based on the very same formula originally implemented in 1965 and still found in Section 4, Georgia remains a covered jurisdiction subject to the preclearance requirements of Section 5.

7.

Georgia brings this action pursuant to 42 U.S.C. § 1973c and 28 U.S.C. § 2201, seeking declaratory judgment that the Georgia HAVA Verification Process neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color, thereby allowing the State to enforce federal and state laws relating to voter registration and verification.

8.

The Court has subject matter jurisdiction of this action under Section 5 and 28 U.S.C. § 1331 because an actual controversy exists between the parties regarding the State's ability to enforce certain procedures at issue in this litigation.

9.

Venue and jurisdiction are proper in this Court pursuant to Section 5 and 28 U.S.C. § 2284.

10.

This action is properly determinable by a district court of three judges in accordance with Section 5 and 28 U.S.C. § 2284.

## FACTS

### Verification Requirements under Federal Law

11.

Congress passed The Help America Vote Act of 2002 ("HAVA") to assist with the administration of federal elections, including the establishment of minimum election standards for states, and to establish a number of related funding mechanisms.  P.L. 107-252, 116 Stat. 1666.

12.

Section 303(a)(5) of  HAVA, 42 U.S.C. § 15483(a)(5) ("Section 303(a)(5)") provides for the verification of voter registration information.

Section 303(a)(5)(A)(i) provides, in pertinent part, as follows:

an application for voter registration for an election for Federal office may not be accepted or processed by a State unless the application includes--

(I) in the case of an applicant who has been issued a current and valid driver's license, the applicant's driver's license number; or

(II) in the case of any other applicant  . . ., the last 4 digits of the applicant's social security number.

13.

Section 303(a)(5)(A)(iii) states, "The State shall determine whether the information provided by an individual is sufficient to meet the requirements of this subparagraph, in accordance with State law."

14.

Section 303(a)(5)(B)(i) provides:

> The chief State election official and the official responsible for the State motor vehicle authority of a State shall enter into an agreement to match information in the database of the statewide voter registration system with information in the database of the motor vehicle authority to the extent required to enable each such official to verify the accuracy of the information provided on applications for voter registration.

15.

A federal court has previously determined that Georgia cannot require voter registrants to provide their complete Social Security numbers on their voter registration applications, *Schwier v. Cox*, No. 00-CV-2820-JEC, Consent Decree (N. D. Ga., June 27, 2006) ("*Schwier*").  Therefore, under Section 303 of HAVA, Georgia must conduct the required Section 303(a)(5) verifications in conjunction

with the State's motor vehicle authority, the Department of Driver Services
("DDS").

16.

The verification obligations imposed upon the States by Section 303(a)(5)
are mandatory, not optional, if the state is unable to collect full Social Security
numbers.  42 U.S.C. § 15483(a)(1).

17.

Although Georgia previously collected full Social Security numbers from
each registrant, as a result of the Consent Decree in *Schwier*, the State of Georgia
is no longer exempt from the verification requirement of Section 303(a)(5).

<u>Communications with the Department of Justice</u>

18.

Following the entry of the Consent Decree in *Schwier*, the State began to
develop a process by which it could utilize the DDS database to perform the
verification required under Section 303(a)(5).

19.

Even though the State had previously begun preparing a process to comply
with Section 303(a)(5), on April 23, 2007, the Chief of the Voting Section at the
United States Department of Justice ("DOJ") notified the State that it was not

compliant with the voter registration verification requirements of Section

303(a)(5).

20.

Following receipt of DOJ's April 23, 2007 letter, the State implemented the

Georgia HAVA Verification Process in June 2007.

21.

The Georgia HAVA Verification Process involves a check of the following

identity information: first name, last name, date of birth, driver's license number,

last four digits of Social Security number, and citizenship status.  All of the

foregoing information are fields included both on the voter registration application

and in the DDS database.

22.

More than a year after the State implemented the Georgia HAVA

Verification Process, DOJ sent a letter to the Georgia Secretary of State, dated

October 8, 2008, advising that the State's implementation of the verification

process required under HAVA may be a change requiring preclearance under

Section 5.

23.

