IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JOSE MORALES, on behalf of
himself and those similarly situated,

    Plaintiff,

      v.

KAREN HANDEL, in her official
capacity as Georgia Secretary of
State,

    Defendant.

CIVIL CASE NO.
1:08-CV-3172

Three-judge court
(SFB, JTC, WSD)

## ORDER

## I. INTRODUCTION

"No right is more precious in a free country than that of having a voice

in the election of those who make the laws under which, as good citizens, we

must live. Other rights, even the most basic, are illusory if the right to vote is

undermined." Wesberry v. Sanders, 376 U.S. 1, 17, 84 S. Ct. 526, 535 (1964).

Accordingly, "[e]very voter . . . , whether he votes for a candidate with

little chance of winning or for one with little chance of losing, has a right

under the Constitution to have his vote fairly counted, without its being

distorted by fraudulently cast votes." Anderson v. United States, 417 U.S.

211, 227, 94 S. Ct. 2253, 2263–64 (1974). "The right to vote freely for the

candidate of one's choice is of the essence of a democratic society, and any

restrictions on that right strike at the heart of representative government.

EXHIBIT

1

ALL-STATE LEGAL®

And the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." Reynolds v. Sims, 377 U.S. 533, 555, 84 S. Ct. 1362, 1378 (1964).

"Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy. Voter fraud drives honest citizens out of the democratic process and breeds distrust of our government. Voters who fear their legitimate votes will be outweighed by fraudulent ones will feel disenfranchised." Purcell v. Gonzalez, 549 U.S. 1, 3, 127 S. Ct. 5, 7 (2006).

"[T]he electoral system cannot inspire public confidence if no safeguards exist to deter or detect fraud or to confirm the identity of voters." Crawford v. Marion County Election Bd., 553 U.S. — ,128 S. Ct. 1610, 1620 (2008) (quotation marks and citation omitted) (noting that "public confidence in the integrity of the electoral process has independent significance, because it encourages citizen participation in the democratic process").

## II. BACKGROUND

Plaintiff Jose Morales (alternatively "Plaintiff" or "Morales") resides in Cherokee County, Georgia and became a naturalized United States citizen in November 2007. He is a registered student at Kennesaw State University. Morales obtained his Georgia driver's license in 2006, prior to becoming a

Case 1:08-cv-03172-JTC-WSD-SFB     Document 36     Filed 10/27/2008     Page 3 of 27

U.S. citizen. In September 2008, he completed a voter registration application on campus.

Thereafter, Morales received a letter dated 19 September 2008 from the Cherokee County Elections and Registration ("County Registrar") office. Citing procedures set out in the Georgia Election Code, the letter informed Morales that he was required to provide verification of his citizenship. On 26 September 2008, the County Registrar's office sent Morales a second letter stating that he might not be qualified to vote because his citizenship status was unclear. Morales was advised in the letter that a hearing had been scheduled for 15 October 2008 to determine his qualifications. At some time on 26 September 2008, Morales appeared at the County Registrar's office where he presented his passport as evidence of his United States citizenship. The passport was accepted as verification and the next day, 27 September 2008, the voter registration records were changed to indicate Morales was eligible and registered to vote. A short time later, Morales received his voter registration card. On 10 October 2008, a letter was sent to Morales advising him that his 15 October 2008 hearing had been cancelled and informing him "YOU WILL BE ALLOWED TO VOTE."

On 9 October 2008, after Morales had received his voter registration card but the day before the 10 October 2008 letter was sent confirming his

3

Case 1:08-cv-03172-JTC-WSD-SFB   Document 36   Filed 10/27/2008   Page 4 of 27

eligibility and registration to vote, Morales filed this lawsuit with the district

court seeking a temporary restraining order ("TRO")[1] and preliminary

injunction against Georgia's Secretary of State, Karen Handel ("the

Secretary").  Morales's claim for the TRO was based upon Section 5 of the

Voting Rights Act of 1965.[2]  Section 5 prohibits certain states with a specified

history of voting discrimination from enacting or administering a change in

existing voting practice or procedure without first receiving "preclearance"

from the United States Department of Justice ("DOJ") or the United States

---

[1] Morales requested a temporary restraining order specifically directing
the Georgia Secretary of State to: (1) cease using any citizenship data derived
from the Department of Driver Services' database; (2) direct all county boards
of elections to cease using any lists derived from that citizenship data as the
basis for voter challenges, correspondences, hearings, or removals; (3) direct
all county boards to immediately send letters rescinding previous
correspondences based on the database matching lists; (4) report any county
that refuses to comply; and (5) rescind the Secretary's prior 24 September
2008 memorandum on absentee voter procedures. (Compl. ¶¶ A-C.)

