

**U.S. Department of Justice**

Civil Rights Division

---

CC:RSB:TCH:BFH:JP:maf
DJ 166-012-3
2008-5243

*Voting Section - NWB*
*950 Pennsylvania Avenue, NW*
*Washington, DC 20530*

June 16, 2009

The Honorable Thurbert E. Baker
Attorney General
40 Capitol Square, S.W.
Atlanta, Georgia 30334-1300

Dear Attorney General Baker:

    On May 29, 2009, the Department of Justice interposed an objection under Section 5 of the Voting Rights Act of 1965, 42 U.S.C. 1973c, to Georgia's proposed voter verification program for voter registration application data. This responds to your request for the Department's views concerning the effect of the objection on the state's voter verification program and the state's obligations under the Help America Vote Act [HAVA], 42 U.S.C. 15301-15545.

    Under Section 5 of the Voting Rights Act, a covered jurisdiction may not implement a change affecting voting unless and until it has obtained preclearance by establishing that the change "neither has the purpose nor will have the effect" of denying or abridging the right to vote on account of race, color or membership in a language minority group. In *Morales* v. *Handel*, No. 1:08-CV-3172 (N.D. Ga., Order dated Oct. 27, 2008), the court found that Georgia violated this requirement by implementing a new "automated voter verification process" absent preclearance. Order at 22.

    The court entered a preliminary injunction requiring Georgia's Secretary of State and all persons acting in concert with her "to undertake [specified] continuing actions that shall remain in effect as a temporary remedy for the lack of preclearance, unless and until preclearance is obtained under Section 5." *Id.* at 23. Although many of the injunction's "continuing actions" focused on the November 4, 2008 election, the injunction is also aimed at "reasonably ensur[ing] that no voter is permanently deleted from the voter registration list, and no voter registration application is permanently denied, based upon information flowing from the unprecleared automated voter verification process, unless the voter admits, in writing, to election officials his/her present ineligibility." *Id.* at 24-25.

    The effect of the Section 5 objection is that preclearance has not been obtained and the *Morales* court's injunction remains in effect. We understand that following the Section 5 objection, the parties jointly requested the *Morales* court to hold a status conference. The Department expects to continue its role as *amicus curiae* and provide assistance to the court as the case proceeds.



EXHIBIT 3

-2-

In this regard, we note that since the *Morales* court entered the injunction, Georgia has provided further definition to the voting change at issue. When the injunction was entered, it was clear that the state had implemented an automated voter verification system that used information from the state's Department of Driver Services [DDS] database or the federal Social Security Administration [SSA] database. In March 2009, in response to the Department's request for additional information, the state clarified the effect of a report of non-matched data on the registration status of new applicants for voter registration or existing registrants seeking to change an aspect of their registration. Specifically, the state reported that "a failure to verify registration triggers further inquiry by the county registrars to resolve any questions in order to verify the registration and move the applicant onto the registration list." Letter from Dennis Dunn to Christopher Coates, March 24, 2009, at 23. The "further inquiry" triggered by the proposed system could result in local election officials requiring "non-matched registrants" to appear at the county courthouse or office building, not at the voter's convenience, but rather on a week day, during normal business hours with only three days notice. See O.C.G.A. § 21-2-228. In our view, Section 5 precludes the implementation of this system and leaves in place the pre-existing system, except as modified by the *Morales* injunction.

At the same time, we recognize that the state is obliged to find a way to comply with HAVA in a manner that passes muster under Section 5. HAVA requires the state to attempt to match certain information provided by registrants against the DDS and/or SSA databases (the state's R1 process). But it neither mandates the manner in which the state seeks to match the information nor the use(s) to which the state can put the results of the verification process; such discretionary decisions are within the province of state officials. The Department's letter identified specific concerns about the state's proposed automated verification system that led it to interpose a Section 5 objection. In attempting to respond to those concerns or devise a new system, state officials may continue to try to run matches or make adjustments to its automated verification system as new registrations or changes in registration are received. However, it is the discretionary aspects of the verification process and the use to which the state puts the "no-match" results that requires Section 5 preclearance, which has not been obtained.

We continue to believe that the state has alternatives that could mitigate or eliminate the identified discriminatory impact of the changes at issue without adversely affecting the state's asserted goal of preventing voter fraud. Our review of the depositions of several of the state's information technology staff, which were taken as part of the *Morales* litigation, indicates that the state may already be aware of some steps that it could take to adjust the process. Further, the state recently enacted legislation codifying a requirement for documentary proof of citizenship for voter registration. The state may wish to consider the relationship between this new requirement and any automated voter verification program as it decides how to proceed. Section 5 does not prohibit a state from taking steps to ensure that only qualified individuals are registered to vote. The state, however, must ensure that the discretionary manner in which it does so is not discriminatory.

-3-

We hope this information is helpful and we express, again, our willingness to discuss these matters with you.

Sincerely,

Christopher Coates
Chief, Voting Section

cc: Court & Counsel of Record