IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STATE OF GEORGIA,<br><br>        Plaintiff,<br><br>v.<br><br>ERIC H. HOLDER, JR., in his official capacity as Attorney General of the United States, *et al.*,<br><br>        Defendants. | CIVIL ACTION<br><br>NO. 1:10-CV-01062<br><br>THREE JUDGE PANEL (ESH, TBG, HHK) |

**RESPONSE TO PLAINTIFF'S AND DEFENDANT'S JOINT MOTION TO DISMISS BY DEFENDANT-INTERVENORS BROOKS, ET AL., GEORGIA ASSOCIATION OF LATINO ELECTED OFFICIALS, AND ORGANIZATION OF CHINESE AMERICANS GEORGIA CHAPTER, ET AL.**

Defendant-Intervenors Brooks, *et al*., Georgia Association of Latino Elected Officials ("GALEO"), and the Organization of Chinese Americans Georgia Chapter ("OCAGC"), *et al*. respectfully submit this Response to the Joint Motion to Dismiss [Doc. 46] filed by Plaintiff State of Georgia and Defendant Eric Holder.[1]   This action was brought by the State of Georgia under Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c, to obtain a declaratory judgment that two new voter registration procedures adopted by the Georgia Secretary of State are nondiscriminatory:  a procedure that seeks to verify the United States citizenship of registration applicants; and a procedure that seeks to verify the identity of registration applicants (*i.e.*, verify that the identity provided on the registration application is their true identity).  The State of

---

[1] The Brooks Defendant-Intervenor group is comprised of Tyrone Brooks, Helen Butler, Edward O. Dubose, the Georgia Association of Black Elected Officials, the Georgia Coalition for the People's Agenda, and the Georgia State Conference NAACP.   The Georgia Association of Latino Elected Officials intervened by itself.  The Intervenor group which includes the Organization of Chinese Americans Georgia Chapter also is comprised of the Asian American Legal Advocacy Center of Georgia and Marvin Lim.  The Intervenors submitting the instant Response collectively are referred to in this Response as the "Brooks, GALEO, and OCAGC Intervenors."

Georgia, joined by Defendant Holder, has moved for voluntarily dismissal under Fed. R. Civ. P. 41(a)(2) on the ground that this action is moot because the two procedures, as described in Plaintiff's First Amended Complaint, received administrative Section 5 preclearance from the United States Attorney General on August 18, 2010.

The Brooks, GALEO, and OCAGC Intervenors agree that this action is moot. However, because of the unusual circumstances attendant to the pending motion, they request and urge this Court to use its authority under Rule 41(a)(2) – to grant voluntary dismissal only "on terms that the court considers proper" – to conduct a review of the events leading to the Joint Motion to Dismiss prior to dismissing this action.

This lawsuit is the culmination of a nearly two-year dispute between African-American, Hispanic, and Asian-American citizens of the State of Georgia and the Georgia Secretary of State. Minority citizens filed suit in Georgia federal court in October 2008 challenging the Secretary of State's unlawful implementation, without the requisite Section 5 preclearance, of a substantially similar version of the citizenship verification procedure at issue here. *Morales v. Kemp*, No. 1-08-3172 (N.D. Ga.) (three-judge court). After the *Morales* court issued a preliminary injunction in October 2008, the United States Attorney General conducted an administrative preclearance review of the citizenship verification procedure challenged in *Morales* and, in addition, a preclearance review of a substantially similar version of the identity verification procedure at issue here. In May 2009, the Attorney General – at the urging of Georgia's minority citizens – found that both procedures are discriminatory and therefore denied preclearance, interposing Section 5 objections to the procedures. Approximately 13 months later, in June 2010, the State of Georgia filed this lawsuit to seek judicial preclearance of slightly

- 2 -

modified versions of the objected-to procedures and, within weeks of filing, minority individuals and groups were granted intervention as Defendants to oppose preclearance.

The Brooks, GALEO, and OCAGC Intervenors respectfully submit that, as described below, the circumstances under which the State of Georgia obtained administrative preclearance for its new voter registration procedures, on August 18, were highly irregular, and that the manner in which the administrative request was made and acted upon was calculated to deprive Intervenors of the opportunity to contest, comment upon, or play any role in the disposition of the voting procedures for which the State had sought preclearance in this Court.  The Attorney General's acquiescence to the State of Georgia's highly prejudicial maneuvers is inconsistent with the Attorney General's practice in previous Section 5 actions, and with the Attorney General's self-defined role as a "surrogate" for this Court.  Procedures for the Administration of Section 5 ("Section 5 Procedures), 28 C.F.R. § 51.52(a).

For these reasons, the Brooks, GALEO, and OCAGC Intervenors respectfully request that, before the Court rules upon the motion to dismiss, Plaintiff State of Georgia and Defendant Holder be required to explain and justify their conduct.  Specifically, they should explain why they conducted an unusual end-run around this litigation via a supplemental administrative review of the two voter  registration procedures at issue here, and why the administrative review was conducted and completed within a period of 24 hours, with no notice to the public or to the Intervenors.  The ruling on the motion to dismiss may then include such findings as appropriate to prevent Defendant-Intervenors in future Section 5 preclearance actions in this Court from suffering similar prejudice.

