IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STATE OF GEORGIA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) |
| ERIC H. HOLDER, JR. in his official capacity as ATTORNEY GENERAL OF THE UNITED STATES, | ) ) ) ) |
| Defendant, | ) ) ) |
| TYRONE BROOKS, *et al.*, | ) ) |
| Defendant-Intervenors, | ) ) |
| MARVIN LIM, *et al.*, | ) ) |
| Defendant-Intervenors, | ) ) |
| CONCERNED BLACK CLERGY OF METROPOLITAN ATLANTA, *et al.*, | ) ) ) |
| Defendant-Intervenors, | ) ) |
| GEORGIA ASSOCIATION OF LATINO ELECTED OFFICIALS, *et al.*, | ) ) ) |
| Defendant-Intervenors. | ) |

Civil No. 1:10-cv-1062

Three-Judge Court
(ESH, HHK, TBG)

**REPLY OF DEFENDANT TO
INTERVENORS' RESPONSE TO JOINT MOTION TO DISMISS**

Pursuant to this Court's September 24, 2010 Order, Defendant Eric H. Holder, Jr.,

Attorney General of the United States ("the Department"), submits the following Reply to the

Response filed by three of the four groups of Defendant-Intervenors in this case, Tyrone Brooks,

*et al.*, Georgia Association of Latino Elected Officials *et al.* ("GALEO"), and Marvin Lim *et al.*,

(hereinafter the three groups are referred to collectively as the "Brooks Intervenors") (Docket

1

#49) to the Joint Motion to Dismiss filed on August 20, 2010, by the State of Georgia and the Department of Justice (Docket #46).

**BACKGROUND**

This litigation was commenced on June 22, 2010, by the State of Georgia, seeking judicial preclearance under Section 5 of the Voting Rights Act, 42 U.S.C. 1973c, of the State's voter registration application information verification process ("Verification Process"). In the alternative, the State seeks a declaratory judgment that Section 5 is unconstitutional. Subsequent to filing of the Complaint in this action, this Court granted permissive intervention to several sets of Intervenors, with the consent of the Department and the State.

On August 16, 2010, the State filed a First Amended Complaint (Docket #38), pursuant to which the State seeks Section 5 preclearance for a revised Verification Process, while maintaining its alternative constitutional claim. On August 16, 2010, the Department informed the Court that, in its view, the proposed Verification Process as set forth in Plaintiff's First Amended Complaint does not violate Section 5 of the Voting Rights Act, as it neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color, or in contravention of the guarantees set forth in Section 4(f)(2) of the Act (Docket ## 43 and 44). In its Answer to the First Amended Complaint, the Department did not consent to the alternative declaratory judgment sought by Plaintiff, seeking a determination that Section 5 of the Voting Rights Act is unconstitutional. The Department averred that Section 5 is constitutional and averred that the State's alternative constitutional claim would be moot upon preclearance for the State's proposed Verification Process as set forth in its First Amended Complaint.

On August 17, 2010, the State submitted the revised Verification Process (identical to the revised Verification Process set forth in the State's First Amended Complaint) to the Department for administrative review under Section 5. By letter dated August 18, 2010, the Department responded that it did not object under Section 5 to the revised Verification Process submitted by the State (Docket #46-2). Thus, the Department has determined that the State has met its burden of establishing that the State's revised Verification Process does not have a discriminatory purpose or effect under Section 5.

On August 20, 2010, the State of Georgia and the Department filed a Joint Motion to Dismiss this action. The State and the Department assert in their Joint Motion that, in light of the Department's August 18, 2010 administrative preclearance of the State's revised Verification Process, which is the subject of the State's Section 5 declaratory judgment request in this action, the claim in Count I of the State's Complaint is moot and should be dismissed under Fed. R. Civ. P. 41(a)(2). In addition, the State and the Department assert that Count II of the State's Complaint, challenging the constitutionality of Section 5, should also be dismissed under Fed. R. Civ. P. 41(a)(2). Count II was brought by the State alternatively in the event that the Court denied declaratory judgment on Count I, and because preclearance has been obtained and Count I is moot, then Count II should be dismissed as well.

On September 7, 2010, one group of intervenors (the Concerned Black Clergy Intervenors) filed a Response to the Joint Motion to Dismiss (Docket #48) stating that, in light of the Department's administrative preclearance of the revised Verification Process as set forth in the First Amended Complaint, they do not oppose the Joint Motion to Dismiss.[1] Also on

---

[1] Previously, on August 21, 2010, the Black Clergy and GALEO Intervenors had jointly filed a Notice (Docket #47) expressing concern about the Attorney General's administrative preclearance of the revised Verification Process. The Notice asked the Court to order the Attorney General to meet and confer with Defendant-Intervenors before deciding the Joint Motion to Dismiss.