The very next day, October 9, 2008, the Mexican-American Legal Defense

and Educational Fund, the ACLU Voting Rights Project and the Lawyers'

Committee for Civil Rights under Law brought suit against the State of Georgia in the United States District Court for the Northern District of Georgia, claiming that the State had failed to obtain Section 5 preclearance for the HAVA verification process it had implemented. *Morales v. Handel*, No. 08-CV-3172 (N. D. Ga., filed Oct. 9, 2008) ("the *Morales* litigation").

24.

The next day, October 10, 2008, the Georgia Secretary of State received another letter from DOJ, requesting information about the status of the Georgia HAVA Verification Process.

25.

On October 14, 2008, five days following the DOJ's first assertion that the Georgia HAVA Verification Process required preclearance, the State of Georgia submitted the Georgia HAVA Verification Process to DOJ for administrative preclearance.

26.

The DOJ acknowledged receipt of the State's submission of the Georgia HAVA Verification Process that same day, October 14, 2008.

27.

The State continued supplementing its submission through December 11, 2008, primarily with additional information specifically related to the temporary

9

HAVA verification process imposed by the District Court in the *Morales* litigation. A copy of the *Morales* Court's initial Order imposing a temporary HAVA verification process is attached as Exhibit 1.

28.

Sixty days after the submission, on December 15, 2008, the Chief of the Voting Section wrote the State, requesting more information related to the Georgia HAVA Verification Process.

29.

On March 24, 2009, the State responded to the request for more information from the DOJ by providing DOJ with additional information and a number of additional documents.  Subsequently, the State provided further supplementary information.

30.

Sixty days after the State provided the additional information, on May 29, 2009, DOJ objected to the Georgia HAVA Verification Process in a letter which failed to explain how the verification process resulted in any more than a *de minimis* discriminatory effect, or how the process burdened the right to vote of minorities because the matching process checked information appearing in two databases.  Similarly, DOJ failed to explain how the Georgia HAVA Verification Process could be amended to avoid a racial impact given that the Georgia HAVA

Verification Process was applied uniformly to all applicants regardless of race or color.  DOJ also did not explain what the State should do to comply with HAVA while the dispute existed regarding the Georgia HAVA Verification Process. Exhibit 2 attached.

31.

After several telephone conversations, the State requested that the DOJ clarify its objection and advise how the State would be able to comply both with HAVA and Section 5 in light of the DOJ's objection.

32.

On June 16, 2009, DOJ responded with another unclear letter, referring to the preliminary process of verification implemented by the District Court in the *Morales* litigation, but providing no additional direction to the State regarding how to comply with its duties under HAVA.  Exhibit 3 attached.

33.

Following the June 16, 2009 letter and as proposed by DOJ, representatives of the Georgia Secretary of State's Office and the Georgia Attorney General's Office met with DOJ to discuss alternative verification procedures in an attempt to reach a resolution that would enable the State to comply with Section 303(a)(5) of HAVA while also complying with Section 5.

34.

On August 11, 2009, the State of Georgia submitted a revised process, that took into account the issues specifically stated by DOJ during those discussions, and requested DOJ reconsider its objection.

35.

Despite the State's request for expedited review, DOJ again took the full sixty days allowed under Section 5 to review the request.  On October 13, 2009, DOJ denied the State's request for reconsideration and, for the first time, advised that DOJ considered the State's August 11, 2009 request for reconsideration to be a new submission.

36.

In its October 13, 2009 letter denying reconsideration, DOJ also asked a number of questions, all of which the State had previously answered in connection with the first submission and/or with the request for reconsideration.

37.

On December 22, 2009, the State responded that it had no information responsive to DOJ's October 13, 2009 request beyond that which the State had already provided in connection with the first submission and the request for reconsideration.

38.

Sixty days after the State provided its response letter, in a letter dated February 22, 2010, DOJ objected to the revised Georgia HAVA Verification Process originally submitted by the State on August 11, 2009.  Exhibit 4 attached.

39.

Due to DOJ's continued refusal to grant Section 5 preclearance to the Georgia HAVA Verification Process, the State is prohibited from complying with Section 303(a)(5) of HAVA.

40.

DOJ has continued to object to the verification processes proposed by the State, despite administratively preclearing an almost identical process for the State of Virginia, which is also covered by Section 5.

41.

The *Morales* Court extended the temporary verification process on June 15, 2010.  Exhibit 5 attached.  However, that process addresses only the verification of United States citizenship and therefore is not a substitute for the entire Georgia HAVA Verification Process.