[2] Morales also based his claim on alleged violations of the National
Voter Registration Act ("NVRA"), 42 U.S.C. § 1973gg et seq.. As a three-judge
court convened pursuant to Section 5, we are only required to address claims
under that section, though we could hear related claims as well. See Allee v.
Medrano, 416 U.S. 802, 812, 94 S. Ct. 2191, 2198 (1974) (noting that a three-
judge court could hear claims ancillary to those for which a three-judge court
was statutorily required, even if those ancillary claims would not otherwise
be heard by such a court). Although the court received evidence and heard
argument on the NVRA claim at the 22 October hearing, we exercise our
discretion not to address that claim, which will instead be decided by a single-
judge court. See White v. Alabama, 851 F. Supp. 427, 429 (finding it proper
for a three-judge court to sever non-Section 5 claims for resolution by a single-
judge court).

District Court for the District of Columbia. See 42 U.S.C. § 1973c, as amended by Pub. L. 109-246, 120 Stat. 577 (2006). The State of Georgia is subject to the requirements of Section 5. See id.; 28 C.F.R. app. § 51. Preclearance is necessary to ensure that a voting change "neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color." 42 U.S.C. § 1973c.

In this case, the "change" in voting practice or procedure alluded to concerns Georgia's attempt to comply with the provisions of the Help America Vote Act ("HAVA")[3], passed by Congress in 2002, which requires the Secretary to maintain a statewide database of registered voters.[4] One of the two principal purposes of HAVA is to prevent voter fraud, and the Act requires that the Secretary create a system to verify the information on voter registration applications by matching the registration information against the State's Department of Driver Services ("DDS") database and the Social Security Administration ("SSA") database. See 42 U.S.C. § 15483; Florida

---

[3] HAVA recognizes the fundamental requirement of United States citizenship to vote in federal elections by specifically providing, in the new mail-in ballot procedures, for the requirement that mail-in ballots include the question: "Are you a citizen of the United States of America?" 42 U.S.C. § 15483(b)(4)(A)(i).

[4] The Georgia Election Code provides that the Secretary of State is responsible for coordinating the obligations of the State under HAVA. O.C.G.A. § 21-2-50.

State Conf. of the NAACP v. Browning, 522 F.3d 1153, 1168 (11th Cir. 2008).
When Morales's voter registration information was matched with the
information in the DDS and SSA databases, the match results indicated that
Morales might not be a citizen.  Because he was "flagged" in the database, the
County Registrar sent him the 19 September 2008 letter requiring him to
verify his citizenship.[5]

On 16 October 2008 the Chief Judge of this court entered an order
denying Plaintiff's requested TRO.  He found that no specific irreparable
harm would occur before the three-judge court convened to warrant entry of
the requested TRO.  In considering the harm to the Secretary should such a
TRO be granted, the court concluded that it was necessary to allow for further
development of the factual record.  The court also concluded that granting the
requested TRO would effectively prevent the Secretary and those acting in
concert with her, specifically the 159 county registrars and their companion
election boards, from removing fraudulent or disqualified voters from the
voting lists.  Such inability was found to significantly injure and diminish the
public's respect for, and confidence in, the electoral process.  Also, the court,

---

[5] It appears that Morales was flagged in the database because he did
not become a citizen until after he obtained his driver's license.  Morales
became a naturalized citizen on 7 November 2007.  In Georgia, an applicant
for a driver's license indicates whether he is or is not a U.S. citizen.

Case 1:08-cv-03172-JTC-WSD-SFB   Document 36   Filed 10/27/2008   Page 7 of 27

in weighing the interests of the parties, concluded that the Secretary's ability to maintain reliable voter lists was paramount to the temporary and minor inconvenience to those individuals whose eligibility had been questioned on the grounds of citizenship. Finally, the court opined that the temporary relief sought by Plaintiff would likely lead to significant voter confusion.