## STATUTORY BACKGROUND

Section 5 of the Voting Rights Act provides that whenever a covered jurisdiction, including the State of Georgia, "shall enact or seek to administer" any change in a voting standard, practice, or procedure, the jurisdiction must obtain federal preclearance, either from this Court (constituted as a three-judge court) or the United States Attorney General.  In order to obtain preclearance, covered jurisdictions must demonstrate that each voting change "neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color, or [language minority status]."  42 U.S.C. § 1973c(a).  *See generally South Carolina v. Katzenbach,* 383 U.S. 301 (1966); Section 5 Procedures, 28 C.F.R. §§ 51.10, 51.52(a).  Unless and until preclearance is obtained, voting changes adopted by covered jurisdictions are not "effective as law," *Connor v. Waller,* 421 U.S. 656 (1975) (per curiam), and may not be implemented.  *Clark v. Roemer,* 500 U.S. 646, 652-53 (1991); *Allen v. State Board of Elections,* 393 U.S. 544, 572 (1969).  Congress thus established through Section 5 a substantial barrier against the implementation of discriminatory voting changes by the specially covered jurisdictions, "shift[ing] the advantage of time and inertia from the perpetrators of [voting discrimination] to its victims."  *Katzenbach,* 383 U.S. at 328.

Under Section 5, three-judge panels of this Court have the primary responsibility for deciding whether covered voting changes are entitled to preclearance.  Covered jurisdictions may bring preclearance lawsuits only before this Court and not before their local district court. Section 5 also allows covered jurisdictions the alternative of obtaining preclearance by making an administrative submission to the Attorney General, and covered jurisdictions typically select that alternative.  Nonetheless, the Attorney General has recognized this Court's primary statutory authority for making preclearance determinations, affirming that the Attorney General's role is to

serve as a "*[s]urrogate for the court*."  Section 5 Procedures, 28 C.F.R. 51.52(a) (emphasis in original).

STATEMENT OF FACTS

**1. Background**

      Georgia's First Amended Complaint [Doc. 38] seeks a declaratory judgment from this Court, under Section 5, that two new voter registration procedures adopted by the Georgia Secretary of State are nondiscriminatory: a citizenship verification procedure; and an identity verification procedure.  Both procedures rely upon computerized matching of records located in different state databases to flag individuals as putative noncitizens or as putatively registered under a false identity, and both condition voter registration on the results of the matching regimen and the responses to the flags that are generated.

      Under the citizenship verification procedure, the State of Georgia purports to verify the statement made on Georgia's voter registration application by each voter registration applicant – under oath or affirmation – that he or she is a United States citizen.[2]  The procedure seeks to accomplish this by using a computer to match administrative records contained in two state databases: a voter registration database maintained by the Georgia Secretary of State, which includes records for registration applicants; and a database maintained by the Georgia Department of Driver Services ("DDS") of persons holding a state driver's license or

---

[2] Georgia Voter Registration Application, *available at* http://sos.georgia.gov/elections/voter_registration/GA%20VOTER%20REGISTRATION%20%20APP(Fill_2007).pdf (the application further advises applicants that "Any person who registers to vote knowing that such person does not possess the qualifications required by law, who registers under any name other than such person's own name, or who knowingly gives false information in registering shall be guilty of a felony.  O.C.G.A. § 21-2-561.").  The federal voter registration postcard, promulgated pursuant to the National Voter Registration Act of 1993, 42 U.S.C. § 1973gg-7(a)(2), also requires that registration applicants swear or affirm their U.S. citizenship.  http://www.eac.gov/assets/1/AssetManager/national%20mail%20voter%20registration%20form%20english%20august%2011%202010.pdf.

- 5 -

identification card, which includes citizenship data.[3]  Registration applicants who are matched

with a DDS record that includes a noncitizen indicator are singled out on what is known as the

"R2" list, and are required to then produce documentary proof of citizenship before being

registered to vote.  Applicants who are not flagged by this procedure are not required to provide

any proof of citizenship.  Exh. 6 to First Amended Complaint, "Process for Entering New Voter

Registration Application Information Into the Statewide Voter Registration System" ("Voter

Registration Process Document") [Doc. 38-6.]  This procedure was implemented by Georgia

without Section 5 preclearance, and was the subject of the aforementioned successful Section 5

enforcement action in Georgia.  *Morales v. Kemp*, No. 1-08-3172 (N.D. Ga.).

　　　Under the identity verification procedure, the State purports to verify that registration

applicants have provided their own genuine identity on their voter registration application.[4]  The

procedure attempts to verify new registrants' identify by seeking to match each applicant's new

registration-database record with a DDS record or, alternatively, with a record contained in the

Social Security Administration database (for persons with a social security number, but not a

---

[3]  The DDS database includes citizenship information provided by license or identification card holders when they applied for their license or identification card.  Certain noncitizens legally in this country may obtain a license or identification card in Georgia, and the database identifies those individuals as being noncitizens.  However, DDS does not maintain its citizenship information on an up-to-date basis since, as indicated, DDS enters the citizenship data into its database only when license and identification card applications are received.  Thousands of Georgia residents become naturalized citizens each year; a substantial majority of these individuals were born in countries located in sub-Saharan Africa, Latin America, the Caribbean, and Asia. U.S. Dep't of Homeland Security, 2008 Yearbook of Immigration Statistics, Naturalizations, Supp. Table 1, *available at* http://www.dhs.gov/ximgtn/ statistics/publications/ YrBk08Na.shtm;

[4]  As noted above, registration applicants are advised on the Georgia registration form that persons who give a false identity are guilty of a felony, footnote 2, *supra*, and Georgia law also requires that persons who vote at the polls or at early voting locations show a government-issued identification card before they are allowed to vote.  GA. CODE ANN. § 21-2-417(a).

driver's license or identification card).[5]  Applicants whose records do not provide a match are singled out on what is known as an "R1" list, and unless and until a match is made, the registration application is not accepted (*i.e.*, no match, no vote).  Voter Registration Process Document [Doc. 38-6.]

On October 8, 2008, the United States Department of Justice wrote to the State of Georgia to advise that the Georgia Secretary of State was implementing the citizenship verification procedure in violation of the Section 5 preclearance requirement, and to request that the procedure be submitted for preclearance.  [Doc. 43, at ¶ 22.]  The Secretary of State refused to cease implementation of the new procedure.