3

September 7, 2010, the other three groups of intervenors (the Brooks Intervenors) filed a response to the Joint Motion. In that response, the Brooks Intervenors agree with the State and the Department that this case is moot and state that they do not oppose dismissal of this action. The Brooks Intervenors also agree that the Department's decision to administratively preclear the revised Verification Process is not subject to review. Despite these concessions, however, the Brooks Intervenors ask this Court, in effect, to review the Department's preclearance actions here, pursuant to Rule 41(a)(2) Fed. R. Civ. P., and require the Department to explain allegedly "irregular" and "hasty" procedures in administratively preclearing the State's revised Verification Process on August 18, 2010.

## THE MORALES LITIGATION AND STATE ACTIONS TO RECEIVE PRECLEARANCE OF ITS VERIFICATION PROCESS

This action cannot be viewed in a vacuum, and any discussion of the history of this litigation and the Department's actions concerning the State's revised Verification Process must include consideration of the extensive history of this matter and of related litigation in the Northern District of Georgia, *Morales v. Kemp*, C.A. No. 1-08-3172 (N.D. Ga.) (three-judge court), as well as of previous attempts by the State to obtain Section 5 preclearance of previous iterations of that process.[2]

The Department began looking into the Section 5 issues involved in this matter in September 2008, when this matter came to its attention. At that time, the Department began the first of many extensive discussions with the State and counsel for many of the intervenors here on these issues. The Department later made a formal request by letter on October 8, 2008 for the

---

[2] The Court's attention is also directed to the Joint Status Report filed by Georgia and the Attorney General on July 7, 2010 (Docket #8) and the Intervenors' Response to the Joint Motion to Dismiss (Docket #49) for additional discussion concerning the *Morales* litigation and previous Section 5 activity concerning the State's Verification Process.

State to submit the voting changes involving its verification process for review under Section 5. On October 9, 2008, private plaintiffs, represented by many of the counsel for the Brooks Intervenors here, filed the *Morales* case, an action in the Northern District of Georgia seeking an order that the State submit its Verification Process, as it then existed, for Section 5 preclearance and seeking an injunction against further use of the Verification Process pending preclearance. On October 14, 2008, the State submitted the original Verification Process to the Department for administrative review under Section 5.[3]

After the originating judge of the three-judge *Morales* panel denied a temporary restraining order requested by the private plaintiffs, the *Morales* panel granted the Department's request to appear as *amicus curiae,* file a brief, and participate in the hearings during the private litigation. Following a hearing in which the Department participated, the three-judge court entered a preliminary injunction in October 2008, not long before the general election, which provided for the State's continued use of the Verification Process with specific conditions aimed at protecting the right to vote of eligible individuals flagged as ineligible by the Process (Docket #38-1). This version of the Verification Process remains in effect today, having been most recently continued by the *Morales* court on June 15, 2010 (Docket #38-5). The relief adopted by the *Morales* Court generally followed the views expressed by the Department, and differed from the position advocated by the *Morales* plaintiffs (and the Intervenors here).

---

[3] It is important to note that the State's Verification Process has been revised in many respects and on many occasions since the Attorney General first discussed this matter with the State in September 2008. The State made changes in its Verification Process after its first discussion with the Attorney General before making the original submission of the Process to the Attorney General in October 2008 for administrative review under Section 5. The Verification Process submitted to the Department for preclearance in August 2009, following the Department's May 29, 2009 objection to the original Process, was substantially revised from the State's original submission. Similarly, the Verification Process submitted to this Court for Section 5 review on June 22, 2010 as set forth in the original Complaint (Docket #1), differed from each of the earlier versions of the Process. Finally, the revised Verification Process which is currently before this Court, as set forth in the First Amended Complaint, and which was precleared by the Attorney General on August 18, 2010, has been revised from the June 22, 2010 version filed in this Court and is different from any previous iteration.

In December 2008, the Department determined that the State had not provided sufficient information to make an administrative determination under Section 5 on the first submitted iteration of the Verification Process and requested additional information from the State. The State responded with additional information in March and April 2009. Following the analysis of that information, the Department interposed an objection under Section 5 to the originally submitted Verification Process, based on discriminatory effect, on May 29, 2009.