Expedited Consideration

42.

The State has already begun the 2010 election cycle.  The General Primary

will be held on July 20, 2010, with a runoff date set for August 10, 2010.

43.

The General Election will take place on November 2, 2010, with a runoff

date set for November 30, 2010.

44.

The voter registration deadline for the General Election is October 4, 2010.

45.

The State desires to use the Georgia HAVA Verification Process for all new

registrants prior to the General Election, and for this reason, requests expedited

consideration of the issues in this Complaint.

The Georgia HAVA Verification Process Sought to be Precleared

46.

In order to comply with Section 303(a)(5) of HAVA, the State of Georgia

wishes to implement the Georgia HAVA Verification Process, which is outlined in

detail in Exhibit 6, incorporated by reference herein and summarized below.

47.

All persons applying to register to vote in Georgia must include on their voter registration application (a) their Georgia driver's license number, (b) their Georgia state identification card number, or (c) if they do not have one of these, the last four digits of their Social Security number.  If an applicant does not have any of these, a unique identifying number will be assigned to the applicant.

48.

Pursuant to the Georgia HAVA Verification Process, all new voter registration applicants (hereinafter "Covered Applicants"), with the exception of those who register to vote through DDS, will have the information contained on their voter registration application verified through the Georgia HAVA Verification Process.

49.

The Georgia HAVA Verification Process is applied uniformly to all Covered Applicants regardless of race or color.

50.

Following submission of a voter registration application, a Covered Applicants' information will be entered into the statewide voter registration system (SVRS), and the Covered Applicants' information will be batched the same evening to DDS for verification.

<u>Verification Process for Covered Applicants Who Provide a Georgia Driver's
License Number or Georgia DDS ID Number</u>

51.

For the Covered Applicants who provide a Georgia driver's license number
or Georgia state identification card number, DDS will run a database comparison
with the information from the SVRS based on first name, last name, date of birth,
driver's license number, last four digits of the Social Security number and
citizenship status.

52.

The names of Covered Applicants for whom there was an exact match for
each field will be shown in the SVRS the following day as an active elector.

53.

The names of the Covered Applicants for whom there is no match will be
displayed on an exceptions report.

54.

The exceptions report will be provided to the Covered Applicant's county
board of registrars for verification of the voter's identity in accordance with
O.C.G.A. § 21-2-226, which has already been precleared.

16

<u>Verification Process for Applicants Who Provide Only Last Four Digits of Social
Security Number</u>

55.

All Covered Applicants who do not provide a Georgia driver's license
number or Georgia state identification card number will have their information
verified against the SSA database.

56.

SSA will check the first name, last name, date of birth, and last four digits of
the Social Security number on the Covered Applicant's voter registration
application against information contained within the SSA database.

57.

If the Covered Applicant's voter registration information matches the SSA
records, the Covered Applicant will be listed in the SVRS as an active elector.

58.

The names of the Covered Applicants for whom there is no match will be
displayed on an exceptions report.

59.

The exceptions report will be provided to the Covered Applicant's county
board of registrars for verification of the voter's identity in accordance with
O.C.G.A. § 21-2-226, which has already been precleared.

17

<u>United States Citizenship Verification Process</u>

60.

If the information from the DDS database indicates that the Covered Applicant is not a citizen of the United States and therefore not entitled to vote, the board of registrars will be provided the list of such individuals so the board of registrars can attempt to verify the Covered Applicant's United States citizenship status.

61.

In attempting to verify a Covered Applicant's United States citizenship, the board of registrars will be required to follow the already-precleared procedures outlined in O.C.G.A. § 21-2-228 to resolve any question concerning the eligibility of a voter.

## **COUNT I – DECLARATORY JUDGMENT**

62.

The allegations of Paragraphs 1 through 62 are incorporated as if fully set forth herein.

63.

The Georgia HAVA Verification Process was adopted for the purpose of complying with HAVA and not for any discriminatory purpose.

64.

The Georgia HAVA Verification Process was implemented for the purpose of complying with HAVA and not for any discriminatory purpose.

65.

The Georgia HAVA Verification Process, when compared to Georgia's existing or "benchmark" verification process, does not lead to a "retrogression" in the position of racial minorities in that it does not have the effect of denying or abridging the right to vote on account of race or color.