This case involves a complex area of the law that is freighted with significance given its timing and nature. As such, a clear understanding of the competing interests before us is in order. First, we sketch the contours of the current voting process in Georgia.

A. <u>Registration</u>

Under both the Georgia Constitution and provisions within the Georgia election code, a person must be a citizen of the United States to register and vote in Georgia. Ga. Const. art. II, § I, ¶ II; O.C.G.A. §§ 21-2-216(a)(2), 21-2-220(b). To register to vote in Georgia, a person must be at least eighteen years old and a resident of the county in which he or she seeks to vote. O.C.G.A. § 21-2-216. A "resident" of Georgia is defined under the state's motor vehicle code as either a United States citizen or an alien with legal authorization from the U.S. government for his or her residency. <u>Id.</u> § 40-5-1(15). Only Georgia residents may obtain either a driver's license or an identification card from the DDS. <u>Id.</u> §§ 40-5-20(a), 40-5-100(a).

Case 1:08-cv-0317 2-J I C-WSD-SFB   Document 36   Filed 10/27/2008   Page 8 of 27

A person can apply to register as an elector[6] in person through the DDS, the Department of Natural Resources, other designated offices or by mail-in voter registration application. Id. § 21-2-220. It is important to note that Georgia has no statutory framework within which same-day registration and voting can take place. A person who applies to register to vote for the first time in Georgia is not "registered" to vote at the time he or she submits a voter registration application to one of the 159 county registrars. The person is only "registered" once eligibility has been established. Georgia law provides that a county board of registrars has the right and duty to examine the qualifications to be an elector in the county. Id. § 21-2-228. The Georgia Election Code further provides that a board of registrars may hold a hearing, upon three days written notice, to examine the qualification or disqualification of applicants or electors and may require the production of documents and subpoena witnesses. Id. If a board of registrars determines that a person is not qualified to register or remain registered to vote, the individual is provided written notice of that decision and may appeal that decision to the Superior Court. Id. § 21-2-228(e, f).

---

[6] The term "elector" under Georgia law means a person registered to vote. Id. § 21-2-216(a).

B. Voting

In Georgia, votes are cast using either a direct reporting electronic machine ("DRE machine") or a paper ballot. Votes that are cast via the DRE machine are final, cannot be retrieved, and the vote of a particular elector cannot be identified after the DRE vote is cast. There are three kinds of paper ballots — "absentee ballots," "provisional ballots," and "challenged ballots." An absentee ballot is mailed to a registered elector upon request. The elector then votes the ballot, places it in an envelope, signs an oath printed on the envelope, places that envelope inside another envelope and mails the whole package back to the registrar any time before the day of the election. Id. § 21-2-385(a).

Provisional ballots look exactly like absentee ballots but are used for different purposes. Id. § 21-2-419(a). Provisional ballots are provided to individuals who present themselves at a polling place on election day and claim to be registered electors, but whose names do not appear on the official list of registered electors. Id. § 21-2-418(a). The provisional ballots, once voted, are placed in colored envelopes to differentiate them from other types of paper ballots and then placed in a separate, secure ballot box. Id. § 21-2-419(a). A registrar has forty-eight hours after the election to determine whether those casting the provisional ballots had, in fact, registered to vote.

Id. § 21-2-419(c).  There is no right to appeal the refusal to count provisional ballots.

Challenged ballots mirror absentee and provisional ballots in appearance.  However, challenged ballots are provided only to those individuals whose status as a registered elector is challenged by either the registrar or another citizen.  Id. § 21-2-230.  If practicable, registrars are directed to clear up any challenges prior to election day.  If an eligibility issue cannot be resolved in that time, the challenged individuals are permitted to cast a "challenged" ballot.  The Georgia election code requires registrars to resolve all challenged ballots prior to the certification of the election results. Id.  Written notice is then provided to the challenged elector indicating whether the challenge was successful.  If the challenge is successful, the elector may then appeal that decision to a Superior Court.  Id.  An appeal does not delay the certification process.  Id. §§ 21-2-229(e), 21-2-230.