On October 9, 2008, the *Morales* lawsuit was filed in the Northern District of Georgia against the Georgia Secretary of State to enjoin implementation of the citizenship verification procedure unless and until preclearance is granted.  The first named plaintiff, Cherokee County resident Jose Morales, had obtained his driver's license as a permanent resident immigrant of the United States.  He then naturalized and applied to register to vote, was identified as a putative non-citizen on the R2 list, and was required to produce documentary proof of his citizenship in order to complete his voter registration application.  [Doc. 38-1.][6]

---

[5] In accordance with federal law, 42 U.S.C. § 15483(a)(5)(A)(i), the Georgia Registration Application requires that registration applicants provide their driver's license or identification card number, or the last four digits of their social security number.

[6]  The lawsuit was filed as a class action and, after filing, the Georgia State Conference of the NAACP and the Georgia Association of Latino Elected Officials (both Defendant-Intervenors in this litigation), as well as the Center for Pan Asian Community Services, joined as plaintiffs.  Counsel for the *Morales* plaintiffs included attorneys who represent the Brooks Intervenors in this action (the Lawyers' Committee for Civil Rights Under Law and the American Civil Liberties Union Foundation), and attorneys who represent Defendant-Intervenor Georgia Association of Latino Elected Officials (the Mexican American Legal Defense and Educational Fund).  The United States participated as *amicus curiae* in the lawsuit.

On October 27, 2008, the three-judge district court in *Morales* issued a preliminary injunction finding that the citizenship procedure was a voting change subject to the preclearance requirement of Section 5.  Order at 21-22 [Doc. 38-1.][7]  The court, however, allowed Georgia to provisionally continue to implement portions of the verification procedure, with safeguards added to protect the affected registration applicants.  Order at 22-27.[8]  The *Morales* court later extended that preliminary injunction with respect to the procedures for conducting the 2010 elections in Georgia.  [Doc. 38-5.]

Prior to the issuance of the October 2008 preliminary injunction, the Georgia Attorney General submitted both the citizenship verification procedure and the identity verification procedure to the United States Attorney General for Section 5 preclearance.  The specific procedures submitted to the Attorney General were substantially the same as the procedures for which preclearance subsequently was sought in this Court.  *Compare* Attorney General's May 29, 2009 Section 5 Objection Letter [Doc. 38-2] *with* Voter Registration Process Document [Doc. 38-6].  The core matching procedures have remained the same.[9]  The differences concern

---

[7] The court rejected the Secretary of State's contention that the Section 5 preclearance requirement did not apply to the citizenship verification procedure.  Although the Secretary conceded that the procedure was a change from the State's prior practices and that it was a change affecting voting, the Secretary argued the procedure was exempt from Section 5 preclearance because it was mandated by the federal Help America Vote Act ("HAVA"), 42 U.S.C. § 15301 *et seq.  See Young v. Fordice,* 520 U.S. 273 (1997) (voting changes mandated by federal election law are not subject to preclearance under Section 5).  The district court found that the State's citizenship verification procedure was not mandated by HAVA but, instead, involved a discretionary policy choice by the Georgia Secretary of State, and therefore Section 5 preclearance was required.

[8] The preliminary injunction prohibited the Secretary of State from deleting from the list of registration applicants those individuals who were flagged as potential noncitizens on the R2 list but who did not produce proof of citizenship.  However, the injunction did allow the Secretary to continue to utilize the R2 procedure to bar from voting any and all flagged applicants who did not satisfy the new requirement that they provide citizenship documentation.  In so doing, the court took into account the fact that the November 2008 election was imminent and it was unknown at that time whether the Attorney General would object to the submission of this voting change.

[9]  Both the administratively submitted procedures and the judicially-submitted procedures rely on the same computer matching procedure, using the DDS and Social Security Administration databases, to verify citizenship

the precise set of individuals who are subject to verification, and the specific procedures that county election officials are to follow when the computer matching yields a negative verification.[10]

On May 29, 2009, after the State of Georgia had responded to a request for additional information made by the Attorney General, the Attorney General concluded that both verification procedures are discriminatory, and so interposed Section 5 objections to both.  [Doc. 38-2.]  The Attorney General found that the computer matching procedures underlying the two verification procedures do "not produce accurate and reliable information and that thousands of citizens who are in fact eligible to vote under Georgia law have been flagged."  May 29, 2009 Objection Letter, at 3.  Furthermore, "[t]he impact of these errors falls disproportionately on minority voters. . . . [A]pplicants who are Hispanic, Asian or African American are more likely than white applicants, to statistically significant degrees, to be flagged for additional scrutiny."  *Id.* at 4. Thus, the Georgia Secretary of State was seeking to implement a "flawed system [which] frequently subjects a disproportionate number of African-American, Asian, and/or Hispanic voters to additional and, more importantly, erroneous burdens on the right to register to vote. These burdens are real, are substantial, and are retrogressive for minority voters."  *Id.*  Following the objections, Georgia sought reconsideration by the Attorney General.  On October 13, 2009, the Attorney General

and verify identity.  In addition, it appears that nothing has changed with regard to the manner in which the DDS and Social Security Administration databases are maintained (either in terms of how data are entered into these databases or the content of the data entered), and likewise nothing has changed with regard to the information included in the Secretary of State's database of new registration applicants.