In its May 29, 2009 letter (Docket #38-2), the Department suggested to the State that issues underlying the Section 5 objection might be resolved through discussion. The Department and the State subsequently met and engaged in further discussions regarding the Verification Process and possible resolutions. On August 12, 2009, the State asked the Department to reconsider the May 2009 objection, and in so doing proposed significant changes to the State's originally submitted Verification Process. By October 2009, the Department had reviewed the information provided by the State and indicated, first, that it would not change its original objection determination since the State had offered no new information on the originally submitted Verification Process, and also that the revised Verification Process was sufficiently different from the initial program so as to constitute a new submission of a new plan seeking to overcome the objection. The Department therefore made a request for additional information needed from the State before a determination on the new submission could be made.

Following the Department's October 2009 request for more information, the State and the Department met again in December 2009 to discuss the State's verification process. The State subsequently advised the Department that additional information concerning the State's process would not be forthcoming and asked the Department to make a determination based on the information the Department already had. Not having received any further information from the

6

State within the next 60 days, in February 2010, the Department again advised the State that it would not withdraw its original objection and could not make a determination on the State's submission of revised procedures (Docket #38-4).

During this period, the *Morales* case had continued. In September 2009, the *Morales* plaintiffs and the State filed motions for summary judgment which focused on questions of permanent relief. The Department filed a short *amicus* brief suggesting that the Morales court should allow more time to see if the administrative Section 5 process resolved the matter, before deciding on permanent relief. In April 2010, the *Morales* court asked the parties, and the Department, to respond to several questions concerning the pending summary judgment motions, prior to a hearing before the three-judge panel on May 17, 2010. Among other things, the *Morales* court's questions sought an update from the parties as to the status of the Section 5 submissions and also sought the parties' views as to whether a permanent injunction should issue or whether the court's preliminary injunction, as it stood or as modified, should remain in effect pending preclearance review of the State's Verification Process. In its response, the State advised the *Morales* Court that it would be filing a Section 5 preclearance action in the near future with regard to the State's Verification Process. The Department took the position that the Court's preliminary injunction, revised to reflect upcoming elections, should remain in effect pending further attempts at preclearance. The *Morales* plaintiffs argued that a permanent injunction should issue.

At the May 17, 2010 hearing, the *Morales* court suggested that the State and the Department might resume discussions in an attempt to resolve Section 5 preclearance issues. At the conclusion of the hearing, the Court took the matter under advisement. On June 15, 2010,

the Court issued an Order continuing the preliminary injunction pending preclearance of the State's Verification Process, as urged by the Department (Docket #38-5).

From the first filing made by the Department in the *Morales* case in October 2008, it has been clear that there were very significant differences of opinion on this matter between the Department, on the one hand, and the private plaintiffs in *Morales*, represented by many of the same private counsel as represent the Brooks Intervenors in this case, on the other hand.  A review of the various filings and hearing transcripts in the *Morales* case would show that these significant differences of opinion have continued to appear at every juncture throughout the course of the *Morales* litigation and have continued into this litigation.  Among these differences has been the consistent publicly expressed view by the Department in the *Morales* litigation, in the administrative Section 5 letters related to this matter, and in the status report and status conference in this case, that this matter was capable of resolution.   That view was not shared by the private Plaintiffs in the *Morales* case, nor the Intervenors in this case.

**POSITION OF THE DEPARTMENT**

All parties in this case, including all Intervenors, agree that this action is moot and that the case should be dismissed.  Nor is there any dispute that the Department's August 18, 2010, decision is not subject to review.  For, as the Brooks Intervenors state on page 14 of their Response to the Joint Motion, citing to *Morris* v. *Gressette,* 432 U.S. 491 (1977): "In administrative preclearance reviews, the Attorney General acts as the sole decisionmaker, and its decision to preclear a submitted voting change is not subject to judicial review under the Administrative Procedure Act or on any other basis."  (Docket #49).  However, despite these concessions, the Brooks Intervenors in their Response ask this Court in effect to conduct the review of the Department's preclearance actions here that even they admit is precluded, under

8

the guise of asking this Court to require the Department to explain allegedly "irregular" and "hasty" procedures in administratively preclearing the State's revised Verification Process. While Intervenors may disagree with the Department's determination concerning the State's revised Verification Process, such disagreement does not present a legal basis for review of the Department's actions. Moreover, Intervenors' disagreement with the Department concerning the Georgia Verification Process is not new, and their suggestion of surprise at and questionable motivation of the Department's actions ring hollow, when viewed in light of the history of these issues and the Department's interaction with the State and counsel for the Intervenors concerning these issues over the past two years.