66.

The Georgia HAVA Verification Process accordingly neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color.

67.

The Georgia HAVA Verification Process does not and will not prohibit any citizen of the United States from electing his or her preferred candidate of choice.

68.

The Georgia HAVA Verification Process applies uniformly to all Covered Applicants regardless of race or color.

69.

The Georgia HAVA Verification Process does not result in any

discriminatory effect that is statistically significant (*i.e.*, more than *de minimis*).

70.

The State of Georgia is entitled to a judgment that the Georgia HAVA

Verification Process neither has the purpose nor will have the effect of denying or

abridging the right to vote on account of race or color under Section 5 of the

Voting Rights Act of 1965, as amended, and that such process, policies, and forms

may be implemented without further delay.

## COUNT II – DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

71.

The allegations of Paragraphs 1 through 71 are incorporated as if fully set

forth herein.

72.

If this Court declines to enter a declaratory judgment that the Georgia

HAVA Verification Process neither has the purpose nor will have the effect of

denying or abridging the right to vote on account of race or color under Section 5,

then, alternatively, the State of Georgia seeks declaratory judgment that the

continued application of Section 5 to the State is an unconstitutional imposition on

the sovereignty of the State of Georgia, is beyond Congress's authority, and

therefore is a violation of the Tenth, Fourteenth, and Fifteenth Amendments to the United States Constitution.

73.

When first adopted in 1965, Section 5 was a temporary measure necessary to address pervasive racial discrimination in the election process which existed in some areas of the country, including Georgia.

74.

When Congress originally enacted the preclearance requirements of Section 5, and even as late as the reauthorization of those provisions in 1982, the conditions justifying the imposition of the preclearance requirements upon Georgia either existed or existed in very recent memory.

75.

However, when reauthorizing Section 5 , Congress continued to base preclearance coverage on a formula based on the 1964, 1968, and 1972 Presidential elections, leaving the State of Georgia in the status of a covered jurisdiction, while not covering other States or portions of States that would have been covered under any modern measure that Congress might reasonably have imposed.

76.

The State of Georgia and its voters are being punished for discriminatory conditions that existed more than forty-five years ago but have long since been remedied, while jurisdictions where similar discriminatory conditions currently *do* exist are not subject to any federal oversight under Section 5 simply because the current discriminatory conditions did not exist or were overlooked when Section 5 coverage was determined more than forty-five years ago.

77.

Congress' 2007 reauthorization of Section 5 was a disproportionate, irrational, and incongruous remedy for the perceived harm, which was measured by a more than forty-five year old formula, which, if updated to today, would not cover the State of Georgia.

78.

Unlike other provisions of the Voting Rights Act, Section 5 is no longer a "congruent and proportional" remedial exercise of Congress's enforcement power.

79.

Unlike Section 5, Section 2 of the Voting Rights Act is not temporary, applies to all States uniformly, and can be used to address many of the same discriminatory voting practices Section 5 was designed to prevent.

80.

Therefore, as applied to the State of Georgia, the preclearance requirements of Section 5 violate the Tenth, Fourteenth, and Fifteenth Amendments to the United States Constitution.

81.

Georgia voters and the State itself are harmed by the overreach of Section 5 because the State cannot make *any* adjustments to *any* elections practice or procedure without the prior approval of the federal government, despite the fact that there is no current cause for such oversight.

82.

Continued imposition of the preclearance requirement on Georgia hinders the right of Georgia voters to decide the manner in which their representation at the local level will be determined—that is, to alter the manner and procedures by which their representatives in the State are elected—because the preclearance procedures are costly and burdensome.

83.

Furthermore, minority voters in the State of Georgia are harmed, not aided, by Section 5 coverage, because they are effectively denied the ability to control, through their elected representatives, the method by which that representation is to be maintained and the procedures by which elections will take place.

84.

In this case, a further harm to the State and its voters is demonstrated by the fact that in order to comply with one federal statute related to the operation of elections (Section 5 of the VRA), the State of Georgia is required to obtain approval by a federal executive agency or a federal court prior to implementation of a *different* mandatory federal statute (Section 303(a)(5) of HAVA).  Unless and until the Georgia HAVA Verification Process is precleared, the State of Georgia will be out of compliance with the Help America Vote Act.