III.  LEGAL STANDARDS

    A. Jurisdiction

    At the hearing on 22 October 2008, the members of the court inquired of all parties as to whether, in light of Morales having secured a voting card and the assurances of his registrar (and the Secretary of State) that he would be allowed to vote, there remained Article III standing.  Essentially, the court

Case 1:08-cv-03172-JTC-WSD-SFB   Document 36   Filed 10/27/2008   Page 11 of 27

wondered aloud if the case were moot, given that the sole plaintiff in the
controversy had achieved complete relief. While the complaint seeks relief for
those "similarly situated" to Morales, there are no class allegations in this
complaint and recognition of a class has not been pressed or adjudicated. A
review of the pertinent precedents reveals that our jurisdiction here is a
thorny issue not easily resolved.

Morales, based upon the voluntary action by his registrar, reinforced by
in-court assurances from the Secretary that he will be able to cast his vote,
appears to have achieved the relief he sought for himself when he filed this
action. Clearly, at the time of the filing of this action the court had Article III
jurisdiction — that point is not at issue. It is the subsequent, voluntary
actions by the Secretary and other election officials in response to Morales'
efforts to establish his eligibility that have occasioned a suggestion of
mootness. However, it should be stressed that Morales challenged, and held
an individual right to do so, the lack of preclearance as to the changes in the
electoral process caused by Georgia's compliance with HAVA.

We conclude that this case, under the unique facts before us, satisfies
an exception to the mootness doctrine in that the injury complained of viz
Section 5 constitutes a "wrong capable of repetition, yet evading review."
Southern Pac. Terminal Co. v. ICC, 219 U.S. 498, 515, 31 S. Ct. 279, 283

Case 1:08-cv-03172-JTC-WSD-SFB   Document 36   Filed 10/27/2008   Page 12 of 27

(1911). As long as Georgia's system for compiling the databases "remains and controls future elections[,]" <u>Moore v. Ogilvie</u>, 394 U.S. 814, 816, 89 S. Ct. 1493, 1494 (1969), we think the exception as outlined by the Supreme Court in a range of cases starting with <u>Southern Pacific</u> and running through <u>Morse v. Republican Party of Virginia</u>, 517 U.S. 186, 116 S. Ct. 1186 (1996), applies.[7]

First, the injury at bar appears to be of a type likely to befall the plaintiff again.  If Morales undertakes one of the actions that would cause his eligibility to be questioned by reference to the databases at issue, there is a "reasonable expectation that . . .[he] would be subjected to the same action again." <u>Weinstein v. Bradford</u>, 423 U.S. 147, 149, 96 S. Ct. 347, 348-49 (1975).  Second, the injury here is of inherently limited duration and is likely to always become moot before federal court litigation is completed. <u>Ogilvie</u>, 394 U.S. at 816.

Our circuit also has addressed this well-established exception to the mootness doctrine.  We have held that "[t]his exception allows a court to reach the merits of a case which is otherwise moot if (1) there is a reasonable expectation or a demonstrated probability that the same controversy will

---

[7] In <u>Morse</u>, the Court observed: "Like other cases *challenging electoral practices,* therefore, this controversy is not moot because it is capable of repetition, yet evading review." <u>Morse v. Republican Party of Va.</u>, 517 U.S. at 235 n.48, 116 S. Ct. at 1213 (quotation marks omitted) (emphasis added).

Case 1:08-cv-03172-JTC-WSD-SFB   Document 36   Filed 10/27/2008   Page 13 of 27

recur involving the same complaining party, and (2) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration." <u>Brooks v. Georgia State Bd. of Elections</u>, 59 F.3d 1114, 1120 (11th Cir. 1995).

Here, given the strong public interest in maintaining confidence in the electoral process, the voluntary nature of the actions undertaken to provide temporal relief to Morales in response to the citizenship evidence he submitted, the ability of the Secretary or other election officials (i.e., the 159 county voter registrars in Georgia) to resume the process and procedures challenged, and the press of time involved in the election cycle, the court is persuaded that the exception to the mootness doctrine exists.  The Secretary also concedes Morales and a few thousand other voter applicants were subject to the citizenship verification procedures he now challenges even though Morales himself was cleared to vote.  Accordingly, we have proceeded to rule on this case within the parameters discussed below.