[10] The administratively submitted verification procedures applied to all new registration applicants and to existing registrants who requested changes in certain identifying information contained in their registration record.  The judicially submitted procedures exclude new applicants who apply to register at state motor vehicle offices and apparently are not triggered when an existing registrant changes his or her identifying information.  With regard to the post-matching procedures, the administratively submitted procedures delegated substantial discretion to county election officials to decide how to process flagged individuals, whereas the judicially submitted procedures prescribe a more uniform set of procedures that local officials are to follow.

informed the State that the objections would not be withdrawn [Doc. 43 at ¶ 35], and again declined to withdraw the objections on February 22, 2010.  [Doc. 38-4.]

Counsel for the *Morales* plaintiffs were active in all stages of the Section 5 administrative review process.  Counsel submitted three detailed comment letters to the Attorney General in which they analyzed the purpose and effect of the new verification procedures, provided further information that plaintiffs had obtained from discovery in *Morales*, and urged the Attorney General not to preclear the verification procedures.[11]  The Attorney General's objection letter specifically cited deposition testimony from the *Morales* litigation that plaintiffs' counsel had provided.

## 2.  The Instant Litigation

On June 22, 2010 – 13 months after the Attorney General's Section 5 objections and also months after the Attorney General denied reconsideration – the State of Georgia filed the instant lawsuit, seeking judicial preclearance for the citizenship verification procedure and the identity verification procedure.  In the alternative, Georgia claimed that Section 5 is unconstitutional. [Doc. 1.]

Shortly after this action was filed, and in recognition of minority citizens' pivotal role in this dispute, this Court granted four separate motions to intervene as defendants filed by minority residents and groups in Georgia [Doc .6, 24, 25, and 30].  At the status conference held in this case on July 9, 2010, the State of Georgia and Defendant Holder advised the Court and

---

[11]  The Section 5 Procedures, 28 C.F.R. §§ 51.29-51.32 encourage interested persons to comment on pending Section 5 submissions.  Counsel for the *Morales* plaintiffs submitted a comment letter on November 25, 2008, urging the Attorney General to require Georgia to provide additional information regarding the purpose and effect of the proposed procedures.  On May 19, 2009, after the State's submission of additional information, counsel for the *Morales* plaintiffs submitted a comment letter urging the Attorney General to interpose Section 5 objections to both the citizenship verification procedure and the identity verification procedure.  On August 29, 2009, counsel for the *Morales* plaintiffs submitted a comment letter urging the Attorney General to reject Georgia's request that the Attorney General reconsider and withdraw the May 2009 objection.

Defendant-Intervenors that they were engaged in settlement negotiations.  Georgia and

Defendant Holder also advised the Court that the Intervenors would not be allowed to participate

in these negotiations in any way.  Thereafter, Intervenors were provided no information as to

what was being discussed by the State and Defendant Holder.

On August 16, 2010, the settlement negotiations reached a swift denouement.  On that

date, the State of Georgia filed a First Amended Complaint, which seeks preclearance for

essentially the same verification procedures that the State had set forth in its original

Complaint.[12]  Later that day, Defendant Holder filed an Answer to original Complaint [Doc. 42],

an Answer to the Amended Complaint [Doc. 43], and a separate Notice [Doc. 44] advising the

Court and Defendant-Intervenors that he would not oppose preclearance of the verification

procedures identified in the Amended Complaint.  The Intervenors were not informed in advance

either that an Amended Complaint would be filed or that Defendant Holder would not oppose

preclearance of the two verification procedures.  Neither the Amended Complaint nor the

Attorney General's Answers or Notice mentioned that an administrative submission of the

revised procedures was to occur the next day.

On August 17, the State of Georgia made an administrative Section 5 submission to the

Attorney General of the verification procedures identified in the Amended Complaint.  The next

day, August 18, the Attorney General granted preclearance.  [Doc. 46-2.]  The Attorney

General's preclearance letter omitted the standard reservation of the Attorney General's right to

---

[12] The Amended Complaint modified the citizenship verification procedure only by indicating that flagged registration applicants may provide documentary proof of citizenship at their polling place or early voting location, as an alternative to providing the documentation to their county registrar before election day.  The Amended Complaint modified the identity verification procedure by including a few additional measures that county registrars should undertake if and when a registration applicant is flagged as a "no match" individual.  *Compare* Voter Registration Process Document [Doc. 38-6] *with* the earlier version of this document attached to the Complaint [Doc. 1-6].

change his determination during the remainder of the statutory 60-day review period.[13]

Intervenors were not informed by the State of Georgia or the Attorney General that Georgia had

made an administrative submission until the submission already had been administratively

precleared.  The typical method by which the Attorney General advises interested persons of all

new Section 5 submissions is the Attorney General's weekly "Notice of Preclearance Activity,"

which is published on the website of the Voting Section of the Department of Justice's Civil

Rights Division.  28 C.F.R. § 51.33.  The instant Georgia submission appeared on the August 23,

2010 Notice, *i.e.*, a Notice dated five days after the State's submission received administrative

preclearance (the August 23 Notice also did not become functional, *i.e.*, readable, on the Voting

Section website until September 7).

## ARGUMENT

Based upon the Attorney General's administrative preclearance of the voter registration

procedures at issue in this lawsuit, the Brooks, GALEO, and OCAGC Intervenors do not oppose

dismissal of this lawsuit as moot.  The Supreme Court's decision in *Morris v. Gressette,* 432

U.S. 491 (1977), as well as past decisions by the District of Columbia District Court, foreclose

this Court from now conducting its own review of the changes contained in the First Amended

Complaint.