### This Action Is Moot And Should Be Dismissed

The Department has administratively precleared the voting change at issue in this case. Accordingly, no claim remains for the Court's decision in this case. Once a jurisdiction receives administrative preclearance of a voting change from the Department, as the State has here, the administrative exercise of discretion of the Department is not subject to judicial review. *Morris v. Gressette*, 432 U.S. 491, 504-505 (1977) ("Since judicial review of the Attorney General's actions would unavoidably extend this period, it is necessarily precluded."). The Supreme Court has also recognized that after "a State has successfully complied with the § 5 approval requirements, private parties may enjoin the enforcement of the new enactment only in traditional suits attacking its constitutionality; there is no further remedy provided by § 5." *Allen v. State Bd. of Elections*, 393 U.S. 544, 549-550 (1969). And as stated in the Joint Motion, this precise situation has arisen a number of times previously, where the Department has administratively precleared the identical voting changes also at issue in a judicial preclearance action pending before this Court. In these circumstances, this Court has recognized under

*Morris* that administrative preclearance renders the declaratory judgment action to be moot under Section 5. There is no further relief to be had under Section 5, and this case should be dismissed as moot.

Where, as here, voluntary dismissal of an action is not available under Rule 41(a)(1) Fed. R. Civ. P., then Rule 41(a)(2) Fed. R. Civ. P. provides that "an action may be dismissed at the plaintiff's request only by court order, on terms that the court considers proper." In applying Rule 41(a)(2), a court should consider whether the motion is made in good faith, whether dismissal would cause the defendant legal prejudice based on factors such as the defendant's trial preparation efforts, any excessive delay in prosecuting the action, an insufficient explanation by the plaintiff for the dismissal, and the filing of motions for summary judgment by the defendant. *Louisiana Environmental Action Network* v. *Jackson*, 685 F. Supp. 2d 43, 45-46 (D.D.C. 2010); *In re Vitamins Antitrust Litig.*, 198 F.R.D. 296, 304 (D.D.C. 2000). Applying the above factors to the circumstances of this case warrants the requested voluntary dismissal. Plaintiff and Defendant have jointly filed their Motion to Dismiss. All of the Intervenors agree with the State and the Department that this action is moot and that the actions of the Department in preclearing the State's revised Verification Process are not subject to review. There is no legal claim remaining for this Court to decide.

### Intervenors' Assertions About the Department's Actions are Without Merit

Notwithstanding agreement by all parties on the legal merits of dismissal of this action as set forth above, the Brooks Intervenors ask that the Court undertake an extra-judicial examination of the actions of the Department in making its administrative preclearance decision concerning the revised Verification Process. As indicated above, there is no legal basis for this Court to conduct such a review. Moreover, even a cursory review of the public record

establishes that the Brooks Intervenors' speculative claims about the Department's actions here lack merit.

First, the Brooks Intervenors' suggestion of surprise at the fact that the Department and the State might reach a prompt resolution concerning the State's revised Verification Process, and their allegations of contrivance to deny them of litigation opportunities, lose substance when viewed in the context of previous, well-publicized interactions between the Department and the State concerning the various iterations of the Verification Process, as well as the Department's interaction with both the State and the Plaintiffs in the *Morales* litigation. As set forth above, throughout the course of the Department's dealings with the State concerning its Verification Process, the Department has consistently identified those aspects of the previous iterations of the process that were of concern and continually sought to engage the State in discussion to bring this matter to a resolution. The Department's December 15, 2008 letter seeking additional information from the State, highlights some of the features of the first submitted version of the Verification Process that might preclude a determination of compliance with Section 5 to the attention of the State and the Intervenors. In the Department's May 29, 2009 letter objecting under Section 5 to that Process, the Department detailed the areas where the process did not comply with Section 5 and sought further discussion with the State to resolve outstanding Section 5 issues. The Department met with the State after its May 2009 determination to explore possible alternative verification procedures. After submission of a revised process, the Department's October 13, 2009 letter again sought additional needed information from the State. The Department's February 22, 2010 letter to the State again sought further discussion with the State aimed toward resolution of the matter.