85.

Upon information and belief, Georgia is the only State in the Nation that is currently unable to comply with the verification requirements of HAVA.  Because of its inability to comply with HAVA, Georgia could be subject to a HAVA enforcement action brought pursuant to 42 U.S.C. § 15511.

86.

Georgia is unable to change the requirements of HAVA that applicants be verified and that the verification take place against the State's motor vehicle database, yet application of Section 5 is prohibiting Georgia from complying with the requirements of federal law.

87.

Bailout under 42 U.S.C. § 1973c is not an option for the State of Georgia because, within the last ten years, the DOJ lodged objections against the State's original submission and request for reconsideration of the Georgia HAVA Verification Process and against voting changes of four subjurisdictions within the State of Georgia.

88.

The State of Georgia has almost 900 subjurisdictions.

89.

The State of Georgia has no operational control over any of its subjurisidictions, either generally or specifically with respect to the election practices and procedures in those subjurisdictions.

90.

As applied to the State of Georgia, Section 5 lacks any continuing justification and is nothing more than a scarlet letter that Congress, without any cognizable justification, has chosen to continue to place on the State to punish it for conditions that existed more than forty-five years ago but do not exist today.

91.

Congress cannot forever rely on findings of conditions that existed forty-five years ago to continue to justify the use of its Fifteenth Amendment enforcement

power in a way that infringes on the rights of an entire generation of voters who were not even alive when those discriminatory practices were ended.

WHEREFORE, the State of Georgia respectfully prays that this Court:

(A)  Convene a three-judge District Court to hear the matters raised by the State of Georgia's Complaint;

(B)  Issue such orders and convene such conferences as may be necessary on an expedited basis to ensure that discovery in this action be taken and completed as quickly as possible, and to ensure that a trial on the merits be had at the earliest possible date so that the State of Georgia and its elections officials can proceed in an orderly fashion in the conduct of elections and in verifying the information contained in new voter registration applications;

(C)  Enter such other and further orders as may be necessary during the pendency of this case to ensure that it be handled as expeditiously as possible;

(D)  Enter a declaratory judgment that the Georgia HAVA Verification Process neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color, and that each of the statutes, regulations, policies, and forms at issue may be enforced by the State of Georgia without any impediment on account of Section 5 of the Voting Rights Act of 1965, as amended;

(E)  In the event the Court finds the Georgia HAVA Verification Process does not meet the requirements for preclearance under Section 5, enter a

declaratory judgment that Section 5 is an unconstitutional extension of Congress's enforcement power to remedy past violations of the Fifteenth Amendment and enjoin further enforcement of Section 5; and

(F)    Grant the State of Georgia such other, further, and different relief as this Court may deem just and proper.

Respectfully submitted this 16th day of August, 2010.

/s/ Anne W. Lewis
Anne W. Lewis
Georgia Bar No. 737490
*Special Attorney General for the State of Georgia*
Frank B. Strickland
Georgia Bar No. 687600
*Deputy Special Attorney General for the State of Georgia*
Bryan P. Tyson
Georgia Bar No. 515411
*Deputy Special Attorney General for the State of Georgia*
STRICKLAND BROCKINGTON
     LEWIS LLP
Midtown Proscenium Suite 2200
1170 Peachtree Street, NE
Atlanta, Georgia  30309
Telephone: 678.347.2200
Facsimile:  678.347.2210

*Special Attorneys General for the State of Georgia*

27

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **STATE OF GEORGIA,** | |
| **Plaintiff,** | **CIVIL ACTION** |
| **v.** | **NO. 1:10-CV-01062** |
| **ERIC H. HOLDER, JR., in his official capacity as Attorney General of the United States,** | **THREE JUDGE PANEL (ESH, TBG, HHK)** |
| **Defendant,** | |
| **TYRONE BROOKS, et al.,** | |
| **Defendant-Intervenors.** | |

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have this day served the within and foregoing

**FIRST AMENDED COMPLAINT** with the Clerk of Court using the CM/ECF

system, which will send notification of such filing to all parties to this matter via

electronic notification.

This 16th day of August, 2010.

/s/ Anne W. Lewis
Anne W. Lewis
Georgia Bar No. 737490

28