B. <u>Voting Rights Act</u>

Congress passed the Voting Rights Act in 1965 to end the practice of racial discrimination in voting in various Southern states, including Georgia. <u>See</u> <u>South Carolina v. Katzenbach</u>, 383 U.S. 301, 315, 329–30, 86 S. Ct. 803, 812, 819 (1966).  Section 5 of the Act assists in achieving this goal by

"suspend[ing] new voting regulations pending scrutiny by federal authorities to determine whether their use would violate the Fifteenth Amendment." Id. at 334, 86 S. Ct. at 822. All changes in the voting process of a covered state would have to be precleared by the Department of Justice in order for that state to implement it, "so long as those changes reflect policy choices made by state or local officials." Young v. Fordice, 520 U.S. 273, 284, 117 S. Ct. 1228, 1235–36 (1997); see also Allen v. State Bd. of Elections, 393 U.S. 544, 566, 89 S. Ct. 817, 832 (1969) (noting that "Congress intended to reach any state enactment which altered the election law of a covered State in even a minor way").

The Supreme Court has separated cases involving preclearance issues into two categories — "substantive discrimination" questions and "coverage" questions. Id. at 559, 89 S. Ct. at 828. "Substantive discrimination" cases involve the issue of whether a change has the "purpose or effect" of infringing on the right to vote based on race or color. Perkins v. Matthews, 400 U.S. 379, 384–85, 91 S. Ct. 431, 435 (1971). Only the Attorney General and the United States District Court for the District of Columbia have the authority to make preclearance decisions in such cases. See id. Accordingly, states making substantive changes to their voting procedures must either seek a declaratory judgment from the District Court for the District of Columbia or

14

submit materials describing the change to the Attorney General.  See 42 U.S.C. § 1973c; Morris v. Gressette, 432 U.S. 491, 502, 97 S. Ct. 2411, 2419 (1977).  The state would be permitted to implement the changes under the latter alternative if "it has (i) filed a complete submission with the Attorney General, and (ii) received no objection from that office within 60 days."[8] Morris, 432 U.S. at 502, 97 S. Ct. at 2419.

"Coverage" questions, on the other hand, involve the preliminary question of "whether a particular state enactment is subject to the provisions of the Voting Rights Act, and therefore must be submitted for approval before enforcement."  Allen, 393 U.S. at 558–59, 89 S. Ct. at 828.  A private party, as well as the United States, has standing to "seek a declaratory judgment that a new state enactment is governed by § 5," and, if "the State has failed to submit the covered enactment for § 5 approval, the private party has standing to obtain an injunction against further enforcement, pending the State's submission of the [covered enactment] pursuant to § 5."  Id. at 555, 89 S. Ct. at 826; see also 42 U.S.C. § 1973j(d), (f).  All such actions must be heard by three-judge district courts, in accordance with the provisions of 28 U.S.C.

---

[8] Under this standard, the Attorney General would not have to affirmatively approve the change, rather he only must not have issued an objection to it. See Morris, 432 U.S. at 502, 97 S. Ct. at 2419.

Case 1:08-cv-03172-JTC-WSD-SFB     Document 36     Filed 10/27/2008     Page 16 of 27

§ 2284, the decisions of which would be immediately appealable to the

Supreme Court. See 42 U.S.C. § 1973c(a).

The present dispute involves a coverage action brought against a state

subject to the preclearance requirements of Section 5. In addressing whether

a Section 5 violation has occurred, we engage in a three-step analysis. See

Lopez v. Monterey County, Cal., 519 U.S. 9, 23, 117 S. Ct. 340, 349 (1996).

First, we must determine whether the state's enactment constitutes a change

covered under Section 5. See id. Second, if the action does constitute a

change, we then look at whether the state has satisfied the requirements for

Section 5 approval. See id. Finally, if the approval requirements have not

been met, we then must determine "what temporary remedy, if any, is

appropriate" until such time as preclearance is obtained or the proposed

change abandoned. Id.

In order to evaluate whether a practice constitutes a "change" under

Section 5, we must compare it to the "baseline" for that coverage jurisdiction.

See Riley v. Kennedy, 553 U.S. —, 128 S. Ct. 1970, 1982 (2008). The

"baseline" would be "the most recent practice that was both precleared and in

force or effect." Id. (quotation marks and citation omitted). After

determining this baseline, we then must look at "whether a State has

enact[ed] or is seek[ing] to administer a practice or procedure that is different

16

Case 1:08-cv-03172-JTC-WSD-SFB   Document 36   Filed 10/27/2008   Page 17 of 27

enough from the baseline to qualify as a change." See id. (quotation marks and citation omitted).