However, before ruling upon the Joint Motion to Dismiss, Intervenors request that this

Court require Plaintiff State of Georgia and Defendant Holder to explain the inequitable and

---

[13]   Section 5 provides that when the Attorney General preclears a voting change in advance of the 60-day
administrative review deadline, the Attorney General may reserve the right to interpose an objection "if additional
information comes to his attention during the remainder of the sixty-day period which would otherwise require
objection."  It is standard practice for the Attorney General to include that reservation in letters granting expedited
preclearance, but the Attorney General chose in this instance to omit it from the August 18 preclearance letter.
Since the submission was made on August 17, the 60-day review period runs until October 18, 2010.

prejudicial events that led to the instant motion to dismiss.  Within the space of just three days,

the State filed its Amended Complaint, the Attorney General filed his Answers and a Notice

stating that he would not oppose preclearance of the verification procedures, the administrative

submission was made, and preclearance was granted.  As a consequence, Defendant-Intervenors

were deprived of the forum they had been granted before this Court and were deprived of the

opportunity to participate in the administrative review process.

      This rush to judgment was not required by Section 5 or the facts of this case, is

inconsistent with the Attorney General's past practices and is inconsistent with important

provisions of the Attorney General's Procedures for the Administration of Section 5.  In order to

equitably resolve this lawsuit, and to preclude the irregular process that unfolded here from being

repeated in future Section 5 declaratory judgment actions, this Court should review Plaintiff's

and Defendant's actions, as more specifically described below.[14]

## A.     The Past Practice Has Been to Allow Section 5 Declaratory Judgment Actions to Continue With Defendant-Intervenors Opposing Preclearance, If and When the Attorney General Informs the Court That He Does Not Oppose Preclearance

      The apparent joint effort by the State of Georgia and the Attorney General to use the

administrative preclearance process to deprive Defendant-Intervenors of a forum in which to

oppose Section 5 preclearance is a departure from past practice, which requires an explanation

by both parties.

      Section 5 vests the Attorney General with two related, but legally distinct, highly

consequential roles in enforcing Section 5.  The Attorney General is the statutory defendant

---

[14] The upcoming release of 2010 Census data soon will lead to an intense period of Section 5 preclearance activity, when thousands of redistricting plans and associated changes will be submitted to the Attorney General for Section 5 preclearance.  Some portion of these voting changes can be expected to result in declaratory judgment actions before this Court, and it also can be expected that minority individuals will seek to intervene in these cases as defendants, especially given what has occurred in this lawsuit.

when Section 5 judicial preclearance actions are filed in the District of Columbia District Court. The Attorney General also has the independent authority to preclear voting changes that are submitted to him administratively by covered jurisdictions.

In Section 5 preclearance litigation, the Attorney General proceeds as a party under the usual rules of civil procedure.  Thus, a decision by the Attorney General to not oppose preclearance generally will end the District of Columbia Court's preclearance review when the Attorney General is the sole defendant.[15]  On the other hand, the Attorney General's non-opposition as a litigant will not terminate preclearance litigation when individuals or groups have intervened as defendants and continue to oppose preclearance.

In administrative preclearance reviews, the Attorney General acts as the sole decisionmaker, and his decision to preclear a submitted voting change is not subject to judicial review under the Administrative Procedure Act or on any other basis.  *Morris v. Gressette*, *supra*.  Thus, this Court may not overrule the Attorney General's preclearance decision, regardless of whether it was substantively incorrect or procedurally improper.[16]  Furthermore, the pendency of a judicial preclearance action, such as the instant lawsuit, does not divest the

---

[15]   However, even in this circumstance this Court has an "affirmative duty" to assess whether the Section 5 plaintiff has met its burden of proof by a preponderance of the evidence.  *Georgia v. Ashcroft*, 195 F. Supp. 2d 25, 72 (D.D.C. 2002), *vacated and remanded on other grounds,* 539 U.S. 461 (2003).

[16] Section 5 preclearance actions in this Court are heard *de novo*.  *See Morris v. Gressette*, 432 U.S. at 501-05.  *Morris* arose after a federal court found that the Attorney General's preclearance of the redistricting plan for the South Carolina state senate was based, entirely, on a legal error, and ordered the Attorney General to undertake the preclearance review a second time; in that second review, the Attorney General interposed an objection.  The Supreme Court held that the Attorney General's preclearance decisions are not judicially reviewable, and therefore the initial preclearance of the state senate redistricting plan ended the Section 5 review process.

Attorney General of his administrative preclearance authority.  *City of Dallas v. United States*, 482 F. Supp. 183 (D.D.C. 1980) (three-judge court).[17]

It follows, therefore, that if and when the Attorney General decides not to oppose preclearance in a pending Section 5 preclearance lawsuit in which defendant-intervenors are participating, the Attorney General has the discretion to either allow the lawsuit to continue – by expressing his non-opposition solely in his role as litigant – or to end the lawsuit – by switching back to his administrative role and granting preclearance to the voting changes being considered by this Court (if a proper administrative submission is made to the Attorney General).  Here, the State of Georgia and the Attorney General followed the latter course, mooting this action.

The Attorney General's usual practice in this situation, however, is to set forth his non-opposition to preclearance solely in his role as litigant, allowing defendant-intervenors to pursue their defense on the merits.  Several leading cases, none of which were cited in the Joint Motion to Dismiss, were reviewed on the merits by the District of Columbia Court, and on occasion by the Supreme Court, in just this posture.  *See City of Lockhart v. United States,* 460 U.S. 125 (1983); *City of Richmond v. United States,* 422 U.S. 358, 366 (1975); *Georgia v. Ashcroft,* 195 F. Supp. 2d 25 (D.D.C. 2002) (three-judge court), *vacated and remanded on other grounds,* 539 U.S. 461 (2003).[18]

---

[17]  *But see Texas v. United States,* 802 F. Supp. at 485 ("As an initial matter, we note that the Department of Justice has posed no objection to SB 1. *See* Notice of Filing of Section 5 Determination (July 21, 1992). Were it not for the presence of the intervenors in this litigation, there would be no dispute. However, given the unusual posture of this case, the Court will proceed to rule on Texas' motion.").