Similarly, in the *Morales* litigation, the Department consistently made clear in its court filings both its desire to engage the State in dialogue to resolve outstanding Section 5 issues and its view that such a resolution could be achieved. In its most recent filing in May 2010, responding to the *Morales* court's questions, the Department delineated its efforts to resolve these issues. Indeed, at oral argument, the *Morales* court suggested that the Department and the State should engage further in such discussion to see if the State could present such a revised process for preclearance review. The Department has maintained course and followed such suggestions. In the Joint Status Report filed by the parties in this action on July 7, 2010 (Docket #8), the Department expressed its view that resolution of this action was possible and desirable. As the Department advised the Court and the then-existing Intervenors at the status conference held on July 9, 2010, it contacted the State shortly after filing of this action to attempt to engage the State in discussions aimed at achieving compliance with Section 5 and obviating the need for litigation. Those discussions continued between the State and the Department. Those discussions resulted in the State's submission to this Court in the First Amended Complaint, and to the Department in a subsequent administrative submission, of a revised Verification Program that meets Section 5 standards and resolves the Department's concerns.

In light of the above, the fact that the State had moved to such a point where it proposed a plan that met Section 5 standards in the view of the Department should have been of surprise to no one, especially to the attorneys for the Intervenors who had followed and been engaged in this process since September 2008.

Second, the Intervenors have been fully aware for two years that their views on this matter differed in significant respects from those of the Department. In the *Morales* litigation, the Department' and private plaintiffs' positions concerning, for example, the legality under

12

federal law of the State's use of a verification process, and the relief to be granted the private plaintiffs in that case, have consistently differed.  Most recently, the Department took the view in *Morales* – a view ultimately adopted by the three-judge court – that, under the circumstances of the case, the permanent relief that private plaintiffs requested should not be granted, but rather interim relief in the form of continuance of the extant preliminary injunction was more appropriate.  The clearly-stated rationale behind the Department' position in this regard was to allow the Section 5 review process to continue and afford Georgia time to implement a process that meets Section 5 standards.  Ultimately, this is what occurred.

      Third, Intervenors complain that the timing of the Department's preclearance actions here deprived them of the opportunity to comment on the State's revised Verification Process as set forth in its First Amended Complaint.  This complaint has no practical substance.  The Department is now and has been well aware of the Intervenors' views on the State's Verification Process through the Intervenors' filings and argument in the *Morales* case and in this case, through specific written comments filed by the Intervenors with the Department concerning the various administrative submissions of earlier versions of the Verification Process made by the State prior to the filing of this action, as well as discussions with counsel for many of the Intervenors over the last two years.  As the Brooks Intervenors indicate in footnote 4 on page 10 of their Response, on November 25, 2008, May 19, 2009, and on August 29, 2009, counsel for the *Morales* plaintiffs submitted extensive comment letters to the Department concerning the State's various Section 5 submissions of the Verification Process.  In fact, if, as Intervenors claim – incorrectly – the revised Verification Process before this Court is little changed from the State's Process originally submitted administratively in October 2008, then there is little to be gained from additional time for comment by the Intervenors, as such comment has been

13

provided. However, given its recent preclearance of the revised Verification Process, the Department obviously views the Verification Process before this Court in the First Amended Complaint as substantially revised and improved, from a Section 5 standpoint, over the previous versions of the State's Process which it has reviewed. Intervenors do not claim that the State's latest revisions to the Process have made the Process worse from a Section 5 standpoint, thus again raising the question of what further time for comment would achieve.[4]

In essence, there has been a longstanding difference of opinion over this matter between the Department and the Intervenors. At any point over the last two years, the State could have administratively submitted the most recent revised version of the Verification Process, and the Department could have precleared it, irrespective of whether any disagreements existed between the Department and the Intervenors. The fact that such submission and administrative preclearance happened now, while this litigation was pending, does not render the Department's discretionary preclearance decision reviewable.

The precise situation about which the Intervenors here complain was recognized decades ago by the D.C. Circuit as simply a consequence of the unique context under Section 5 of having parallel administrative and judicial means of resolving the question of whether a voting change meets the Section 5 standards:

---

[4] Intervenors request that, in light of their differences with the Department's decision concerning Georgia's revised Verification Process, the Court should find a lack of adequate representation by the Department to assist in future intervention attempts in Section 5 declaratory judgment actions. This request is both misguided and unnecessary. There is no basis to conclude that the Department has not performed its statutory duty here. The fact that the Department may reach a different conclusion than Intervenors regarding whether a particular voting change should meet the Section 5 standard does not merit such a finding. Moreover, such a finding would not preclude what Intervenors paint as their concern: A jurisdiction can still make an administrative submission of a change affecting voting to the Department at any time and the Department can determine that no objection should be interposed to that change despite the objections of private parties. Finally, as indicated in the Department's responses to the Intervenors' motions to intervene in this action, the Department's consistent position for many years in Voting Rights Act cases in this Court has been to agree to permissive intervention by private parties, as it has here. There is no basis to believe that the Department will not continue to consent to intervention in the future, and there is no reason to believe that the Court will not continue to grant intervention in the future, thereby allowing intervenors to present their views to the Court.