   C. Help America Vote Act of 2002

   As previously noted, Congress passed the Help America Vote Act of 2002, 42 U.S.C. § 15301 et seq., as part of an effort to reform federal election administration. See Browning, 522 F.3d at 1155. Under HAVA, states are required to establish and maintain a centralized computerized voter registration list that contains the name and registration information for every legally registered voter in that state. See 42 U.S.C. § 15483(a). Each registered voter in the list must be assigned a unique identification number. See id. § 15483(a)(1)(A)(iii).

   HAVA also imposes a series of voter verification requirements on states, thereby limiting their ability to accept and process applications for voter registration. When an individual fills out such an application, she is required to provide either her driver's license number or the last four digits of her Social Security number. See id. § 15483(a)(5)(A)(i). If she does not have one, the state must assign her a unique identifying number, which should be the same as the one used for her entry in the computerized list. See id. § 15483(a)(5)(A)(ii). For all new applicants, HAVA gives states the discretion to decide on the appropriate standards for evaluating, in accordance with

17

Case 1:08-cv-03172-JTC-WSD-SFB   Document 36   Filed 10/27/2008   Page 18 of 27

state law, whether an applicant provided sufficient and valid information to
meet the statute's requirements. See id. § 15483(a)(5)(A)(iii). As part of the
voter verification process, HAVA requires the chief state election official, here
the Secretary, to enter into an agreement with the official in charge of the
state motor vehicle authority. See id. § 15483(a)(5)(B)(i). Under the terms of
such an agreement, information from the statewide voter registration system
would be matched with that contained in the motor vehicle authority's
database, though only to the extent needed to permit the assessment of the
accuracy of the information contained on the registration applications. See
id. The motor vehicle authority must enter into a similar agreement with the
Commissioner of Social Security, which would cover those situations in which
no driver's license number was provided. See id. §§ 405(r)(8),
15483(a)(5)(B)(ii).

   Georgia only began to comply with the voter verification provisions of
HAVA in March of 2007, when the Secretary entered into an information-
sharing agreement with the DDS.[9] Under this agreement, DDS verifies the

_____

   [9] Until 2006, Georgia believed itself to be exempted from these
requirements based on 42 U.S.C. § 15483(a)(5)(D), which exempts states
which are permitted to request applicants to provide their full nine-digit
Social Security numbers. A 2006 court order forbade the use of complete
Social Security numbers, in response to which Georgia agreed to follow the
HAVA scheme pursuant to a consent decree. See Schwier v. Cox, 439 F.3d
1285 (11th Cir. 2006).

Case 1:08-cv-03172-JTC-WSD-SFB   Document 36   Filed 10/27/2008   Page 19 of 27

following fields from registration applications: driver's license number, last
name, first name, date of birth, last four digits of Social Security number, and
citizenship status. DDS has also entered into an agreement with the SSA,
pursuant to which the SSA will verify the accuracy of the following fields
from the applications: forename/surname, date of birth, last four digits of
Social Security number, and whether the individual is deceased.

As part of its compliance with HAVA's requirements, Georgia has
created a voter registration database, which contains the information from all
applicants. All newly inputted information is transmitted to the DDS every
week night in order for DDS to conduct the HAVA verification process. DDS
sends this information on to the SSA. The next business day, the results of
DDS and SSA verification are available to county registrars, who can access
the information either by looking up an individual applicant in the database
or by requesting a county-wide compilation report. If the data verification
process could not verify that the applicant was a United States citizen, then
the registrar would be made aware of the discrepancy. This would occur
either by "NON-CITIZEN" or "N" being displayed in flashing red letters on
the screen when that applicant's registration entry is displayed or by a

Case 1:08-cv-03172-JTC-WSD-SFB   Document 36   Filed 10/27/2008   Page 20 of 27

notation on the compilation report.[10]  If a registrar receives this information, the Secretary has suggested, but cannot require, that the registrar treat the application in the manner prescribed under Sections 21-2-226 and 21-2-228 of the Georgia Election Code for challenging the vote.  In the absence of clear guidance from the Secretary, registrars for the 159 counties in Georgia could conceivably adopt a range of disparate methodologies for resolving these discrepancies.[11]  At the time of the 22 October hearing, these voter verification processes had identified 50,378 applications with potential data mismatches in any of the listed categories, 4538 of which involved questions of citizenship.[12]

---

[10] Based on the record and responses at the 22 October 2008 hearing, it appears that the registrars would be similarly notified if any of the other fields could not be verified.  However, questionable citizenship is the only one that would produce a flashing red light on the computer screen.