[18]  This Court's decision in *City of Dallas v. United States*, *supra*, dealt with a different situation, where the change precleared by the Attorney General while a Section 5 preclearance suit was pending was not the same change that was before this Court.  That preclearance action concerned a new method of election for the Dallas, Texas city council. After the preclearance lawsuit was filed and individuals intervened, the city adopted a second (different) election plan, which superseded the plan before this Court.  The City submitted the second plan to the Attorney General for administrative preclearance, but did not amend its complaint to seek judicial preclearance of that plan,

*Georgia v. Ashcroft* provides a particularly striking and relatively recent example of what should have occurred in this case.  In *Ashcroft*, this Court reviewed the defendant-intervenors' opposition on the merits to preclearance of Georgia's post-2000 state House and Congressional redistricting plans, even though the Attorney General had informed the Court that he did not oppose preclearance of either plan.  In fact, the lead counsel for Georgia in *this* action (Ms. Lewis) represented the defendant-intervenors in the *Ashcroft* case and was permitted to press her clients' opposition to Georgia's House and Congressional redistricting plans independently of the Attorney General at trial.  195 F. Supp. 2d at 72-73 ("If the State were correct that this Court's jurisdiction is stripped when the United States fails to object to a plan submitted for judicial preclearance, the three-judge court in *City of Richmond* would have been without jurisdiction to consider intervenors' claims.").  Later in the *Ashcroft* case, the defendant-

and obtained administrative preclearance for the second plan from the Attorney General.  Intervenors sought to argue that the plan that was administratively precleared was essentially the same plan that was before this Court, but this Court found that that claim as "not a correct description of the facts."  *Id.* at 186.

In their Joint Motion to Dismiss, Plaintiff and Defendant provide to the Court three unpublished decisions of this Court.  At least two of those decisions also involved situations substantially different from this one, and thus those two decisions similarly fail to support a claim that the Attorney General's decision to administratively preclear Georgia's verification procedures is consistent with past practice.  In *State of Florida v. United States,* No. 02-0941 (D.D.C. June 13, 2002), the administrative preclearance submission *preceded* the filing of the judicial preclearance action, and thus the administrative submission also occurred before private individuals joined the preclearance litigation as defendant-intervenors.  That case therefore involved an effort to supplant a pending administrative preclearance submission by filing of a lawsuit, not the situation presented here, where a post-lawsuit administrative submission was used to supplant a pending lawsuit.  In *State of North Carolina v. Ashcroft*, No. 1:03CV02477 (D.D.C. April 1, 2004), there were no defendant-intervenors, so it was irrelevant whether the Attorney General either conceded preclearance in the litigation or administratively precleared the change at issue.

In the third unpublished decision, *North Carolina Board of Elections v. United States,* No. 01-1174 (D.D.C. Aug. 2, 2002), the Attorney General administratively precleared the change at issue after defendant-intervenors had joined the preclearance lawsuit; however, the brief order that Plaintiff and Defendant have provided does not offer any further information as to the circumstances presented by that case.  *See also Texas v. United States,* 802 F. Supp. 481, 485 (D.D.C. 1992) (Attorney General administratively precleared the voting change at issue in a Section 5 lawsuit in which there were defendant-intervenors; however, this Court's opinion did not discuss the relative timing of the lawsuit, the interventions, and the administrative preclearance action).

intervenors were permitted (still represented by Ms. Lewis) to oppose preclearance of Georgia's revised state Senate redistricting plan independently of the Attorney General.  204 F. Supp. 2d 4, 5 (2002) ("The United States indicated that it no longer contended that the Senate plan violated Section 5, while the defendant-intervenors argued that the State had again failed to meet its burden.").

Accordingly, Section 5 preclearance actions typically continue with defendant-intervenors who are participating in the case if and when the Attorney General decides not to oppose preclearance.  Nothing about the instant lawsuit required a different approach.  Allowing Defendant-Intervenors their day in court, after Defendant Holder filed his Answer to the First Amended Complaint and Notice announcing his non-opposition to judicial preclearance, clearly would have been equitable and appropriate, given that minority citizens and their representatives have been intimately involved in this dispute for two years, as plaintiffs in *Morales*, commenters during the Section 5 administrative preclearance process, and Defendant-Intervenors in this lawsuit.  This Court should require a full explanation from Plaintiff State of Georgia and Defendant Holder as to why the process in this case deviated from past practice.

**B.**     **The Hasty and Precipitous Administrative Preclearance of Georgia's Voter Registration Changes Unfairly Prejudiced Defendant-Intervenors' Opportunity to Litigate this Action**

The State of Georgia and Defendant Holder also need to explain why administrative preclearance was granted to the State's revised voter registration verification procedures within 24 hours of the State's Section 5 submission, with no notice given to Defendant-Intervenors.  If there was some understanding between the Attorney General and the State that a preclearance submission and fast-track preclearance would be forthcoming, it was not reflected in the Attorney General's August 16 Notice or Answers, or in any filing made by the State (and notice

was not otherwise provided by telephone or email).  Although the Attorney General acted within his technical legal authority when he granted expedited preclearance here, this expedited review appears to have been taken at Georgia's behest solely to prejudice the State's own citizens who intervened in this case.  It should give the Court pause to see such an outcome in a matter of public importance.  The elemental unfairness of this furtive maneuver requires the Court's attention before allowing Georgia to dismiss its claims.

The Attorney General's rushed administrative preclearance unnecessarily prejudiced Defendant-Intervenors in several material ways.  First, the Attorney General could easily have waited for the Defendant-Intervenors to review and comment upon the administrative submission, but because the Defendant-Intervenors had no opportunity to review the State's submission, Defendant-Intervenors were unable to comment upon the evidence, or lack of evidence, that the State of Georgia submitted to the Attorney General to meet its burden of proof.