> By statute, a redistricting plan, such as those at issue in the present case, can be precleared only by the Attorney General or the district court through a declaratory judgment action. Once a plan has been submitted to the Attorney General, although interested parties may voice their opposition or support of the plan, the final decision is the Attorney General's alone. If the plan is precleared, that decision is not itself subject to judicial review. … These facts combine in the context of a declaratory judgment action to place a defendant-intervenor in an unusual position. Although by the grant of intervention he has become a party, by statute he is precluded from having any actual impact on the approval or disapproval of what appellees here call a "compromise plan" submitted to the Attorney General during the course of litigation. The defendant-intervenor is thus powerless to participate in a meaningful way in any "settlement" or "compromise" negotiations.
>
> A defendant-intervenor cannot withhold approval of the plan in the hopes of receiving terms more favorable to his interests. The submission of a "compromise plan" to the Attorney General, as a practical matter, strips a defendant-intervenor of all bargaining power. Furthermore, unlike a settlement in which some but not all parties participate, the nonparticipating party may not continue to litigate. Nor may the nonparticipating party present to the court objections to the compromise settlement.

*Commissioners Court of Medina County v. United States*, 683 F.2d 435, 440-441 (D.C. Cir. 1982).

In short, this action should be dismissed as moot, as agreed by all parties. The actions of the Department here are the culmination of the Department's consistent efforts, aimed at resolving the Section 5 issues which were first placed before it by the State in October 2008, of which Intervenors have been fully aware and concerning which Intervenors have had ample opportunity to comment. While the Department respects the fact that Intervenors disagree with the decision that it has made in this action, that disagreement, where all agree that this action is moot and should be dismissed, does not provide a basis for this Court to review how the Department came to its decision where that decision is not subject to the Court's review.

Date:  October 8, 2010

                              Respectfully submitted,

RONALD C. MACHEN, JR.       THOMAS E. PEREZ
United States Attorney            Assistant Attorney General
District of Columbia              Civil Rights Division

                              */s/ Brian F. Heffernan*
                              _____
                              T. CHRISTIAN HERREN, JR.
                              BRIAN F. HEFFERNAN (lead counsel)
                              Voting Section
                              Civil Rights Division
                              U.S. Department of Justice
                              950 Pennsylvania Avenue, N.W.
                              Washington, D.C. 20530
                              Telephone:    (202) 514-4755
                              Facsimile:     (202) 307-3961

CERTIFICATE OF SERVICE

       I hereby certify that on October 8, 2010, I served a true and correct copy of the foregoing via the Court's ECF filing system on the following counsel of record:

Anne W. Lewis
Frank B. Strickland
Bryan P. Tyson
Strickland, Brockington, Lewis LLP
Midtown Proscenium Suite 2200
1170 Peachtree Street NE
Atlanta, GA 30309
Phone: (678) 347-2200
*Counsel for Plaintiff*

Kristen Clarke
NAACP Legal Defense and Educational Fund, Inc.
1444 Eye Street, N.W., 10th Floor
Washington, D.C. 20005
Phone: (202) 682-1300
*Counsel for Movant-intervenors Concerned Black Clergy, et al.*

Michael D. Nolan
Milbank, Tweed, Hadley & McCloy LLP
1850 K Street, N.W.
Suite 1200
Washington, D.C. 20006
Phone: (202) 835-7500
*Counsel for Intervenors Marvin Lim, et al.*

Jon M. Greenbaum
Lawyers' Committee for Civil Rights under Law
1401 New York Avenue, NW, Suite 400
Washington, DC 20005
Phone: (202) 662-8325
*Counsel for Intervenors Tyrone Brooks, et al.*

Nina Perales
Mexican American Legal Defense and Educational Fund
110 Broadway, Suite 300
San Antonio, TX
Phone: (210) 224-5476
*Counsel for Intervenors GALEO, et al.*

*/s/ Brian F. Heffernan*
_____
Brian F. Heffernan
Voting Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D, C, 20530
Phone: (202) 514-4755