[11] Many registrars appear to have dispatched letters to potential ineligible voters, as occurred with Morales.  They could also have adopted other methods, such as calling those applicants, visiting their reported addresses, or performing general research into birth records and so on.

[12] The vast majority of these came from applications involving individuals trying to register for the first time — 3821 of the 4538 citizenship mismatches and 47,190 of the 50,378 total mismatches.  At the time of the hearing, Georgia had processed and submitted for verification more than 550,000 registration applications.

Case 1:08-cv-03172-JTC-WSD-SFB   Document 36   Filed 10/27/2008   Page 21 of 27

## IV. DISCUSSION

The changes Georgia adopted as a result of HAVA must be compared against the Section 5 baseline in order to determine if they constitute a change that should have been precleared. According to the DOJ[13], the appropriate baseline would be the system Georgia had in place at the time HAVA was adopted. At that point in time, the state did not have an automated system for verifying registration applicant information nor any standards for operating that system. Given this baseline, there are at least two features of Georgia's post-HAVA system that constitute changes that require preclearance. One is the comparison of information in the DDS and SSA databases that results in the identification of applicants whose eligibility could not be verified. The other is the disparate methodologies employed by registrars in attempting to evaluate, notify and qualify potential ineligible voters.[14] Though these could both be characterized as exercises of local discretion, permitted under federal and state law, in response to the federal mandate of HAVA, this does not shield them from review under Section 5. See Young, 520 U.S. at 284, 117 S. Ct. at 1235–36 (noting that preclearance is

---

[13] The DOJ requested to participate in this action as *amicus curie* and, by agreement of the parties and the court, was permitted to do so.

[14] The Court implies no ruling on whether the 159 local registrars must seek preclearance under Section 5.

Case 1:08-cv-03172-JTC-WSD-SFB   Document 36   Filed 10/27/2008   Page 22 of 27

required, even when "the changes are made in an effort to comply with federal law"). The two changes which were implemented by the State and its county registrars reflect policy choices requiring preclearance under Section 5.

Accordingly, since Georgia has failed to preclear either of these changes, we find it to have committed a technical violation of Section 5. Though the Secretary has not conceded that she should have sought preclearance for these changes, we note that the State has filed for preclearance of its new procedures in response to an 8 October 2008 letter from the Department of Justice as well as the initiation of this suit. To date, the State appears to be cooperating fully with the Attorney General and DOJ's requests in the preclearance evaluation.

V. REMEDY

This challenged automated voter verification process is a change affecting voting that is covered by the preclearance requirements of Section 5. See Young, 520 U.S. 273, 117 S. Ct. 1228. The Secretary has implemented this automated voter verification process without first obtaining preclearance under Section 5 from the United States District Court for the District of Columbia or the Attorney General of the United States.

Case 1:08-cv-03172-JTC-WSD-SFB   Document 36   Filed 10/27/2008   Page 23 of 27

The Secretary now has submitted to the Attorney General this automated voter verification process for review under Section 5, and that submission remains pending.

Because the Secretary is currently implementing an unprecleared voting change covered by Section 5, and because there is an imminent federal general election occurring on 4 November 2008, temporary injunctive relief is required under Section 5, to remain in effect unless and until preclearance is obtained by the Secretary. Accordingly, the court will grant the Plaintiff's request for a preliminary injunction under Section 5, to the extent set forth below.