Second, the rush to preclearance prevented this Court from holding even a status conference to discuss the Attorney General's schedule and how the submission would affect this litigation and the interests of the Defendant-Intervenors.  This rush to preclear is in marked contrast to what occurred in *City of Dallas v. United States*, *supra*.  As described above, that Section 5 preclearance lawsuit concerned a new election plan for the Dallas, Texas city council, and defendant-intervenors representing African-American and Hispanic voters were participating in the suit; after they intervened, the City submitted a second election plan to the Attorney General for administrative preclearance and preclearance was ultimately granted (mooting the lawsuit).  In conducting the administrative review in that instance, the Attorney General carefully and deliberately designed the review process to ensure that minority individuals and their

representatives would have a full and fair opportunity to participate, and granted preclearance only at the end of the 60-day review period.[19]

Third, if the Attorney General had waited out the 60-day review period, the Brooks, GALEO, and OCAGC Intervenors could have moved for summary judgment or sought an expedited trial.  In so doing, they could have relied on the information provided by the State during the 2008-09 administrative submission, as well as updated (computer-generated) data the State could have provided as to the number of persons, by race, included on its R1 and R2 lists.[20] This Court might then have been able to reach a final decision on the merits before the expiration of the 60-day review period.[21]  Even that limited opportunity for the Intervenors to make their case would have been preferable to what actually occurred, and if the Court had denied

---

[19] The Attorney General's letter granting administrative preclearance included the following explanation by the Assistant Attorney General for Civil Rights of the procedure he followed in reviewing the City of Dallas' submission:

> Your submission included a request that we expedite our consideration of the matter. While we have been fully aware of your request throughout the course of our analysis of this change, we have also been aware of the widespread and intense interest in this matter from varied interest groups and individuals in the City, and especially the minority groups affected by the major protections of the Voting Rights Act. We have made a particular effort to invite, encourage and give full consideration to the input of these parties. I have personally reviewed the City's submission as well as the comments of interested persons. I have also met on this matter with four separate delegations of Dallas residents and members of my staff have held numerous meetings with representatives of the city as well as with other interested persons. Because of the extent of this consultation and the extent of our review of your submission, we have been unable to respond until this time.

482 F. Supp. at 186.

[20] The Georgia Secretary of State maintains computer data identifying the individuals flagged on the R1 and R2 lists, and the data identifies registrants by race (including black, Hispanic, and Asian).

[21] With the pendency of a summary judgment motion or an expedited trial in this case, the Attorney General also could have concluded that additional information was needed to make any administrative decision, which, in turn, would have meant that the 60-day review period would not have begun until after the State provided the requested information.  Procedures for the Administration of Section 5, 28 C.F.R. § 51.37.

preclearance, it is inconceivable that the Attorney General would have failed to defer to this Court's judgment in responding to the administrative submission.

Finally, the Brooks, GALEO, and OCAGC Intervenors might alternatively have moved this Court to issue preliminary relief, to preserve the Court's jurisdiction pending a full trial on the merits. A preliminary finding by this Court that Defendant-Intervenors were likely to prevail on the merits would have weighed powerfully on the Attorney General's position on administrative preclearance.[22]

In contrast, the Attorney General's rapid administrative preclearance was unnecessary and was materially at odds with the Attorney General's own Procedures for the Administration of Section 5. Most importantly, this was not a situation which required an expedited decision by the Attorney General on the pending administrative preclearance submission, let alone the one-day response that occurred. The Attorney General's Section 5 Procedures provide that a submitting jurisdiction may request that the Attorney General give a submission "expedited consideration" when the jurisdiction "is required under State law or local ordinance or otherwise finds it necessary to implement a change within the 60-day [statutory review] period following submission." 28 C.F.R. § 51.34. Clearly, this circumstance was not present here. The State waited for 13 months after the Attorney General interposed his objections to the verification procedures before filing suit, and subsequently agreed in this litigation to a schedule that would not resolve the preclearance issues until at least early next year.

---

[22]   Having invoked this Court's jurisdiction Georgia could not complain if this Court acted to protect it. *Cf. State of New York v. United States*, 869 F. Supp. 10, 13 (D.D.C. 1994) (three-judge court) (discussing this Court's authority to enjoin unprecleared voting changes *pendent lite*). A preliminary injunction that rendered the voting changes before the Court incapable of implementation, pending the Court's decision, also would have relieved any pressure on the Attorney General to reach a determination within the statutory 60-day deadline. *See* Section 5 Procedures, 28 C.F.R. § 51.9.

The Attorney General's Section 5 Procedures also specifically provide that any individual or group may send written comments to the Attorney General regarding a voting change that is pending before the Attorney General for administrative preclearance.  28 C.F.R. § 51.29.  The Section 5 Procedures further provide that "[c]omments by individuals or groups concerning any change affecting voting may be sent at any time; however, individuals and groups are encouraged to comment as soon as they learn of the change."  *Id.*  Here, of course, the Defendant-Intervenors were not permitted to submit comments on Georgia's new preclearance submission prior to the Attorney General's administrative decision since they did not "learn of the [submission]" until after the preclearance determination already had been made.