The Secretary and all persons acting in concert with the Secretary, including county election officials, are hereby ENJOINED to undertake the following continuing actions that shall remain in effect as a temporary remedy for the lack of preclearance, unless and until preclearance is obtained under Section 5:

(1) Consistent with state and federal law, to reasonably ensure that persons who have been identified ("flagged") as potentially ineligible by the State's unprecleared automated voter verification procedures, and who remain in that status at the time of voting, shall have the opportunity to cast a ballot during early voting, absentee voting and election day voting for the

November election by existing paper ballot procedures established under state law, namely the challenged ballot procedure (O.C.G.A. § 21-2-230). The Secretary has advised this court that these persons have been entered into the state's voter registration database, will be entered onto the state's electronic poll books and will have their flagged status noted, both in the voter registration database that is used during early and absentee voting, and in the electronic poll books used in polling place on election day. Timely notice shall be provided to persons who cast challenged ballots pursuant to the provisions of this paragraph of specifically what steps they must take to provide any needed proof of eligibility, and when these steps must be taken, in order to have their challenged ballots counted under state law. Consistent with state and federal law, these paper challenged ballots shall be set aside and considered under existing state law procedures for evaluating and counting challenged ballots. The Secretary hereby is required to issue before the 4 November 2008 election uniform guidance, in writing, to all county registrars explaining the operation of existing challenged balloting requirements of state law in this regard; and shall certify such notice to this court upon completion;

(2) Consistent with federal law, to reasonably ensure that no voter is permanently deleted from the voter registration list, and no voter registration

application is permanently denied, based upon information flowing from the
unprecleared automated voter verification process, unless the voter admits, in
writing, to election officials his/her present ineligibility.  This is designed and
intended to reasonably ensure that voter information will remain on the voter
registration list to be checked against challenged ballots cast by voters in the
November election;

(3)  Make diligent and immediate efforts to notify, in a uniform manner,
every person whose voter registration presently remains flagged as
potentially ineligible under the unprecleared automated verification
procedures, that they can vote in the November election by challenged paper
ballot and make diligent and immediate efforts to notify every such person
that information contained in the person's registration or Department of
Driver Services records, or both, has raised a question regarding the person's
eligibility to vote, and that they will be given an opportunity by the local
registrar to address their qualifications.  The persons filing challenged ballots
shall be notified promptly, in writing, of what is necessary to resolve the
challenge (e.g., delivering a document demonstrating proof of citizenship to a
county voter registration office in person or by later-verified facsimile, or
bringing such document to those persons responsible for resolving challenged
ballots within a certain specified number of days after election day); and,

(4) Consult with the Department of Justice to determine whether there are any additional actions that can be taken prior to the November election to reasonably ensure that persons who are actually eligible to vote, but whom the State's unprecleared voter verification procedures have flagged as potentially ineligible, are allowed to vote a ballot in the November election.

This temporary injunction addresses the Secretary's and the State of Georgia's compelling interest in complying with Section 5's mandate to ensure that no eligible voter is denied the right to vote for failure to comply with an unprecleared voting practice. It also preserves the integrity of the voting process by ascertaining the eligibility of the challenged voter to cast a vote, thereby preventing the dilution of the votes of eligible voters. Moreover, this temporary remedy addresses the Secretary's compelling interest in complying with HAVA so that no ineligible voter casts a ballot that cannot be later adjudged eligible, since there will be an opportunity for voters to provide additional information as to their eligibility before election day, on election day or after the election, as well as an opportunity for election officials to review this information and make a reasoned and informed determination on challenged ballots after the election. This remedy is designed and intended to reasonably ensure that no eligible voter is denied the right to cast a vote that can be counted later, and that no ineligible voter is allowed to cast a ballot

Case 1:08-cv-03172-JTC-WSD-SFB   Document 36   Filed 10/27/2008   Page 27 of 27

that cannot be discounted later.  Such a remedy is intended to avoid irreparable harm to the interests of both voter access and voter integrity, and to voters and the State.  In discharging their respective obligations under the law and in complying with this order such intent should inform and guide the actions of the Secretary and all those acting in concert with the Secretary, particularly the local registrars and elections boards.  This is "a remedy that in all the circumstances of the case implements the mandate of § 5 in the most equitable and practicable manner and with least offense to its provisions" as well as with the least offense to the requirements of HAVA.  Clark v. Roemer, 500 U.S. 646, 660, 111 S. Ct. 2096, 2105 (1991).

**SO ORDERED**, this _27_ day of October, 2008.

_____
STANLEY F. BIRCH, JR.
UNITED STATES CIRCUIT JUDGE
ELEVENTH CIRCUIT COURT OF APPEALS

_____
JACK T. CAMP, CHIEF
UNITED STATES DISTRICT JUDGE
FOR THE NORTHERN DISTRICT OF GEORGIA

_____
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE
FOR THE NORTHERN DISTRICT OF GEORGIA