The Attorney General also acted contrary to his standard practice in issuing the preclearance letter, by omitting from the letter the usual reservation of a right to object during the remainder of the 60-day review period.  This apparently was done in an attempt to eliminate the possibility of an argument by the Defendant-Intervenors that the Attorney General's administrative preclearance of Georgia's verification procedures was not final until the expiration of the statutory 60-day review period, since the Attorney General still would retain the legal authority to change course and interpose an objection (which, in turn, would revive this litigation).[23]

Finally, the Attorney General represents that, in carrying out his administrative preclearance responsibility, he acts as a surrogate for this Court:

> *Surrogate for the court.* Section 5 provides for submission of a voting change to the Attorney General as an alternative to the seeking of a declaratory judgment

---

[23]  Notwithstanding the omission from the letter, it appears that the Attorney General retains this residual authority to object to the verification procedures.  Section 5 Procedures provide that the Attorney General reserves the right to interpose an objection in every submission in which he grants preclearance prior to the expiration of the 60-day review period.  28 C.F.R. § 51.43.

from the U.S. District Court for the District of Columbia. Therefore, the Attorney
General shall make the same determination that would be made by the court in an
action for a declaratory judgment under Section 5: Whether the submitted change
has the purpose or will have the effect of denying or abridging the right to vote on
account of race, color, or membership in a language minority group. The burden
of proof is on a submitting authority when it submits a change to the Attorney
General for preclearance, as it would be if the proposed change were the subject
of a declaratory judgment action in the U.S. District Court for the District of
Columbia. *See South Carolina v. Katzenbach*, 383 U.S. 301, 328, 335 (1966).

28 C.F.R. § 51.52(a).  Before this Court, Defendant-Intervenors had the opportunity to make

their case regardless of the Attorney General's position.  The "expedited" administrative review

that mooted this case was an unnecessary contrivance to deprive this Court of jurisdiction and to

foreclose any redress for the Defendant-Intervenors.  The Court should be loath to condone such

actions by its surrogate.

## C.   The Actions of the Attorney General Point to the Need for Intervention as a Matter of Right in Future Section 5 Litigation

The actions of the Attorney General in this case underline and reinforce the arguments

previously made by the Brooks, GALEO, and OCAGC Intervenors, in their motions to intervene,

that they were entitled to intervene as of right in this litigation pursuant to Rule 24(a)(2) of the

Federal Rules of Civil Procedure. [Doc. 5-1, 21, 22.]   Rule 24(a)(2) conditions intervention as of

right on a determination that the named defendant does not "adequately represent [the

applicants'] interest."  It is clear that the Attorney General has not adequately represented the

interest of the Brooks, GALEO, and OCAGC Intervenors in this case.  Accordingly, Intervenors

request that the Court's ruling on the motion to dismiss include a finding of a lack of adequate

representation, which in turn would assist this Court in future Section 5 lawsuits in considering

intervention motions filed by minority individuals and groups.

## CONCLUSION

For the preceding reasons, as a predicate for granting leave to dismiss this lawsuit, Plaintiff State of Georgia and Defendant Holder should be required to explain to this Court their actions leading up to their Joint Motion to Dismiss.  Specifically they should be required to explain why, after the State had decided to seek judicial preclearance and contrary to past practice in Section 5 litigation, the State then initiated a supplemental administrative preclearance request, which has deprived Defendant-Intervenors of their opportunity to oppose preclearance, and why the administrative review was conducted and completed within a period of less than 24 hours with no notice to Defendant-Intervenors.

Respectfully submitted,

September 7, 2010

_s/ Jon M. Greenbaum_
Jon M.Greenbaum (D.C. Bar No. 489887)
Robert A. Kengle
Mark A. Posner (D.C. Bar No. 457833)
jgreenbaum@lawyerscommittee.org
bkengle@lawyerscommittee.org
mposner@lawyerscommittee.org
LAWYERS' COMMITTEE FOR CIVIL RIGHTS
UNDER LAW
1401 New York Avenue, NW
Suite 400
Washington, D.C. 20005
(202) 662-8315 (phone)
(202) 628-2858 (fax)

Laughlin McDonald
Meredith Bell-Platts (D.C. Bar No. MI0049)
lmcdonald@aclu.org
mbell@aclu.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION, INC.
230 Peachtree Street, NW
Suite 1440

Atlanta, GA  30303-1227
(404) 523-2721(phone)
(404) 653-0331 (fax)

Arthur B. Spitzer (D.C. Bar. No. 235960)
artspitzer@aol.com
AMERICAN CIVIL LIBERTIES UNION OF THE
NATION'S CAPITAL
1400 20th Street, N.W., Suite 119
Washington, DC 20036
 (202) 457-0800 (phone)

Chara Fisher Jackson
cfjackson@acluga.org
ACLU OF GEORGIA
1900 The Exchange, Suite 425
Atlanta, GA 30339
(770) 303-8111

*Counsel  for Defendant-Intervenors Brooks, et al.*

Nina Perales (D.C. Bar No. TX0040)
nperales@maldef.org
MEXICAN AMERICAN LEGAL
DEFENSE & EDUCATIONAL FUND
110 Broadway, Suite 300
San Antonio, Texas 78205
(210) 224-5476 (telephone)
(210) 224-5382 (facsimile)

*Counsel for Defendant-Intervenor GALEO*

Ken Kimerling
Glenn Magpantay
gmagpantay@aaldef.org
ASIAN AMERICAN LEGAL DEFENSE &
EDUCATION FUND
99 Hudson Street, 12th Floor
New York, NY 10013
(212) 966-5932 (phone)
(212) 966-4303 (fax)

Michael D. Nolan (D.C. Bar No. 461907)
mnolan@milbank.com
MILBANK, TWEED, HADLEY & MCCLOY LLP
1850 K Street, NW Suite 1200
Washington, DC 20006
(202) 835-7500 (phone)
(202) 835-7586 (fax)

*Counsel for Defendant-Intervenors OCAGC, et al.*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 7, 2010, I served the foregoing Response to Plaintiff's and Defendant's Joint Motion to Dismiss on counsel of record electronically using the CM/ECF system.

_s/ Jon M. Greenbaum_
Jon M. Greenbaum
D.C. Bar No. 489887